**No. 12-2316 (Consolidated with No. 12-2460)**

In The

# United States Court of Appeals

## For The Seventh Circuit

## BIG RIDGE, INC.; PEABODY MIDWEST MINING, LLC,

*Petitioners*,

**v.**

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION; THE SECRETARY OF LABOR, MINE SAFETY AND HEALTH ADMINISTRATION,

*Respondents.*

## ON PETITION FOR REVIEW OF A FINAL DECISION OF THE FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

———————————

## BRIEF OF PETITIONERS
## WITH REQUIRED SHORT APPENDIX

———————————

**Thomas C. Means**
**Daniel W. Wolff**
CROWELL & MORING LLP
**1001 Pennsylvania Avenue, N.W.**
**Washington, D.C.  20004**
**(202) 624-2500**

*Counsel for Petitioners*
 *Big Ridge, Inc. and*
 *Peabody Midwest Mining, LLC*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA  23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

## DISCLOSURE STATEMENT

Petitioner Big Ridge, Inc. ("Big Ridge") was formed under the laws of, and maintains its principal place of business in, Illinois.  It is a wholly owned subsidiary of Peabody Midwest Operations, LLC, which in turn is a wholly owned subsidiary of Peabody Operations Holding, LLC, which in turn is a wholly owned subsidiary of Peabody Investments Corp., which in turn is a wholly owned subsidiary of Peabody Energy Corporation, which is a publicly held company.

Petitioner Peabody Midwest Mining, LLC ("Peabody Midwest") was formed under the laws of, and maintains its principal place of business in, Indiana.  It is a wholly owned subsidiary of Peabody Midwest Operations, LLC, which in turn is a wholly owned subsidiary of Peabody Operations Holding, LLC, which in turn is a wholly owned subsidiary of Peabody Investments Corp., which in turn is a wholly owned subsidiary of Peabody Energy Corporation, which is a publicly held company.

In the agency proceedings below, Petitioners were represented by the law firm of Crowell & Moring LLP.  Crowell & Moring attorneys Daniel W. Wolff, Thomas C. Means, and Timothy M. Biddle, all resident in the firm's Washington, D.C. office, appeared in the proceedings before the administrative law judge. Messrs. Wolff and Means appeared in the proceedings before Respondent Federal Mine Safety and Health Review Commission and represent Petitioners before this Court.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iii

JURISDICTIONAL STATEMENT ...................................................................... 1

STATEMENT OF THE ISSUES............................................................................ 2

STATEMENT OF THE CASE................................................................................ 2

STATEMENT OF THE FACTS ............................................................................. 5

    A.    Regulatory Overview..................................................................... 5

    B.    Factual Background ........................................................................ 6

SUMMARY OF ARGUMENT ............................................................................... 9

STANDARD OF REVIEW.................................................................................... 12

ARGUMENT ........................................................................................................ 12

    I.    Petitioners Were Not Required To Disclose Their Confidential Records To MSHA And The Commission Erred In Upholding The Citations And Orders .................................................. 13

        A.    MSHA Acted *Ultra Vires* ............................................ 16

        B.    The Commission's Rationale Is Foreclosed By The Mine Act .......................................................................... 19

        C.    Before MSHA May "Inspect And Copy" Records, It Must Promulgate A Rule Requiring Operators To Keep Those Records ............................................................ 25

    II.    The MSHA Citations And Orders Offend The Fourth Amendment ............................................................................ 35

III.    MSHA's Audit Demands At Petitioners' Mines Conflict With
Other Laws Protective Of Individual Privacy ....................................... 44

IV.    MSHA Is Not Entitled to Deference ....................................... 47

CONCLUSION .................................................................................................. 51

REQUEST FOR ORAL ARGUMENT .......................................................... 53

CERTIFICATE OF COMPLIANCE

CIRCUIT RULE 30(d) STATEMENT

CERTIFICATE OF SERVICE

SHORT APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ainsworth v. Century Supply Co.,*
    295 Ill. App. 3d 644 (Ill. App. Ct. 1998) .......................................................... 44

*Ali v. Achim,*
    468 F.3d 462 (7th Cir. 2006) ........................................................................ 12

*Am. Mining Cong. v. MSHA,*
    995 F.2d 1106 (D.C. Cir. 1993) ..............................................................*passim*

*Auer v. Robbins,*
    519 U.S. 452 (1997) ............................................................................... 48, 50

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon,*
    515 U.S. 687 (1995) ...................................................................................... 27

*Bay v. Cassens Transp. Co.,*
    212 F.3d 969 (7th Cir. 2000) ........................................................................ 45

*Bevan v. Smartt,*
    316 F. Supp. 2d 1153 (D. Utah 2004) ........................................................... 41

*Camera v. Mun. Court of the City and Cnty. of San Francisco,*
    387 U.S. 523 (1967) .................................................................................. 42-43

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ................................................................ 12, 17, 48, 50

*Christopher v. SmithKline Beecham Corp.,*
    132 S. Ct. 2156 (2012) ................................................................ 35, 49, 50, 51

*City of Joliet, Ill. v. New W., L.P.,*
    562 F.3d 830 (7th Cir. 2009) ........................................................................ 47

*Cleary v. Fed. Express Corp.,*
    313 F. Supp. 2d 930 (E.D. Wis. 2004) ........................................................... 45

*Colonnade Catering Corp. v. United States*,
  397 U.S. 72 (1970) ................................................................ 36, 42

*Consolidation Coal Co.*,
  11 FMSHRC 966 (June 1989) ................................................ 2, 38

*Donovan v. Dewey*,
  452 U.S. 594 (1981) ..........................................................*passim*

*Duncan v. Walker*,
  533 U.S. 167 (2001) ................................................................ 28

*E.E.O.C. v. Murray, Inc.*,
  175 F. Supp. 2d 1053 (M.D. Tenn. 2001).............................. 46

*Edward Hines Lumber Co. v. Vulcan Materials Co.*,
  861 F.2d 155 (7th Cir. 1988) .................................................. 13

*Edward J. DeBartolo Corp. v. Fla.*
*Gulf Coast Bldg. & Constr. Trades Council*,
  485 U.S. 568 (1988) ................................................................ 49

*Hoctor v. U.S. Dep't of Agric.*,
  82 F.3d 165 (7th Cir. 1996)................................................ 28-29

*Johnson v. United States*,
  628 F.2d 187 (D.C. Cir. 1980) .............................................. 16

*Kohler Co. v. Moen Inc.*,
  12 F.3d 632 (7th Cir. 1993) .................................................. 48

*Koons Buick Pontiac, GMC, Inc. v. Nigh*,
  543 U.S. 50 (2004) .................................................................. 12

*Kyllo v. United States*,
  533 U.S. 27 (2001) .................................................................. 35

*Lyng v. Payne*,
  476 U.S. 926 (1986) ................................................................ 16

*Marshall v. Barlow's Inc.*,
  436 U.S. 307 (1978) ..........................................................*passim*

*Marshall v. Nolichuckey Sand Co.*,
   606 F.2d 693 (6th Cir. 1979) ........................................................................... 37

*Matter of Establishment Inspection of Skil Corp.*,
   846 F.2d 1127 (7th Cir. 1988) ......................................................................... 22

*Minard Run Oil Co. v. U.S.F.S.*,
   670 F.3d 246 (3d Cir. 2011) ............................................................................ 17

*N. Ill. Steel Supply Co. v. Sec'y of Labor*,
   294 F.3d 844 (7th Cir. 2002) ..................................................................... 12, 48

*New York v. Burger*,
   482 U.S. 691 (1987) ......................................................................................... 41

*NMA v. U.S. Dep't of the Interior*,
   105 F.3d 691 (D.C. Cir. 1997) ......................................................................... 17

*Pac. Operators Offshore, LLP v. Valladolid*,
   132 S. Ct. 680 (2012) .................................................................................. 24-25

*Peabody Coal*,
   6 FMSHRC 183 (Feb. 1984) ...................................................................... 32, 33

*Pub. Utilities Comm'n of Calif. v. United States*,
   355 U.S. 534 (1958) ......................................................................................... 48

*Reuters Ltd. v. F.C.C.*,
   781 F.2d 946 (D.C. Cir. 1986) ......................................................................... 28

*Rodriguez v. United States*,
   480 U.S. 522 (1987) ......................................................................................... 22

*Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*,
   29 F.3d 655 (D.C. Cir. 1994) (en banc) .......................................................... 17

*Sandifer v. U.S. Steel Corp.*,
   678 F.3d 590 (7th Cir. 2012) ........................................................................... 51

*See v. City of Seattle*,
   387 U.S. 541 (1967) ......................................................................................... 35

*Sewell Coal Co.*,
   1 FMSHRC 864 (July 1979) .....................................................................*passim*

*Showers v. Spangler,*
  182 F.3d 165 (3d. Cir. 1999) ............................................................ 41

*The Youghiogheny & Ohio Coal Co. v. Morton,*
  364 F. Supp. 45 (S.D. Ohio 1973) ................................................... 38

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) ......................................................................... 43

*United Energy Servs., Inc. v. MSHA,*
  35 F.3d 971 (4th Cir. 1994) ............................................................. 12

*United States v. Biswell,*
  406 U.S. 311 (1972) .................................................................... 36, 42

*United States v. Blue Diamond Coal Co.,*
  667 F.2d 510 (6th Cir. 1981) ........................................................... 38

*United States v. Consol. Coal Co.,*
  560 F.2d 214 (6th Cir. 1977), *vacated and remanded,*
  436 U.S. 942 (1978), *reinstated,*
  579 F.2d 1011 (6th Cir. 1978) ......................................................... 38

*United States v. Farinella,*
  558 F.3d 695 (7th Cir. 2009) ........................................................... 34

*United States v. Knight,*
  306 F.3d 534 (8th Cir. 2002) ........................................................... 41

*United States v. Pulungan,*
  569 F.3d 326 (7th Cir. 2009) ........................................................... 34

*United States v. Sec. State Bank and Trust,*
  473 F.2d 638 (5th Cir. 1973) ...................................................... 16-17

*United States v. Thornton,*
  539 F.3d 741 (7th Cir. 2008) ........................................................... 12

*Wyeth v. Levine,*
  129 S. Ct. 1187 (2009) ............................................................... 30, 47

*Wynne v. Loyola Univ. of Chicago,*
  318 Ill. App. 3d 443 (Ill. App. Ct. 2000) ........................................ 44

*Yi v. Sterling Collision Ctrs., Inc.,*
    480 F.3d 505 (7th Cir. 2007) .......................................................... 35

## CONSTITUTIONAL PROVISION

U.S. Const. amend. IV ................................................................ *passim*

## STATUTES

5 U.S.C. § 706 ................................................................................. 29

21 U.S.C. § 876(a) ......................................................................... 23

29 U.S.C. § 557a ............................................................................. 2

29 U.S.C. § 657(a) ........................................................... 36, 37, 40

29 U.S.C. § 657(b) ................................................................. 17, 23

29 U.S.C. § 2601 ........................................................................... 11

30 U.S.C. § 508 ............................................................... 15, 16, 27

30 U.S.C. § 802(h) ......................................................................... 29

30 U.S.C. § 811 ............................................................................. 16

30 U.S.C. § 811(a) ................................................................. 15, 16

30 U.S.C. § 811(d) ......................................................................... 29

30 U.S.C. § 813 ....................................................................... 2, 14

30 U.S.C. § 813(a) ................................................................ *passim*

30 U.S.C. § 813(b) ...................................................... 14, 16, 17, 23

30 U.S.C. § 813(d) ............................................................. 5, 15, 32

30 U.S.C. § 813(e) ................................................................. 15, 28

30 U.S.C. § 813(h) ................................................................ *passim*

30 U.S.C. § 813(i) ................................................................. 14, 20

30 U.S.C. § 814(a) ............................................................................ 3, 23

30 U.S.C. § 814(b) ...................................................................... 3, 4, 23

30 U.S.C. § 815(d) ................................................................................. 1

30 U.S.C. § 816(a)(1) ............................................................................ 1

30 U.S.C. § 818 ................................................................................... 44

30 U.S.C. § 818(a)(1) ...................................................................... 22, 23

30 U.S.C. § 820(f) .............................................................................. 40

30 U.S.C. § 823 .................................................................................... 2

30 U.S.C. § 823(d) (113(d)) .............................................................. 1, 2

30 U.S.C. § 901 (111) ........................................................................ 16

30 U.S.C. § 901(b) ..................................................................... *passim*

30 U.S.C. § 955(a) .............................................................................. 47

30 U.S.C. § 957 ................................................................................... 15

30 U.S.C. § 961 .................................................................................... 2

410 ILCS §§ 305/1, *et seq.* ............................................................... 44

410 ILCS §§ 513/15 and 40 ................................................................ 44

42 U.S.C. §§ 12101, *et seq.* .............................................................. 11

910 IAC § 3-3-11 ............................................................................... 44

Indiana Code § 22-9-5-20 .................................................................. 44

## REGULATIONS

29 C.F.R. § 825.500(g) ...................................................................... 44

29 C.F.R. §§ 1630.14(b)-(c) ............................................................... 44

29 C.F.R. § 1630.15(e) ................................................................... 45

30 C.F.R. § 41.10 ........................................................................... 27

30 C.F.R. § 50.11 ........................................................................... 27

30 C.F.R. § 50.11(b) ........................................................................ 5

30 C.F.R. § 50.20 ................................................................. 5, 6, 27

30 C.F.R. § 50.30 ................................................................. 5, 6, 27

30 C.F.R. § 50.40 ................................................................. 5, 6, 27

30 C.F.R. § 50.41 ................................................................... *passim*

30 C.F.R. § 57.5075 ...................................................................... 27

## OTHER AUTHORITIES

42 Fed. Reg. 55568 (Oct. 17, 1977) ............................................ 30

42 Fed. Reg. 65534 (Dec. 30, 1977) ....................... 16, 19, 27, 30

Briefing by Department of Labor, Mine Safety and Health Administration on Disaster at Massey Energy Upper Big Branch Mine at p. 9 (April 15, 2010) (Report to the President) Available at http://www.msha.gov/performancecoal/DOL-MSHA_president_report.pdf (last visited Aug. 8, 2012) ................................................................... 19

http://www.fmshrc.gov/new/meetings.html (audio of meeting of October 13, 2011) (comments of Commissioners Young, Nakamura, and Cohen) (last visited Aug. 21, 2012) ................................................................... 46

Random House Webster's Unabridged Dictionary (2d ed. 2001) ............................... 20

Subcommittee on Labor, S. Comm. on Human Resources, S. Rep. No. 95-461 (1977) (Conf. Rep.), *as reprinted in* Legislative History of the Federal Mine Safety and Health Act of 1977 ................................................................... 26

U.S. House of Representatives, Committee on Education and the Workforce, Hearing on "Learning from the Upper Big Branch Tragedy," March 27, 2012. http://edworkforcehouse.granicus.com/MediaPlayer.php?view_id=2&clip_id=7 7  (relevant comments of Assistant Secretary Main beginning at approximately 1:05:58) (emphasis added) (last visited Aug. 7, 2012) ....................... 19

## JURISDICTIONAL STATEMENT

This is a petition for review of a final decision of the Federal Mine Safety and Health Review Commission ("Commission"), issued on May 24, 2012 ("Commission Decision"), upholding citations and orders issued to Petitioners Big Ridge, Inc. ("Big Ridge") and Peabody Midwest Mining, LLC ("Peabody Midwest") by the Mine Safety and Health Administration ("MSHA"), an agency within the Department of Labor, for alleged violations of an MSHA regulation. As parties adversely affected by the Commission Decision, Petitioners are authorized to seek review of the Commission Decision in this Court pursuant to Section 106(a)(1) of the Federal Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C. § 816(a)(1). The Commission's jurisdiction to hear the matter was authorized by Mine Act §§ 105(d) and 113(d), 30 U.S.C. §§ 815(d) and 823(d), on Petitioners' timely petition to the Commission to review the decision of a Commission administrative law judge ("ALJ") issued on May 20, 2011.

The Mine Act provides that parties adversely affected by a decision of the Commission may, within 30 days of the order, petition the United States Court of Appeals for the circuit in which the alleged violation giving rise to the action occurred or for the District of Columbia Circuit for review of the decision. *See* 30 U.S.C. § 816(a)(1). Because Petitioners' affected operations are located in Illinois (Big Ridge) and Indiana (Peabody Midwest), respectively, this Court is a proper appellate venue. The petition was timely filed in this Court on June 4, 2012.

## STATEMENT OF THE ISSUES

Whether, consistent with Mine Act § 103, the Fourth Amendment, and applicable federal and state laws, MSHA may compel mine operators, under threat of citation and substantial civil penalties for non-compliance, to allow it to inspect and copy confidential personnel and business records, including medical records, (i) where such records are not required by any statutory or regulatory provision to be maintained by operators in the first instance; (ii) where Congress has not given MSHA subpoena authority to obtain such records; and (iii) where there has been no allegation or evidence that the operators violated the law.

## STATEMENT OF THE CASE

Petitioners are underground coal mine operators. Big Ridge operates the Willow Lake Portal Mine ("Willow Lake") in Illinois; Peabody Midwest operates the Air Quality No. 1 Mine ("Air Quality") in Indiana.

The Secretary of Labor ("Secretary") is charged under the Mine Act with administering and enforcing the Mine Act and its implementing regulations and standards. Congress created MSHA for that purpose. *See* 29 U.S.C. § 557a. At the same time, Congress created the Commission as an independent agency to, among other things, adjudicate mine operator contests of MSHA citations and orders. *See* 30 U.S.C. §§ 823, 961. Evidentiary hearings are conducted in the first instance by ALJs employed by the Commission; review by the Commission is discretionary. *See id*. § 823(d). MSHA bears the burden of proving a violation by the preponderance of the evidence. *See Consolidation Coal Co.*, 11 FMSHRC 966, 973 (June 1989).

MSHA cited Petitioners under Mine Act § 104(a) on November 9, 2010 for alleged violations of 30 C.F.R. § 50.41, on the grounds that they refused to let MSHA "inspect and copy" certain records, including medical records of their miners. Each mine was also issued a "no-area-affected" order under Mine Act § 104(b) when it refused to comply with the demand for the records within the 15 minutes the inspector allowed them. Under Mine Act § 104(b), MSHA is authorized to order miners withdrawn from affected areas of a mine if the operator does not abate an alleged violation within the timeframe established by the citing MSHA inspector. A "no-area-affected" order means simply that although the operator has not abated the alleged violation set forth in the § 104(a) citation, the failure to abate does not adversely affect miners, so nobody needs to be withdrawn.

Petitioners contested the citations and orders at the Commission on November 11, 2010, on the grounds that MSHA was not entitled to inspect and copy the requested records, and the next day moved for an expedited hearing. Record ("AR") 1-33. The contests were consolidated for a hearing before the ALJ, and the consolidated matter was heard on December 14, 2010. AR 89-90, 175-369. The parties submitted post-hearing briefs and, on May 20, 2011, the ALJ issued his decision upholding the citations and orders. Stipulated Joint Appendix ("JA") 6-23.

Petitioners sought review by the Commission on June 20, 2011, which was granted on June 27, 2011. AR 625-626. In a separate but related administrative proceeding, MSHA sought to assess daily civil penalties against Peabody Midwest (but not Big Ridge) in the amount of $4,000 per day to coerce compliance. JA 92-95;

AR 910-914. Petitioners then, on July 1, 2011, applied to the Commission for temporary relief from the § 104(b) order (and, consequently, accrual of the daily penalties). AR 627-785. Following briefing by Petitioners and MSHA, intervention and briefing by a number of aggrieved miners from both mines (many of whom are now petitioners in No. 12-2460), and a temporary stay of the § 104(b) order, the Commission held oral argument on the application on August 4, 2011. AR 869-960. On August 5, 2011, the Commission denied the application, finding that the "extraordinary" remedy of temporary relief was not justified under the circumstances. AR 961A-961E.

Briefing on the merits concluded October 12, 2011, AR 1113, and on May 24, 2012, by a 4-1 vote, the Commission affirmed the ALJ decision. Required Short Appendix ("RSA") 1-31. In relevant part, the Commission held that MSHA was authorized by Mine Act §§ 103(a) and (h), as well as its own regulation, 30 C.F.R. § 50.41, to inspect and copy the confidential records without first promulgating a regulation specifically requiring operators to maintain them in the first instance. RSA 9-14. It also held that the confidential records that MSHA was seeking were "relevant and necessary" to verifying operators' compliance with their incident reporting obligations. RSA 15-20. It rejected the privacy and constitutional arguments raised by the Petitioners and intervening miners, and held that provisions or rules of applicable federal and state laws requiring certain employee personnel and medical information to be kept private and confidential were not relevant. RSA 21-30.

The dissenting Commissioner filed a lengthy, separate opinion detailing his conclusion that MSHA's actions ran afoul of both the Mine Act and the Fourth Amendment, *inter alia*. RSA 32-48.

Petitioners timely petitioned this Court for review of the Commission Decision on June 4, 2012.

## STATEMENT OF THE FACTS

### A.     Regulatory Overview

As mine operators, Petitioners are required to:

1) investigate and prepare a report for each workplace accident or occupational injury, *see* Mine Act § 103(d), 30 U.S.C. § 813(d); 30 C.F.R. § 50.11(b);

2) file an "MSHA Form 7000-1" report with MSHA for each accident, occupational injury, or occupational illness, *see* 30 C.F.R. § 50.20; and

3) file a quarterly "MSHA Form 7000-2" report providing certain employment data, including coal production data. *See id.* § 50.30.

By regulation, MSHA requires mine operators to maintain copies of each investigation report and each Form 7000-1 and 7000-2 report "for inspection and copying" at the mine office closest to the mine for five years. *Id.* § 50.40. MSHA has also promulgated a rule that requires operators to allow MSHA to "inspect and copy" any information "which MSHA considers relevant and necessary to a determination of compliance" with the above-noted Part 50 reporting requirements. *Id.* § 50.41. No statutory or regulatory provision requires mine operators to establish or maintain the records sought by MSHA in this enforcement proceeding.

**B.     Factual Background**

On October 19, 2010, MSHA officials appeared without prior notice at each mine site purporting to be conducting a "Part 50 audit" and to that end demanded that Petitioners provide them immediately with access to and copies of the following:

    1.      All MSHA Form 7000-1 Accident Records

    2.      All quarterly Employment and Production Reports, MSHA Form 7000-2

    3.      Payroll Records or Time Sheets

    4.      Number of Employees for each Quarter

    5.      Medical records in your possession for all persons employed for the period of July 1, 2009 through June 30, 2010, as listed below: Worker compensation filings, FMLA releases and records, sick leave records, tests including drug tests, studies, medical reports, medical histories, treatment notes, face sheets, transfer records, EMT or ER notes, ambulance reports, explanation of benefits (EOB), UB 92s, HICFs, nursing notes, chest x-rays.

JA 39-40. Document demand letters presented at each mine were addressed to a different operator altogether, so the MSHA official serving the demand blackened out the addressee. *See id.*; *see also* AR 280-281, 302-303.

The managers of health and safety at the two mines immediately made available for MSHA the documents listed in items 1 and 2, which they are required by MSHA regulations to maintain for inspection. *See* 30 C.F.R. §§ 50.20, 50.30, and 50.40. They objected, however, to the broad and unqualified document demands of

items 3 and 5 on grounds of privacy and business confidentiality, and because nothing in the Mine Act or MSHA's regulations requires operators to maintain such records, let alone provide copies of them to MSHA. *See* AR 282-283, 302. (Item 4 was also not objectionable.)

MSHA officials returned on October 20 to renew their demands for records listed in items 3 and 5. *See* AR 283, 303. At Willow Lake, an MSHA official brandished an excerpt from the preamble to regulations promulgated by the Secretary of Health and Human Services under the Health Insurance Portability and Accountability Act ("HIPAA") and stated that, pursuant to HIPAA, Big Ridge was required to turn over the requested records to MSHA, *see* JA 44; *see also* AR 283-284, a point of law which MSHA's counsel subsequently stated at the hearing was *not* the agency's position. AR 266-268. Petitioners again objected.

In letters dated October 28, the MSHA district manager with jurisdiction over Petitioners' mines renewed the demands, albeit modified in relevant part as follows:

> \*\*\*
> 3.    All payroll records and time sheets for all individuals working at [the mine] for the covered time period [*i.e.*, July 1, 2009-June 30, 2010]
> \*\*\*
> 5.    All medical records, doctor's slips, worker compensation filings, sick leave requests or reports, drug testing documents, emergency medical transportation records, and medical claims forms in your possession relating to accidents, injuries, or illnesses that occurred at the mine or may have resulted from work at the mine for all individuals working at your mine for the period of July 1, 2009 through June 30, 2010.

JA 56, 61.

At that point, Petitioners' corporate legal department got involved in the matter, responding by letter to the district manager that the records demands made on the Petitioners' mines were overly broad and would, if followed, jeopardize important rights of individual privacy and company confidentiality. JA 67, 70. In their letters, Petitioners invited MSHA to meet with them to discuss how the demands could be narrowed "to accommodate whatever legitimate concerns MSHA may have without jeopardizing the privacy rights of those employees working at the ... mine or the company's right to keep its business information confidential." JA 69, 72; *see also* AR 243. MSHA never responded. *See* AR 243; *see also* JA 9.

During the relevant time period, approximately 500 miners worked at Willow Lake; approximately 230 at Air Quality. *See* AR 278, 299. Many of those miners expressed strong disagreement with MSHA's attempt to obtain records containing private information about them. *See* JA 81 ¶ 3; AR 286, 308; *accord* AR 660-729 (declarations of miners in support of Petitioners). *See also* AR 844-54, 856-64 (miners' motion to intervene below and position statement). At Air Quality, the issuing MSHA inspector acknowledged that he would not want the private records that MSHA was demanding to be disclosed to MSHA if he (the inspector) were a miner. *See* AR 306-307.

At the December 14, 2010 hearing, MSHA revealed that its demands for records were made pursuant to a new initiative that the agency had commenced that October, *see* JA 8, and that Petitioners' mines were two of 39 mines that had been targeted for Part 50 "audits" as part of that initiative. *Id.* MSHA's witness

acknowledged that no statutory or regulatory provision requires mine operators to maintain the types of records or other information that MSHA was seeking, *see* AR 213-214, and Government counsel made it clear that MSHA was *not* alleging that Petitioners had been non-compliant with their Part 50 reporting obligations. *See* AR 199. Finally, although MSHA submitted into the record an undated agency memorandum to its district managers purporting to represent agency procedures for protecting confidential information obtained in Part 50 audits (JA 30-31), MSHA's witness did not know when it was issued, AR 217, and a week after the hearing, Government counsel notified the ALJ that the memorandum had not been issued until December 13, 2012, the day before the hearing. AR 462.

## SUMMARY OF ARGUMENT

Claiming *de facto* subpoena authority, MSHA improperly demanded that Petitioners turn over copies of certain records, including medical records of their miners, and improperly cited Petitioners when they refused to comply on the ground that MSHA lacked the authority to compel production of the private and confidential records. The Commission erroneously upheld MSHA's actions as lawful. The problem is that none of the records that Petitioners objected to providing are required to be kept by the Mine Act or any MSHA regulation, and MSHA does not have the broad subpoena authority it claims. On the contrary, unlike other agencies that have been given general subpoena power in furtherance of their statutory mandates – including MSHA's sister agency within the Department of Labor, the Occupational Safety and Health Administration ("OSHA") – Congress granted MSHA subpoena authority only for public hearings held in connection with its mine

accident investigations, not applicable here. In short, MSHA's actions were *ultra vires*.

The Commission erred in finding support for MSHA's actions under the agency's general inspection and investigation authority, Mine Act § 103(a). That provision grants MSHA broad inspection and investigation authority over the physical mine site and operations, and allows MSHA to ask as many questions of as many people on the site as it desires. But it nowhere affords MSHA a right to inspect, copy, and carry away records – such as the medical and other confidential records it demanded at Petitioners' mines – that are not specifically required to be maintained by the Act or a duly promulgated regulation.

Mine Act § 103(h), on the other hand, does grant MSHA authority to obtain certain records, reports, or other information not specifically required to be maintained or provided under the Mine Act itself. *But* that provision is not self-executing; it requires that MSHA first "reasonably require[]" operators to do something more, such as keep other records. 30 U.S.C. § 813(h). The only interpretation of MSHA's authority that is consistent with the Mine Act enforcement scheme is that MSHA must promulgate a regulation to the extent it wants to obligate operators to generate and maintain additional records for prospective inspection and copying by the agency.

Moreover, accepting MSHA's position in this case, as the Commission did, gives rise anew to the very Fourth Amendment defect that the Supreme Court addressed in *Marshall v. Barlow's Inc.*, 436 U.S. 307 (1978), in which it held

unconstitutional the statutory provision that gave warrantless and unbridled inspection authority to OSHA field agents. The Commission ignored *Marshall*, relying instead on *Donovan v. Dewey*, 452 U.S. 594 (1981), which upheld MSHA's right to inspect the nation's mines on demand and without warrant. But *Donovan* did not deal with the search and seizure of *documents*, and documents have always enjoyed greater Fourth Amendment protection than business premises generally, a distinction lost on the Commission.

The Commission also gave short shrift to the competing privacy interests at stake, not only those inherent to the type of records it sought, but by virtue of other laws, including including the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq*., and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, both of which impose obligations of their own on Petitioners to maintain the confidentiality of certain information. MSHA's records demands would impose conflicting regulatory obligations on Petitioners, which further underlies why MSHA must pursue its aims through rulemaking – in which competing interests can be examined and reconciled – not *ad hoc* initiative.

Finally, in the event that this Court finds the Mine Act ambiguous, it should not accord deference to MSHA's position. Because the question of interpretation in this case goes to the breadth of MSHA's enforcement authority and implicates legitimate Fourth Amendment concerns, and because MSHA's interpretation is unreasonable and does not reflect its fair and considered judgment about the nature of its actions, deference should be denied.

## STANDARD OF REVIEW

When reviewing final decisions of the Commission, the federal courts of appeals review conclusions of law *de novo*, *see*, *e.g.*, *United Energy Servs., Inc. v. MSHA*, 35 F.3d 971, 974 (4th Cir. 1994), consistent with this Court's usual practice of reviewing questions of law *de novo*. *See United States v. Thornton*, 539 F.3d 741, 742 (7th Cir. 2008). As this case involves a question of statutory interpretation, the Court's analysis begins with the statute itself, keeping in mind the Supreme Court's admonition that statutory interpretation is a "holistic endeavor," such that individual provisions must be read in the context of the entire statute. *Koons Buick Pontiac, GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004). If, when taken in its entirety, the relevant provisions are unambiguous, the Court applies the statute without regard to deference; unreasonable agency interpretations are not entitled to deference. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Ali v. Achim*, 468 F.3d 462, 468 (7th Cir. 2006). Moreover, this Court has held that where the statutory question goes to the scope of the Secretary's jurisdiction under the Mine Act, deference is not appropriate. *See N. Ill. Steel Supply Co. v. Sec'y of Labor*, 294 F.3d 844, 847 (7th Cir. 2002).

## ARGUMENT

There is no question that the records sought by MSHA, in particular the medical records of Petitioners' miners, are "private" in nature.  *See* RSA 23 n.17. There is also no question that no statutory or regulatory provision administered by MSHA requires Petitioners to maintain the records in the first instance. *See* AR 213-214. Finally, there is no allegation that Petitioners violated any of their Part 50

reporting obligations. *See* AR 199. Nonetheless, MSHA claims a right to copy and carry away the confidential records, including medical records.

At bottom, this case is about two very different views about the power of executive agencies: Petitioners believe that MSHA has only those specific powers delegated to it by Congress. MSHA, in contrast, sees very few inherent constraints on its power, as though what Congress did not expressly hold back MSHA possesses as of natural right. Indeed, even though the Mine Act grants it only very limited subpoena authority, MSHA took the position below that it has *broader* authority even than agencies to which Congress has actually delegated general subpoena power.

Whatever can be said of the policy rationale advanced below by MSHA and embraced by the Commission in upholding MSHA's position, the critical question here is not what they think the law *should* say, but what the law *does* say. Because the Commission failed to enforce the logical stopping point of MSHA's authority, *see Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 157 (7th Cir. 1988) (pointing out that statutes, as the product of legislative compromise, "have not only ends but also limits," and that a court's job "is to find and enforce stopping points no less than to implement other legislative choices"), Petitioners respectfully ask that this Court reverse the Commission's decision.

## I.    Petitioners Were Not Required To Disclose Their Confidential Records To MSHA And The Commission Erred In Upholding The Citations And Orders.

MSHA contended below that it was entitled to copy and haul away confidential records not required to be kept by Petitioners because its "audit"

demand was "in the nature of a *subpoena duces tecum*." AR 1052. In fact, MSHA

asserted that its audit authority "is generally much broader" than the *subpoena*

*duces tecum* authority of other agencies. AR 1046 & n.4. The Commission, for its

part, found that MSHA's action fell, generically, within its statutory "inspections

and investigations" authority. RSA 10. There is no support for either rationale in

the Mine Act.

Of particular relevance is Mine Act § 103. Subsection (a) is the broadly

worded source of MSHA's authority to "inspect" mines and "investigate" accidents,

workplace injuries, and Mine Act compliance. It states in relevant part:

> *Authorized representatives* of the Secretary ... shall make frequent
> inspections and investigations in coal or other mines each year for the
> purpose of (1) obtaining, utilizing, and disseminating *information*
> relating to health and safety conditions, the causes of accidents, and
> the causes of diseases and physical impairments originating in such
> mines, (2) gathering information with respect to mandatory health or
> safety standards, (3) determining whether an imminent danger exists,
> and (4) determining whether there is compliance with the *mandatory*
> *health or safety standards* or with any citation, order, or decision
> issued under this title or other requirements of this Act.

30 U.S.C. § 813(a) (emphasis added). Underground mines must be inspected in their

entirety at least quarterly; surface mines at least twice a year. *See id.* Subsection (i)

provides for supplemental "spot" inspections of mines that liberate excessive

explosive gases. *See id.* § 813(i).

Subsection (b) authorizes MSHA to conduct public hearings in conjunction

with its accident investigations. It grants subpoena power to MSHA for use in

connection with such public hearings. This is the *only* grant of subpoena power that

Congress gave to MSHA. *See id.* § 813(b).

- 14 -

Subsection (d) requires operators to investigate mine accidents, make their records of accident investigations available for MSHA review, and report their accidents and man-hours worked on at least an annual basis. *See id.* § 813(d).

Subjection (e) interjects the concept of *reasonableness* into MSHA's authority to obtain information from mine operators, stating in relevant part that "[a]ny information obtained by the Secretary ... under this Act shall be obtained in such a manner as *not to impose an unreasonable burden upon operators*, especially those operating small businesses, consistent with the underlying purposes of this Act." *See id.* § 813(e) (emphasis added).

Finally, there is subsection (h), which is the source of MSHA's authority to require operators to maintain and make available records not already required to be kept under the Mine Act itself, the question here being whether it can do so *ad hoc*, as it claims, or must do so through rulemaking, as Petitioners contend and as the agency has done time and again in the past. That subsection states in relevant part:

> In addition to such records as are specifically required by this Act, *every operator* ... shall establish and maintain such records, make such reports, and provide such information as the Secretary … *may reasonably require from time to time.*

30 U.S.C. § 813(h) (emphasis added). This language was largely carried over from § 111(b) of the Federal Coal Mine Health and Safety Act of 1969 ("Coal Act").

Also relevant are the Mine Act's two sources of authority for rulemaking. Section 101(a) authorizes MSHA to promulgate mandatory health or safety standards, and § 508 authorizes it to issue other regulations that it deems appropriate to carry out any provision of the Mine Act. *See id.* §§ 811(a) and 957.

- 15 -

Mandatory standards are typically performance standards addressing occupational safety and health concerns; regulations are typically administrative or housekeeping provisions. Both rulemaking provisions were carried over in material part from the identically numbered sections of the Coal Act.

Most of the provisions found in Part 50 of the Title 30 of the Code of Federal Regulations, including § 50.41, were promulgated as *regulations* under what was then *Coal Act* §§ 111 and 508. *See* 42 Fed. Reg. 65534 (Dec. 30, 1977). What is now Mine Act § 103(a) *was not* a noted source of authority for the Part 50 regulations. *See id.* (Section 50.10, not applicable here, was amended in 2009 to become a mandatory standard under Mine Act § 101(a), 30 U.S.C. § 811(a).)

A.    **MSHA Acted *Ultra Vires.***

The most obvious problem with MSHA's claim that its audit was "in the nature of a *subpoena duces tecum*" (to say nothing of its claim, free of citation to authority, that its right to documents is actually "much broader" than that of other agencies with general subpoena authority) is that the statute does not permit it. Mine Act § 103(b) grants MSHA subpoena power *only* in relation to public hearings held as part of its accident investigations. *See* 30 U.S.C. § 813(b). Inasmuch as executive agencies have no authority beyond what is granted to them by Congress, *see Lyng v. Payne*, 476 U.S. 926, 937 (1986), MSHA's action was *ultra vires*. "Subpoena power is not an intrinsic feature of the administrative process"; if such authority has not been granted by Congress, an agency is not free to confer it upon itself. *Johnson v. United States*, 628 F.2d 187, 193 (D.C. Cir. 1980); *see also United*

*States v. Sec. State Bank and Trust*, 473 F.2d 638, 642 (5th Cir. 1973) (agencies have "no subpoena power other than that conferred by statute").

Nonetheless, MSHA contended below that it would be "difficult to imagine" that Congress would have given MSHA less sweeping subpoena power than it gave OSHA. AR 1047. But it is not difficult to *imagine* Congress doing so at all: that is precisely what it did. *Compare* 29 U.S.C. § 657(b) *with* 30 U.S.C. § 813(b).

On its lack of *express* subpoena power, MSHA argued that the limitation extended only to its authority over *third parties*. AR 1047 n.5. That is simply wrong: the statute makes no distinction between operators and third parties, and it is *ultra vires* to assume authority to act where Congress has legislated otherwise. *See, e.g.*, *Minard Run Oil Co. v. U.S.F.S.*, 670 F.3d 246, 252 (3d Cir. 2011) (rejecting argument that a limited grant of regulatory authority did not preclude more expansive regulation under agency's general regulatory authority because that would render the limited grant of authority superfluous and "has no logical stopping point and would therefore raise difficult constitutional questions"); *NMA v. U.S. Dep't of the Interior*, 105 F.3d 691, 695 (D.C. Cir. 1997) (rejecting agency argument that it could take an action because it was not expressly prohibited by statute, noting that such a rule would permit the agency to "enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well") (citation omitted); *Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670-71 (D.C. Cir. 1994) (en banc) ("categorically" rejecting

"suggestion that [agency] possessed plenary authority to act within a given area" where Congress had given it only "some" authority) (emphasis omitted).

Moreover, the public comments of MSHA's leader, Assistant Secretary of Labor for Mine Safety and Health Joseph Main, as well as members of Congress, belie MSHA's argument. For example, testifying to Congress on April 27, 2010 in the wake of the fatal accident at the Upper Big Branch Mine in West Virginia, Assistant Secretary Main implored Congress to give MSHA broader subpoena power, declaring that "MSHA and federal prosecutors need more tools to investigate" mine operators, including "the authority to issue subpoenas to require companies and individuals to turn over documents promptly when needed." JA 74. And in a July 19, 2011 letter to the current owner of that mine, two ranking members of the House committee with jurisdiction over Mine Act enforcement stated that, "[u]nder the Mine Act, *MSHA lacks subpoena authority except when conducting a public hearing in connection with an accident,*" and asked the owner if it specifically would support legislation authorizing the agency to, for example, "secure information to detect whether *mine operators* are failing to record hazards in mine examination books." AR 1111 (item 10) (emphasis added).

The Court can also take judicial notice of a more recent comment of the Assistant Secretary at a March 27, 2012 congressional oversight hearing. Addressing the question of MSHA's authority to investigate a mine operator that kept "two sets of books" – one required by law; the other presumably with additional information kept secret from MSHA – Assistant Secretary Main replied: "We can go

ask the *mine owner* to produce a book that's not legally required to be maintained by the Mine Act, and they can say no, and *what we do beyond that is what we're creative enough to do. We do not have the ability to demand those.*" U.S. House of Representatives, Committee on Education and the Workforce, Hearing on "Learning from the Upper Big Branch Tragedy," March 27, 2012.[1] MSHA, in fact, told the President in its preliminary report on the Upper Big Branch accident that the Mine Act needed to be amended to "[e]mpower MSHA to use subpoena authority to require companies and individuals to turn over information promptly when needed." Briefing by Department of Labor, Mine Safety and Health Administration on Disaster at Massey Energy Upper Big Branch Mine at p. 9 (April 15, 2010) (Report to the President).[2]

**B.    The Commission's Rationale Is Foreclosed By The Mine Act.**

The Commission relied on Mine Act § 103(a) as a source of MSHA's claimed audit authority. *See* RSA 10. Multiple shortcomings undermine that rationale. First, the "audit" regulation allegedly violated here, § 50.41, was not promulgated pursuant to either Mine or Coal Act § 103(a), so reliance on that section was totally misplaced. *See* 42 Fed. Reg. 65534. Second, § 103(a) authorizes "inspections" and

---

[1]Available at http://edworkforcehouse.granicus.com/MediaPlayer.php?view_id=2&clip_id=77 (relevant comments of Assistant Secretary Main beginning at approximately 1:05:58) (emphasis added) (last visited Aug. 7, 2012).

[2] Available at http://www.msha.gov/performancecoal/DOL-MSHA_president_report.pdf (last visited Aug. 8, 2012).

"investigations" by MSHA's "authorized representatives," but there is no evidence in the record that the attempted audit (distinct from the perfunctory service of the pre-typed enforcement papers after Petitioners raised their objections) was executed by *authorized representatives* of the Secretary (*e.g.*, mine inspectors), as § 103(a) requires. If anything, the record indicates otherwise. *See* AR 279. Third, although MSHA tepidly tried to equate its audit to an investigation, AR 1067 n.14, it is in fact neither an "inspection" nor an "investigation" under § 103(a) as those terms have traditionally been understood.

A Mine Act "inspection" is a routine event, regularly occurring either as part of the mandatory quarterly or semi-annual inspections authorized by § 103(a) or a mandatory spot inspection under § 103(i), or as part of some other process for which MSHA has developed appropriate "guidelines." 30 U.S.C. § 813(a). As discussed below in Part II, it is the *regularity and certainty* of the inspection scheme as prescribed in § 103(a) that caused the Supreme Court to uphold it as constitutional in *Donovan*. Moreover, an "inspection" means to critically *view* or *examine* something, such as mine conditions or operations. *See* Random House Webster's Unabridged Dictionary 987 (2d ed. 2001). While an inspection might extend to reviewing documents *required to be kept, in situ*, it does not encompass the copying and carrying off of records not required to be kept.

Nor was the audit an "investigation" as used in Mine Act § 103(a). MSHA acknowledged it was not investigating suspected wrongdoing, and while the Commission cited § 103(a)'s first and fourth purposes for an investigation, RSA 10;

30 U.S.C. § 813(a), neither is apt. The first investigatory purpose is aimed at the gathering and use of certain "information," not the copying and carting away of "records" that operators are not required to maintain. That MSHA went beyond relevant *information*-gathering is demonstrated not only by its own characterization of its action as a *subpoena duces tecum* but also by the fact that it ignored Petitioners' attempt to negotiate a narrower set of information in lieu of the wholesale production of confidential records. JA 9. In fact, in its post-hearing briefing, it stated it would "strongly object" to allowing operators to even "redact the background medical information from medical records before disclosure." AR 558; *see also* AR 960F-960G (objecting to "an internal coding system through which personally identifying information is redacted with a code"). The fourth purpose fits MSHA's action no better because it speaks to determining compliance with "mandatory standards," clearly not applicable here inasmuch as (i) there was no allegation of non-compliance and (ii) neither the Part 50 record-keeping standards nor § 50.41 itself are mandatory standards. It is telling that even the ALJ below recognized that the audit was *not* an investigation. *See* JA 18.

Finally, and in any case, the authority to conduct inspections and investigations under § 103(a) – even if that is what occurred here – no more authorizes MSHA to obtain copies of private medical records than it does to conduct body cavity searches, take DNA samples, or wiretap the mine phone system. *See*, *e.g.*, *Marshall v. Barlow's*, 436 U.S. at 324 n.22.

Below, MSHA relied on this Court's decision in *Matter of Establishment Inspection of Skil Corp.*, 846 F.2d 1127 (7th Cir. 1988), to validate its audit. AR 1040. But the agency in that case had obtained a warrant issued from a federal magistrate for cause, based on known safety hazards. In other words, it was conducting a genuine investigation of alleged consumer product defects. (Moreover, the business records at issue in *Skil* were not inherently private, as are the records demanded in this case.)

For its part, the Commission reasoned that MSHA's ability to monitor compliance with Part 50 reporting obligations would be frustrated if the agency could not get its hands on the sensitive medical records it was seeking. RSA 17. But that conclusion is neither accurate nor determinative. It is not accurate because, as the dissenting Commissioner pointed out, MSHA could likely achieve its aims through rulemaking. *See* RSA 48. And it is not determinative in any event because a policy objective cannot trump the limits on agency authority delineated in the governing statute. *See Rodriguez v. U.S.*, 480 U.S. 522, 526 (1987) (stating it "frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law") (emphasis in original).

Nor does it matter, as the Commission assumed it did, that MSHA is authorized in certain circumstances to seek an injunction in federal district court under Mine Act § 108(a)(1) to enjoin non-compliance. *See* RSA 10-11; 30 U.S.C. § 818(a)(1). Reliance on § 108(a)(1) just begs the question of Petitioners' statutory

duties in the first instance, and says nothing about whether a court would *grant* an injunction or, at best, the scope of the injunction (which might explain why MSHA did not seek one here). As MSHA and the Commission portray it, § 108(a)(1) provides an alternative remedy to the administrative enforcement process. The shortcoming to this portrayal is that it equates § 108(a)(1) with the right found in other statutes to seek district court enforcement of administrative subpoenas. *See*, *e.g.*, 29 U.S.C. § 657(b) (OSHA); 21 U.S.C. § 876(a) (U.S. Drug Enforcement Administration). But how can that be when, as discussed above, Congress granted only very limited subpoena power to MSHA (inapplicable here) under § 103(b)?

Moreover, allowing MSHA its choice of remedies to enforce its supposed "subpoena" authority leads inexorably to injustice. It would mean that MSHA could, but need not, seek enforcement of its audit demand in federal court, as other agencies with actual subpoena power are *required* to do (which, in the process, affords the operator the opportunity to have its concerns promptly heard by a federal court). It could instead opt to slow roll the process by issuing an administrative enforcement citation under Mine Act § 104(a), followed by a failure-to-abate order under § 104(b), as it did here, putting the onus on the operator to contest the citation before the Commission and risk daily civil penalties if it did not turn over the records in the meantime, no matter how sensitive the record or unreasonable the demand. Such power and discretion as to a choice of remedies would be unprecedented and would, moreover, make Commission ALJs, instead of the federal district courts, the front-line arbiters of Fourth Amendment disputes,

*inter alia*, and even then only long after the damage of disclosure has been done (to abate the citation) or the threatened daily civil penalties (if no disclosure) have accrued to potentially crippling amounts.

Finally, the Commission's opinion that the records sought by MSHA are "relevant and necessary" for MSHA to carry out its audit responsibilities distorts the issue. *See* RSA 15-20 & n.9. The "relevant and necessary" inquiry is lifted from § 50.41, which as written and interpreted in this case by MSHA and the Commission is basically an open-ended regulation allowing MSHA to see anything it wants. It states an operator "shall allow MSHA to inspect and copy information which MSHA considers relevant and necessary." 30 C.F.R. § 50.41. Not only is MSHA's claim to open-ended subpoena authority contrary to the Mine Act, but, as we explain below in Part II, such a vague regulation – the classic henhouse guarded by the agency fox – is ripe for Fourth Amendment abuses.

That "relevant and necessary" conclusion also masks the illegitimate, ugly truth of MSHA's operative principle that the ends justify the means. It is irrelevant whether the medical records sought by MSHA "contain important information" about reportable occupational injuries or illnesses, RSA 16, and whether company safety departments are prone to "[f]lawed incident reporting." RSA 17. These may be legitimate policy concerns – even the dissenting Commissioner recognized MSHA's legitimate *policy* aims. RSA 32, 48. But, as the dissenting opinion highlights, there is a right and wrong way for MSHA to go about achieving its

statutory aims. RSA 48. *Cf. Pac. Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 690 (2012) ("[I]f Congress' coverage decisions are mistaken as a matter of policy, it is for Congress to change them. [The courts] should not legislate for them.") (citation omitted).

As discussed below, the right way is by rulemaking, to prescribe the records operators are required to generate or keep on premises for MSHA's auditing purposes. Without prejudging whether a legislative rule creating such duties would be lawful in its own right in all of its particulars, it is, at least, the irreducible minimum starting point for MSHA to achieve lawfully what it has attempted to achieve unlawfully in this case.

### C. Before MSHA May "Inspect And Copy" Records, It Must Promulgate A Rule Requiring Operators To Keep Those Records.

MSHA argued below, and the Commission majority agreed, that rulemaking was not required because Mine Act § 103(h) already obligates operators to "provide" MSHA with "such information" as reasonably required. RSA 10. But not so fast. There is no question (even by MSHA) that an operator could *not* be required to "generate and maintain" records or "make" reports absent rulemaking prescribing it. *See* 30 U.S.C. § 813(h). As the D.C. Circuit stated about MSHA's Part 50 rules, "clearly some agency creation of a duty is a necessary predicate to any enforcement action against an operator for failure to keep records." *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (stating further that "in the absence of a legislative rule by the agency, the legislative basis for agency enforcement would be

inadequate"). A requirement to "provide such information" is no less conditioned on MSHA first promulgating a rule obligating an operator to do so.

Ignoring *American Mining Congress*, MSHA and the Commission mistakenly relied on legislative history indicating that an earlier version of the bill that became § 103(h) would have limited MSHA's authority to obtain only those records as "prescribed by regulation." RSA 11. Yet, the conference report specifically points out that the "prescribe by regulation" language was dropped because it was mere surplusage. *See* Subcommittee on Labor, S. Comm. on Human Resources, S. Rep. No. 95-461, at 47 (1977) (Conf. Rep.), *as reprinted in* Legislative History of the Federal Mine Safety and Health Act of 1977, at 1325 ("The Senate bill authorized the Secretaries to publish rules and regulations as they deemed necessary to carry out their responsibilities under the Act. *The conference substitute contains no such provision since both the Senate bill and the House amendment provide such authority elsewhere in the Act.*") (emphasis added). In its final form, the relevant language of Mine Act § 103(h) was just a simple carry-over of Coal Act § 111(b). If it means anything, that legislative history supports Petitioners.

In any event, regardless of whatever other "information" it wanted from Petitioners, MSHA in no uncertain terms sought to copy and haul away "records" and "reports." The reports Petitioners are *required* to "make" (7000-1 and 7000-2) were provided. The crux of the case thus centers on "payroll *records*," "medical *records*," and other forms of documentation that, under any common sense understanding of the word, would be considered, and have been referred to by

MSHA as, "records" (*i.e.*, doctor's slips, worker compensation filings, sick leave requests or reports, drug testing documents, EMT records, and medical claims forms). *See*, *e.g.*, JA 25 ¶ 9 (referring to "uniform Part 50 *records* requests") (emphasis added); JA 32, 34 (audit demand letters for each mine, stating in second sentence that "MSHA is requesting certain *records* that are considered to be relevant and necessary to complete its audit") (emphasis added). MSHA cannot simply recast "records" as "information" to gain *ad hoc* access to them, relegating the term "records" to the cast-off lot of surplusage. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 698 (1995).

By its own terms, Mine Act § 103(h) is not self-executing. Before *Petitioners* can be required to turn over copies of records, the statute requires that *MSHA* first promulgate a rule requiring operators to establish and maintain them. To that end, MSHA has in the past resorted to § 508 rulemaking to implement its authority under Mine Act § 103(h) (or its predecessor, Coal Act § 111(b)). For example, the record-keeping and reporting obligations of 30 C.F.R. §§ 50.11, 50.20, 50.30, and 50.40 are the product of such rulemaking. *See* 42 Fed. Reg. 65537-40.  Also, the requirement of underground metal and non-metal mines to make and maintain diesel particulate records was promulgated pursuant to Mine Act § 103(h)). *See* 30 C.F.R. § 57.5075. *See also id.* § 41.10 (supplementing statutory legal identity report requirements). Similarly, the record-keeping and reporting provisions of the mandatory health standards for underground coal mines were promulgated pursuant to Mine Act § 103(h). *See id.* Part 70.

This is because, in enacting the Mine Act (and the predecessor Coal Act), Congress – presumptively aware that "orderliness and predictability … are the hallmarks of lawful administrative action," *Reuters Ltd. v. F.C.C.*, 781 F.2d 946, 950-51 (D.C. Cir. 1986) – imposed the same constraint on MSHA that is a prerequisite for all Executive-Branch agencies that seek to impose binding obligations on the public: legislative rulemaking. This is what Congress meant when it stated in § 103(h) that "every operator" will abide by what MSHA "may reasonably require from time to time" with respect maintaining records, *inter alia*. Congress did not say "an operator" shall comply "whenever" MSHA so requests. It intended MSHA to promulgate rules of general applicability. To read § 103(h) as permitting *ad hoc* demands for copying records is to again ignore key terms Congress used. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (every word of a statute should be given meaning).

Moreover, this result flows from the requirement of § 103(e) that MSHA act "in such a manner as not to impose an unreasonable burden upon operators." The reasonableness of any requirement – of any "duty" as the D.C. Circuit described it in *American Mining Congress* – is addressed through rulemaking. Giving notice of a proposed rule and providing an opportunity for public comment allows interested parties (operators, miners, other agencies, associations, etc.) to spot problems with the proposed rule (such as overbreadth, privacy concerns, or potential conflicts with other legal obligations) and allow the agency the opportunity to resolve them, justify the proposal, or scrap it altogether. *See*, *e.g.*, *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d

165, 170-71 (7th Cir. 1996) (observing that notice-and-comment rulemaking "is the procedure by which the persons affected by legislative rules are enabled to communicate their concerns in a comprehensive and systematic fashion to the legislating agency").

Only through such rulemaking can MSHA give mine operators notice of their obligations and the assurance that they will be treated in a fair and consistent manner, by a rule that applies equally and in the same manner to *every operator*, with certainty and regularity, and thus does not impose an unreasonable burden. Rulemaking, with the concomitant right of aggrieved parties to judicial review, is how society holds agencies accountable to act reasonably and within the limits of their authority. *See* Mine Act § 101(d), 30 U.S.C. § 811(d); 5 U.S.C. § 706. As the dissenting Commissioner pointed out, RSA 42 n.5, if MSHA's *ad hoc* position is upheld, operators could simply structure their records-maintenance and retention policies in such a manner so as to avoid the reach of MSHA – by, for example, using third parties to maintain their records or keeping records at a corporate office over which MSHA lacks jurisdiction. *See* 30 U.S.C. § 802(h). Given this loophole, MSHA's audit system is doomed to fail if allowed to stand as an *ad hoc* initiative because MSHA has no means (absent rulemaking) to compel operators to keep such records in the first place or make them available if they are kept away from the mine site.

Citing MSHA's implementing regulation, § 50.41, and its preambles, the Commission opined that MSHA has already fulfilled its rulemaking obligation. RSA 11-14. The fatal flaw in that analysis is the regulation itself: it does not

obligate operators to generate or maintain the records MSHA is seeking. There is no dispute on this point. The Commission, however, found a cure in the regulation's preambles. The preamble to the *proposed* regulation stated that MSHA intended by it to be able to copy company medical records, *inter alia*, for the benefit of (i) compiling epidemiological data relevant to health standards, (ii) uncovering intentional violations of statutory or regulatory requirements, and (iii) controlling the data flow so as not to be dependent on "operator filtered records." 42 Fed. Reg. 55568, 55569 (Oct. 17, 1977).  And the preamble to the *final* regulation, responding to critics of the proposal, reiterated why the agency felt such a broad right of access was necessary and cited Coal Act § 111(b) and § 13 of the Federal Metal and Nonmetallic Mine Safety Act of 1966 ("Metal Act") as authorizing such a rule, 42 Fed. Reg. 65534, 65535 (Dec. 30, 1977).

These preambles are an inadequate crutch for reasons discussed by the dissent, RSA 40 n.4, and, for at least three reasons, the Commission's reliance on them is misplaced.

First, and most obviously, the preamble itself is not law, *see Wyeth v. Levine*, 129 S. Ct. 1187, 1201 (2009); *see also* RSA 40 n.4, and it does not solve the very practical problem that nowhere in Part 50 does MSHA require mine operators to keep even a single copy of any of the records it asserts authority to inspect and copy. Second, for the reasons explained more completely below in Part II, it raises serious constitutional questions under the Fourth Amendment. *See*, *e.g.*, *Marshall v.*

*Barlow's*, 436 U.S. at 323 (finding unconstitutional a statutory provision that "devolves almost unbridled discretion upon" agency officials).

Third, Coal Act § 111(b) was (as noted) largely carried over into Mine Act § 103(h), and it no more authorized unlimited *ad hoc* agency record-keeping and inspection powers than § 103(h) does, for the reasons made clear in *American Mining Congress*. And Metal Act § 13 only reinforces the need for rulemaking, as it plainly stated that the Secretary of the Interior was to require mine operators "*to submit, at least annually and at such other times as he deems necessary, and in such form as he may prescribe*, reports of accidents, injuries, and occupational diseases, and related data" (emphasis added) for the Secretary to compile, analyze, and make public, *inter alia*. That language, too – if anything, even more clearly – is stated in terms of what the Secretary may do by way of general rulemaking.

In any case, whatever it was in 1977, two sources of authority indicate that MSHA's bootstrapping viewpoint as expressed in the preambles was abandoned early on.

The first is the only Mine Act decision that ever actually confronted the scope of MSHA's audit authority, *Sewell Coal Co.*, 1 FMSHRC 864, 873 (July 1979) (ALJ), in which the then-Chief Commission ALJ ruled that, as a general matter, operators have a privacy interest protected by the Fourth Amendment in corporate records that are not specifically required to be kept under the Mine Act. He also held that MSHA's authority to verify an operator's reporting requirements under Part 50 does not extend to inspection of "personnel files containing medical and other

information," some of which may not be related at all to accidents and occupational injuries and illnesses, without a search warrant. *Id.* Although *Sewell* is not binding Commission authority, it had until this case withstood the test of time, and the Commission itself has taken pains to distinguish it, including in the decision below. *See* RSA 15. In a 1984 decision, for example, upholding MSHA's right to review those *accident-investigation* records which *are required to* be *maintained* by Mine Act § 103(d), the Commission stated:

> Because this case involved only a request for records *specifically required by the Act to be maintained*, it does not present the situation faced in *Sewell Coal Company*, 1 FMSHRC 864 (July 1979) (ALJ). There the inspector sought to personally review accident, injury and illness and medical and compensation records at the mine. Those records were contained in *individual personnel files which also contained other data not required to be maintained* by the Mine Act. 1 FMSHRC at 865.

*Peabody Coal*, 6 FMSHRC 183, 186 n.5 (Feb. 1984) (emphasis added).

The second is a 1987 letter opinion authored by MSHA's top legal officer embracing the *Sewell* rationale as MSHA's own. In a letter to a mine operator that had specifically asked for MSHA's official position on the "limits on MSHA's legal authority to examine 'payroll and personal files containing medical and other information not required to be maintained by Part 50,'" Associate Solicitor of Labor for Mine Safety and Health Edward P. Clair explained that "it is our position that MSHA has a right of access to any information *required to be maintained by the Mine Act or the implementing regulations in Part 50.*" JA 76 (emphasis added). Addressing the Commission's decision in *Peabody* and the critical factor that distinguished it from *Sewell*, Mr. Clair stated:

Under the holding in *Peabody*, we would not view the operator's designation of a file as "personnel" or "medical" or the form in which the data is maintained as necessarily determinative of MSHA's right of access. *Rather, the key factor is whether the information is required to be maintained under the Mine Act or implementing regulations.* \*\*\*

\*\*\* It is our position that as long as these audits *do not constitute the 'wholesale' warrantless search proscribed by Sewell, they are entirely permissible.*

JA 76-77 (emphasis added).

In this litigation, MSHA initially forgot about the Clair opinion, taking the position in its pre-hearing brief that its audit authority entitled it to records "even when the statute and regulations do not require such records to be maintained." AR 144. After the hearing, having been reminded of what its top attorney had stated unequivocally was "the key factor," MSHA changed its tack, first saying it had already done the necessary rulemaking in 1977, AR 502-03, and then saying that Mr. Clair's 1987 letter did not say anything to the contrary. AR 513-14. But of course it did say something to the contrary – it was the difference between night and day.

Before the Commission, after a timid and unpersuasive attempt to explain again how the Clair opinion was actually consistent with its litigating position in this case, MSHA – *for the first time* – tried to throw the Clair opinion under the bus by claiming its reasoning was renounced years ago. AR 1049. For its part, the Commission split the baby: recognizing the inconsistency between the Clair opinion and MSHA's current litigating position, it took the view that MSHA was "renounc[ing]" the Clair opinion "in her current litigation before the Commission," *i.e.*, *post hoc*, in *this* case. RSA 14 n.8.

- 33 -

It is specious for MSHA to claim that it renounced the Clair opinion "years ago." It certainly never did so publicly, and it is well ingrained in our system of laws that an agency cannot seek to impose liability through "secret law." *See United States v. Pulungan*, 569 F.3d 326, 328 (7th Cir. 2009) (stating that government may not enforce laws pursuant to "unspecified criteria;" it must, rather, "operate through public laws and regulations" which are "published for all to see" and to which "[p]eople can adjust their conduct to avoid liability"); *United States v. Farinella*, 558 F.3d 695, 699 (7th Cir. 2009) ("The idea of secret laws is repugnant."). Moreover, as highlighted *supra* at 18-19, the idea that MSHA has the power to obtain documents that operators are not required to keep is belied by the pleas of its top official to congressional oversight committees for the last two years.

In sum, (i) the case *sub judice* is the first to arise under 30 C.F.R. § 50.41 since *Sewell*; (ii) in the intervening 30-year period MSHA's top lawyer issued an opinion that flatly contradicts what MSHA now claims to be its long-standing interpretation; and (iii) the very audit giving rise to this case was part of an admittedly "new initiative" launched in October *2010*. Indeed, as noted above, it was not until the eve of trial, literally (and nearly two months after it launched its initiative), that MSHA saw fit to issue special "procedures" for the safekeeping of confidential documents obtained during the audits. If the ability to inspect and copy medical records and other confidential personnel and business records is as vitally important to its mission as MSHA now claims, one is left to wonder why it did not do anything about it for almost 30 years following *Sewell*, and then only by an *ad*

*hoc* initiative that continued to evolve even after it was launched. As the Supreme

Court said recently, in quoting this Court:

> But where, as here, an agency's announcement of its interpretation is
> preceded by a very lengthy period of conspicuous inaction, the potential
> for unfair surprise is acute.  As the Seventh Circuit has noted, while it
> may be "possible for an entire industry to be in violation of the [Fair
> Labor Standards Act] for a long time without the Labor Department
> noticing," the "more plausible hypothesis" is that the Department did
> not think the industry's practice was unlawful.

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012) (quoting *Yi*

*v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 510-11 (7th Cir. 2007)). Surely a

program as important as MSHA claims its Part 50 audit initiative to be is the very

type of program that Congress intended the agency to implement through public

rulemaking.

## II.     The MSHA Citations And Orders Offend The Fourth Amendment.

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses,
> papers, and effects, against unreasonable searches and seizures,
> shall not be violated, and no warrants shall issue, but upon
> probable cause, supported by oath or affirmation, and
> particularly describing the place to be searched, and the persons
> or things to be seized.

U.S. Const. amend. IV. The touchstone to the Fourth Amendment is the guarantee

against unreasonable government intrusion, *see Kyllo v. United States*, 533 U.S. 27,

31 (2001), and it has long been settled that the protections of this amendment

extend to commercial properties. *See See v. City of Seattle*, 387 U.S. 541 (1967). To

this end, the general rule is that government searches and seizures of private

property must be authorized by a warrant because it is the warrant – specifically

crafted and authorized by a neutral magistrate – that provides the imprimatur of reasonableness. *See Donovan*, 452 U.S. at 599.

No rule is without exceptions, of course. In particular, it has been held that *Congress* may in its wisdom see fit to craft legislation authorizing warrantless search regimes by government enforcement agencies in industries historically subject to pervasive regulation where, on balance, it is in the public interest to do so. *See*, *e.g.*, *United States v. Biswell*, 406 U.S. 311 (1972); *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970). And so it has for the mining industry. As described in Part I, Mine Act § 103(a) mandates that MSHA conduct complete inspections of all underground mines at least four times a year, and all surface mines at least two times a year. *See* 30 U.S.C. § 813(a). Against a Fourth Amendment challenge, this warrantless search regime was upheld by the Supreme Court in *Donovan*, *supra*.

Cases, however, have contexts, and the particular circumstance in which the *Donovan* case arose cannot be ignored. There, a mine operator refused to allow an MSHA inspector onto its property without a warrant. The question presented was whether, under Mine Act § 103(a), the inspector had the right to enter and inspect the mine property notwithstanding his lack of a warrant. Distinguishing *Marshall v. Barlow's*, 436 U.S. at 323, in which the Court held that § 8(a) of the Occupational Safety and Health Act ("OSH Act") was unconstitutional because it "devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search" (the result being that OSHA

was required to obtain a warrant before searching a place of business), the *Donovan* Court held that § 103(a) sets firm boundaries on MSHA's investigation and enforcement discretion and provides mine operators with the proper level of "certainty and regularity" regarding MSHA's inspection program that it neatly substitutes itself for a warrant. 452 U.S. at 601-04. Key, also, to the Court's analysis was that "the standards with which a mine operator is required to comply are all specifically set forth in the Act or in Title 30 of the Code of Federal Regulations." *Id.* at 604.

*Donovan* thus dealt with Mine Act § 103(a) and the physical inspection of a mine; it had nothing to say about MSHA's right to search and copy an operator's personnel and business records, and did not address the meaning and breadth of Mine Act § 103(h). On the question of records in particular, the Supreme Court's opinion in *Marshall v. Barlow's* remains apt: "Delineating the scope of a search with some care is *particularly important where documents are involved*." 436 U.S. at 324 n.22 (emphasis added). In that case, OSHA took the view that (i) because its statutory authority under the OSH Act did not require a warrant, and (ii) because it had through regulation taken the position that it was entitled to review records, it did not require a warrant to effect its examination of workplace records. *See id.* It was this position that the Court rejected. *See id.*

As was true of OSH Act § 8(a) at issue in *Donovan*, Mine Act § 103(a) says nothing about the inspection of records. *Accord Marshall v. Nolichuckey Sand Co.*, 606 F.2d 693, 696 (6th Cir. 1979) (pre-*Donovan* decision upholding the Mine Act

warrantless search regime on grounds that § 103(a) "permits warrantless inspections only of the 'active workings' of coal mines," and pointing out that "[a] warrant is required for the inspection of offices and other areas where the operator has a general expectation of privacy"). Thus, the Commission's reliance on Mine Act § 103(a) and *Donovan* for support of MSHA's audit authority was misplaced. The issue here – concerning MSHA's demand to inspect and copy confidential personnel records not required to be maintained by law – presents a different question.

As it relates to records, there is a well-recognized distinction in the law between records required to be kept by statute or regulation and those not – in the latter, employers retain a reasonable expectation of privacy protected by the Fourth Amendment that they do not retain in the former. *See, e.g., United States v. Consol. Coal Co.*, 560 F.2d 214, 217 (6th Cir. 1977), *vacated and remanded*, 436 U.S. 942 (1978), *reinstated*, 579 F.2d 1011 (1978) (recognizing a Fourth Amendment privacy interest in records not required to be maintained by statute); *United States v. Blue Diamond Coal Co.*, 667 F.2d 510, 519-20 (6th Cir. 1981). As the concurring judge in *Blue Diamond* explained with respect to the records at issue in *Consolidation Coal* that were *not required to be maintained by the Mine Act*, "the defendant [*i.e.*, the operator] retained *a significant expectation of privacy* as to their contents." 667 F.2d at 522 (Wiseman, J., concurring) (emphasis added). *Accord, The Youghiogheny & Ohio Coal Co. v. Morton*, 364 F. Supp. 45, 51 n.5 (S.D. Ohio 1973). Indeed, this distinction served as the basis for the *Sewell* decision and, in turn, the opinion of

Associate Solicitor Clair in 1987, that MSHA's audit authority was similarly limited.

Having already downplayed the intrusiveness of the audit demand in its discussion of *Sewell*, saying it was "limited in time and scope, narrowly tailored to the Secretary's functions under the Act, and does not involve MSHA representatives personally rummaging through Petitioners' file cabinets," RSA 15, the Commission dismissed the importance of these federal court decisions. RSA 26-27. This characterization is mistaken. As the ALJ pointed out, the entire purpose of the audit process is to remove the operator's filter on what records MSHA sees, JA 16, a point that MSHA reiterated in its briefs. AR 558; *see also* AR 960F-960G.

There can be no doubt this was an attempted search and seizure in the classical sense – government agents were on private property seeking to carry away records under threat of civil enforcement. But for § 103(a), the MSHA officials would have been required to obtain a warrant to be on the property in the first place, to say nothing about searching and seizing records – that was the entire point of the *Donovan* decision. While it may not have been "rummaging" in the sense that the MSHA officials physically opened the filing cabinets, it was functionally the same thing because it was still government agents directing private parties on what to retrieve from the files and then reviewing the universe of records and deciding what to copy and haul down to the MSHA district office for further scrutiny.

Nor is it enough to cite *Donovan* and say underground mining is so pervasively regulated that mine operators abandon all Fourth Amendment

protections upon entering the field. The *Donovan* Court certainly did not so hold. Constitutional limits remain, and the details of case precedent matter. The simple fact is that the particular concerns about mining that the *Donovan* Court found justified the relaxed Fourth Amendment analysis at mine sites had to do with the *inherent dangers of mining*, *i.e.*, the physical labor of mining in an inherently dangerous environment. *See* 452 U.S. at 602-03. Those concerns do not translate to government searches *of documents* in mine offices because there is nothing to suggest that mine office managers are any more prone to misreporting data than their counterparts at other businesses regulated by OSHA or other agencies (especially given the fact that Mine Act § 110(f), 30 U.S.C. § 820(f), makes it a felony to do so).

MSHA's new audit "initiative" is thus a far cry from the inspection scheme the Supreme Court countenanced in *Donovan*. There, the Court emphasized the reasonableness of the Mine Act's warrantless inspection scheme in light of "the assurance of regularity" in the text of § 103(a) itself, and the "provision of rules governing the procedures that inspectors must follow," as the linchpin to the scheme's constitutionality. 452 U.S. at 599. The Court distinguished Mine Act § 103(a) from OSH Act § 8(a) because § 103(a) actually sets understandable boundaries. *See* 452 U.S. at 602; *see also id.* at 603 (emphasizing "certainty and regularity" of inspection program); and *id.* at 604 (pointing out operators are made aware in advance of the "limits of [an inspector's] task"). Petitioners get no "certainty and regularity" from *ad hoc* initiatives that only inform operators of what

records to make available for inspection and copying upon MSHA's arrival at the mine.

Not surprisingly, warrantless searches under otherwise lawful warrantless search regimes have been stricken in other contexts, too, civil and criminal, where the searches have *exceeded* the scope of those regimes. In *Showers v. Spangler*, 182 F.3d 165 (3d Cir. 1999), for example, the Third Circuit held that although a taxidermy business was a "highly regulated" one in which all "records" related to the taxidermist's *permit* were open to inspection without a warrant, that did not support a construction of the term "records" that would apply it to *all business records* that the government officer *speculated* might expose some broader criminal activity. *See id.* at 172 & n.10. As the court stated: "Whatever the merits of permitting even limited searches pursuant to administrative regimes, the power to conduct them is *not more extensive than the actual authority vested* in the officers by the administrative regime itself." *Id.* at 172 (emphasis added). The constitutionality of the underlying regulatory scheme turns, after all, on it having a "properly defined scope" that "must *limit the discretion* of the inspecting officers." *New York v. Burger*, 482 U.S. 691, 703 (1987) (emphasis added). *See also United States v. Knight*, 306 F.3d 534, 535-36 (8th Cir. 2002) (holding that officer searching truck pursuant to a regulatory search program, not probable cause, violated driver's constitutional right of privacy when he searched driver's personal briefcase, which was not authorized by the regulation to be searched); *Bevan v. Smartt*, 316 F. Supp. 2d 1153, 1162 (D. Utah 2004) ("It is reasonable to infer that if the statute itself puts owners … on

notice that certain areas of a business are subject to warrantless searches, then the statute simultaneously creates a reasonable expectation that other areas will not be exposed to police intrusion.").

To be clear, we recognize that the warrantless search and seizure *of documents* will not always run afoul of the Fourth Amendment. For example, the statutory provisions at issue in *Colonnade* and *Biswell* specifically authorized the search and seizure of records or documents "required to be kept." *See Biswell*, 406 U.S. at 311-12; *Colonnade*, 397 U.S. at 74 n.1. But this just brings us back to the point made by the D.C. Circuit in *American Mining Congress* that in order to take enforcement action, an enforceable duty must first be created. As Part I explains, MSHA does this through rulemaking.

The Commission essentially turned the Fourth Amendment on its head in upholding the citations, taking the position that because MSHA has given such a broad interpretation to its statutory authority, Petitioners cannot successfully maintain that the audits were unlawful. Indeed, at the oral argument held in this matter, one of the commissioners challenged Petitioners' counsel about the merits of Petitioners' case in light of how "*staggeringly broad*" § 50.41 is worded. AR 877 (emphasis added). Far from this broadly worded regulation providing the solution, however, Petitioners' counsel responded that the staggering broadness was *the* problem – it is an unconstitutionally broad blunderbuss, AR 877-878, and gives rise to the very type of unpredictability that the Supreme Court was trying to foreclose in *Marshall v. Barlow's*, 436 U.S. at 323. *Accord Camera v. Mun. Court of the City*

*and Cnty. of San Francisco*, 387 U.S. 523, 532-33 (1967) (holding unconstitutional a warrantless search protocol authorized by local housing code that left the occupants subject to the discretion of the official in the field).

The Commission contented itself, however, that operators remain free to refuse to comply with audits, take a citation, and then seek relief *at the Commission* on a case-by-case basis on grounds MSHA had abused its discretion in determining what was "reasonable and necessary" under the circumstances. RSA 29. As noted *supra* at 23-24, this formulation is fraught with injustice. For one thing, it will put Commission ALJs repeatedly on the front line of constitutional objections in painstakingly slow enforcement proceedings, making judicial review at best a long-term proposition (this "expedited" case the perfect example). However innocuous it may be for the Commission to entertain Constitution-based defenses now and again in run-of-the-mill enforcement cases, *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215 (1994), it would surely be odd to expect this *mine safety and health* tribunal to develop a unique strain of Fourth Amendment jurisprudence. Moreover, the privacy interests that will be at the heart of many, if not every one, of the controversies that will inevitably arise will time and again be compromised because, when faced with civil enforcement and mandatory penalties, and even more so with *daily* penalties, most operators will capitulate. Miners, for their part, will have no say in protecting their records. The Commission's view would thus permit an MSHA inspector to "inspect and copy" literally *anything* in an operator's custody, subject only to *post-hoc*, largely meaningless contests at the Commission. This process

- 43 -

would deny operators even those privacy protections afforded by immediate federal court review under § 108, which the *Donovan* Court cited as a basis for upholding the constitutionality of § 103(a). *See* 452 U.S. at 604-05.

## III. MSHA's Audit Demands At Petitioners' Mines Conflict With Other Laws Protective Of Individual Privacy.

Petitioners also objected to MSHA's audit demands because they would potentially cause Petitioners to run afoul of other federal laws that in important respects are protective of individual privacy, including the ADA and the FMLA, *inter alia*, as well as Indiana and Illinois common law (invasion of privacy) and statutes. *See* Indiana Code § 22-9-5-20 and 910 IAC § 3-3-11; 410 ILCS §§ 513/15 and 40; 410 ILCS §§ 305/1, *et seq.*; *Ainsworth v. Century Supply Co.*, 295 Ill. App. 3d 644, 648 (Ill. App. Ct. 1998) (invasion of privacy); *Wynne v. Loyola Univ. of Chicago*, 318 Ill. App. 3d 443, 453 (Ill. App. Ct. 2000) (same). The ADA and FMLA pose a particular concern to Petitioners because those laws touch so many of the records within the scope of MSHA's audit.

The ADA requires that information regarding the medical condition or history of any employee collected by an employer be treated as confidential. *See* 29 C.F.R. §§ 1630.14(b)-(c). Although there are several exceptions, MSHA's Part 50 audit requests do not fall within any of them. *See id.* The FMLA similarly requires protecting an employee's health information, and none of the exceptions to that rule apply here, either. *See* 29 C.F.R. § 825.500(g).

This is where the lack of prior rulemaking on the specific issue of whether and to what extent operators are required to maintain certain records which MSHA

seeks comes into full relief. Because Petitioners are not required to maintain the records that MSHA is demanding to see, their records-management systems are not compatible with MSHA's demands and compliance potentially would require disclosure of information protected by the ADA and FMLA, among other laws. *See* AR 230-231, 236-239, 245-246; *see also* AR 477-478 ¶ 3. Given the well-known obligations of the ADA and FMLA, Petitioners felt legally obligated, when confronted with the novel and *ad hoc* Part 50 initiative, to say "no" to MSHA's demands.

Citing this Court's decision in *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000), the most the Commission could say on this issue that the ADA was not a legitimate concern because Petitioners "may" have an affirmative defense under the governing regulation to any liability that would otherwise flow from the disclosure of the sought-after records to MSHA. RSA 29 (citing 29 C.F.R. § 1630.15(e)). This assurance from the Commission – no expert in the ADA – rests on flimsy logic and offers little comfort to Petitioners. It should suffice to point out that any defense is conditional at best, meaning that even if Petitioners interpreted § 50.41 as MSHA does to require the disclosure of private information *in this or some other particular case*, and thus raised that as a defense in some future ADA case brought against them by aggrieved miners, the defense fails upon a *post hoc* showing by the ADA plaintiff that Petitioners misinterpreted the law and disclosed more than was necessary under the circumstances. *See*, *e.g.*, *Cleary v. Fed. Express Corp.*, 313 F. Supp. 2d 930 (E.D. Wis. 2004) (rejecting employer's defense based on

its interpretation of other federal law justifying alleged ADA violation); *cf. E.E.O.C. v. Murray, Inc.*, 175 F. Supp. 2d 1053, 1066-67 (M.D. Tenn. 2001) (denying employer's motion for summary judgment where applicability of other federal law defense turned on a disputed question of material fact). If nothing else, having at best an affirmative defense would still result in substantial defense costs.

Similar problems arise with the FMLA. The Commission cited a regulation that creates an exception for records disclosed to government agencies "investigating compliance with the FMLA (or other pertinent law)." RSA 30. There are at least two problems with this. First, it assumes the answer to the question, *i.e.*, that MSHA has the broad audit authority that it claims. But irrespective of the outcome of this case, Petitioners had a good-faith belief when confronted for the first time in October 2010 with MSHA's audit demands that MSHA did not have such vast authority.[3] Second, the Commission failed to provide any supporting authority for the proposition that a Part 50 audit constitutes a "pertinent law" as used in the FMLA regulation, instead treating the reference to "other *pertinent* law" as a reference to *any* other law. The interpretation makes little sense because the Mine

---

[3] This Court can take judicial notice that three of the four Commissioners who joined the majority opinion stated in a public meeting held on October 13, 2011, that notwithstanding their individual views of the merits of Petitioners' argument, Petitioners at the very least had a good-faith basis to contest the citations, and that coercive daily penalties should *not* have been threatened. *See http://www.fmshrc.gov/new/meetings.html* (audio of meeting of October 13, 2011) (comments of Commissioners Young, Nakamura, and Cohen) (last visited Aug. 21, 2012).

Act is not "pertinent" to FMLA compliance; and (2) MSHA's Part 50 *audit* is not an "investigation."

Finally, citing Mine Act § 506(a), 30 U.S.C. § 955(a), the Commission considered the state law provisions preempted. RSA 30. But § 506(a) preempts state provisions that conflict with the Mine Act or any "mandatory health or safety standard." As noted, 30 C.F.R. § 50.41 is not a mandatory standard and, for its part, Mine Act § 103(h) on its face is not self-executing, so the preemption clause of Mine Act § 506(a) is not implicated by either provision. In any event, MSHA's self-serving opinion on the preemptive effect of its Part 50 audit is not entitled to deference and should be dismissed here. *See*, *e.g.*, *Wyeth*, 129 S. Ct. at 1201-04; *see also id.* at 1204 (Breyer, J., concurring); *City of Joliet, Ill. v. New W., L.P.*, 562 F.3d 830, 837 (7th Cir. 2009).

Given their potential legal exposure under these other laws, when Petitioners were confronted with MSHA's entirely unfamiliar audit initiative in October 2010 and the self-interested word of an agency official brandishing a preamble to HIPAA regulations and telling them, in effect, "don't worry, the records are relevant and necessary to what we do," they understandably believed the ADA and FMLA required that they object. These are among the legitimate, competing interests MSHA must address in a rulemaking.

## IV. MSHA Is Not Entitled to Deference.

Although the Commission purported to reach its decision based on its own interpretation of the Mine Act, RSA 15 n.9, MSHA will certainly urge this Court – as it did the Commission – to defer to its interpretation of Mine Act § 103(h)

and 30 C.F.R. § 50.41 under the principles announced in *Chevron* and *Auer v. Robbins*, 519 U.S. 452 (1997), to the extent the Court finds ambiguity in either. Because Mine Act § 103(h) is unambiguous when read in the context of the Mine Act as a whole, and does not permit MSHA to inspect and copy private records without at least first promulgating a rule requiring operators to maintain such records, deference is inappropriate. But to the extent ambiguity were found, deference would still be inappropriate for several reasons.

First, this Court has not deferred to agency interpretations of governing statutes that would expand their enforcement jurisdiction. *See Northern Illinois Steel*, 294 F.3d at 847. The same wisdom that informs the rule recognized in *Northern Illinois Steel* applies here. This is, simply, a question of pure statutory interpretation concerning the scope of MSHA's authority – it is thus for the Court to decide without regard to MSHA's self-interested view of the matter.

Second, deference here would essentially mean deference, at least in part, to MSHA's and the Commission's interpretation of the Fourth Amendment. Not only has constitutional interpretation long been held to be uniquely within the province of the federal courts, *see Pub. Utilities Comm'n of Calif. v. United States*, 355 U.S. 534, 539 (1958), but courts (including this one) routinely decline to give deference to agency constructions of statutory or regulatory provisions that raise serious constitutional questions. *See*, *e.g.*, *Kohler Co. v. Moen Inc.*, 12 F.3d 632, 634 n.2 (7th Cir. 1993) ("It is a basic canon of statutory interpretation that a court should not defer to an agency's interpretation of a statute that raises serious constitutional

- 48 -

concerns if 'there is another interpretation, not raising these serious constitutional concerns, that may be fairly ascribed to [the statute].") (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 577 (1988)).

Third, and in any event, courts do not – as a prudential matter – defer to agency interpretations unless, as an irreducible minimum, the record reflects that the position the agency is taking is the product of its "fair and considered judgment on the matter." *Christopher*, 132 S. Ct. at 2166. Here, from the beginning, MSHA's position has reflected an *ad hoc*, shot-gun approach to the agency's interpretation and application of its Mine Act authority, first in its manner of enforcement at two Petitioners' mines (issuing multiple versions of the demand letters and invoking HIPAA as authority), then in the manner by which the agency tried to back-fill freshly minted privacy protections into its position on the eve of trial (JA 30; AR 462), and finally in the shifting and ever-evolving arguments raised by MSHA's counsel in defense of the government's position.  For example:

- In its pre-hearing memorandum of law, MSHA argued that it was entitled to see any records regardless of whether they were specifically required to be kept by statute or regulation, AR 144-145, but after being confronted with the 1987 opinion letter of MSHA's chief legal officer (discussed *supra* at 32-33) which said exactly the opposite, JA 76, it changed its position in its post-hearing brief to contend that it had, in fact, already conducted the necessary rulemaking in 1978, consistent with the 1987 opinion of its top lawyer. AR 502-503, 513-514. Then, while briefing its position to the Commission, it stated for the first time that the 1987 opinion had been repudiated. AR 1049.

- In four submissions, three to the ALJ and one to the Commission, MSHA argued in defense of its position that the Privacy Act protected the information it sought to obtain. AR 152, 554, 572, 825. In a

subsequent brief to the Commission, however, it acknowledged that, in fact, the Privacy Act did not even apply to the records. AR 843W n.7.

- At oral argument on Petitioners' application for temporary relief, counsel for MSHA was unable even then to fully articulate MSHA's position on the privacy protections it had put into place (nearly eight months earlier) for the records it was seeking, and had to respond to the Commission's questions in two supplemental written responses. AR 960A-960Q.

No aspect of MSHA's conduct in this case has been "fair and considered." *Accord* RSA 43 n.6.

Finally, deference is no more due under *Auer* to MSHA's interpretation of its regulation at issue, 30 C.F.R. § 50.41, than it is under *Chevron* to its interpretation of Mine Act § 103(h). As a threshold matter, the Court need not even consider § 50.41 because it should find that § 103(h) does not permit MSHA's actions. But on its own merits, MSHA's current view of § 50.41 should be rejected because the regulation is written so broadly that it would, if given deference, essentially allow MSHA to see any record at a mine, the very problem at the heart of *Marshall v. Barlow's*.

The dissenting Commissioner pointed out the dubious benefit of the majority's view that operators could still contest citations for alleged violations of § 50.41 as overbroad on a case-by-case basis at the Commission given the Secretary's argument "that she is owed great deference on the matters of reasonableness and relevance." RSA 43 ("Under such circumstances, judicial review becomes something of an empty exercise with a predetermined outcome."). The dissenting Commissioner could have been writing for the Supreme Court which, in the more recently decided *Christopher v. SmithKline Beecham* case, denied *Auer*

deference to the Secretary of Labor's interpretation of her regulations implementing the Fair Labor Standards Act ("FLSA") out of a reluctance to further facilitate the "risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby frustrating the notice and predictability purposes of rulemaking." 132 S. Ct. at 2168 (citation and internal quotation marks omitted).

Finally, we note an oddity to the timing of MSHA's various purported interpretations of § 50.41 that is not unlike that which this Court found troubling in another recent case, *Sandifer v. U.S. Steel Corp.*, 678 F.3d 590 (7th Cir. 2012). Even if the preamble to the original Part 50 rules is to be viewed as MSHA's understanding of its authority at that time, then it would mean that in the Carter Administration the Mine Act meant one thing; in the Reagan Administration it meant another, given the 1987 Clair opinion letter and its reliance on the *Sewell* decision as the definitive view of § 50.41; and now in the Obama Administration it again means what the Carter Administration said it meant. Noting a similar political gyration in *Sandifer*, this Court refused to give deference. *See id.* at 599. It should similarly decline deference here.

## CONCLUSION

For the reasons stated, the Commission's decision should be reversed and the contested citations and orders vacated.

Respectfully submitted,

/s/ Daniel W. Wolff
Thomas C. Means
Daniel W. Wolff
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500

*Attorneys for Petitioners*
Big Ridge, Inc. and Peabody
Midwest Mining, LLC

September 4, 2012

## REQUEST FOR ORAL ARGUMENT

Petitioners respectfully request that the Court hear oral argument in this case given the important and unsettled questions of law that this case raises.

## CERTIFICATE OF COMPLIANCE

The foregoing Brief was prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 12-pt Century Schoolbook font and contains 13,882 words, and therefore complies with the type-face requirement of Cir. R. 32(b), the type-style requirement of Fed. R. App. 32(a)(6), and the type-volume limitation of Fed. R. App. 32(a)(7)(B).

/s/ Daniel W. Wolff
Daniel W. Wolff

**CERTIFICATE OF SERVICE**

I certify that on September 4, 2012, a copy of the foregoing Brief was electronically filed with the Clerk of Court for the U.S. Court of Appeals for the Seventh Circuit by using the Court's CM/ECF system.  I certify that all participants in the case are represented by attorneys who are registered CM/ECF users with this Court and that service on such participants will be accomplished by CM/ECF system service on the following:

John T. Sullivan, Esq.
Office of General Counsel
Federal Mine Safety and Health Review Commission
601 New Jersey Ave., N.W.
Washington, D.C.  20001

Robin A. Rosenbluth, Esq.
Mine Safety and Health Division
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Boulevard
22nd Floor West
Arlington, VA  22209-2296

James Lastowka, Esq.
Arthur Sapper, Esq.
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, D.C.  20005-3096

/s/ Daniel W. Wolff
Daniel W. Wolff

## CIRCUIT RULE 30(d) STATEMENT

Undersigned Counsel for Petitioners certifies that all materials required by Circuit Rules 30(a) and (b) are included in the short appendix set out below and bound with Petitioners' Brief and the separate Stipulated Joint Appendix.


/s/ Daniel W. Wolff
Daniel W. Wolff

# **REQUIRED SHORT APPENDIX**

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

601 NEW JERSEY AVENUE, N.W.
SUITE 9500
WASHINGTON, DC 20001-2021

## MAY 2 4 2012

| | | |
|---|---|---|
| BIG RIDGE, INC. | : | Docket Nos. LAKE 2011-116-R |
| | : | LAKE 2011-117-R |
| v. | : | |
| | : | |
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| PEABODY MIDWEST MINING, LLC | : | Docket Nos. LAKE 2011-118-R |
| | : | LAKE 2011-119-R |
| v. | : | |
| | : | |
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| INDEPENDENCE COAL COMPANY, INC. | : | Docket Nos. WEVA 2011-402-R |
| | : | WEVA 2011-403-R |
| v. | : | |
| | : | |
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | |
| | : | |
| | : | |
| | : | |
| INMAN ENERGY CORPORATION | : | Docket Nos. WEVA 2011-398-R |
| | : | WEVA 2011-399-R |
| v. | : | |
| | : | |
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | |
| | : | |

12-05-20

RSA-1

PROCESS ENERGY     : Docket Nos. KENT 2011-255-R
             :        KENT 2011-256-R
             :
    v.         :
             :
SECRETARY OF LABOR,    :
 MINE SAFETY AND HEALTH  :
 ADMINISTRATION (MSHA)   :
             :
             :
             :

SPARTAN MINING COMPANY   : Docket Nos. WEVA 2011-540-R
             :        WEVA 2011-541-R
             :
    v.         :
             :
SECRETARY OF LABOR,    :
 MINE SAFETY AND HEALTH  :
 ADMINISTRATION (MSHA)   :
             :
             :
             :

ROAD FORK DEVELOPMENT COMPANY : Docket Nos. KENT 2011-305-R
             :        KENT 2011-306-R
             :
    v.         :
             :
SECRETARY OF LABOR,    :
 MINE SAFETY AND HEALTH  :
 ADMINISTRATION (MSHA)   :
             :
             :
             :

KNOX CREEK COAL CORPORATION  : Docket Nos. VA 2011-386-R
             :        VA 2011-387-R
             :
    v.         :
             :
SECRETARY OF LABOR,    :
 MINE SAFETY AND HEALTH  :
 ADMINISTRATION (MSHA)   :

2

BEFORE: Jordan, Chairman; Duffy, Young, Cohen, and Nakamura, Commissioners

## DECISION

BY: Jordan, Chairman; Young, Cohen, and Nakamura, Commissioners

These cases involve two sets of consolidated contest proceedings arising under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (2006) ("Mine Act" or "Act").[1] The Secretary of Labor ("Secretary") issued citations alleging violations of 30 C.F.R. § 50.41,[2] and failure to abate orders to Big Ridge, Inc., and Peabody Midwest Mining, LLC (jointly "Peabody" or "Peabody Petitioners") for refusal to turn over records containing medical and payroll information to inspectors of the Department of Labor's Mine Safety and Health Administration ("MSHA"). The Secretary considered the records necessary to determine compliance with regulatory reporting requirements. The Secretary issued substantively similar citations and orders to Independence Coal Company, Inc., Inman Energy Corporation, Process Energy, Spartan Mining Company, Road Fork Development Company, and Knox Creek Coal Corporation (jointly "Massey" or " Massey Petitioners").[3]

---

[1] Pursuant to Commission Procedural Rule 12, on our own motion, we hereby consolidate the above-listed dockets, all involving similar issues. 29 C.F.R. § 2700.12.

[2] Section 50.41 states that:

> Upon request by MSHA, an operator shall allow MSHA to inspect and copy information related to an accident, injury or illnesses which MSHA considers relevant and necessary to verify a report of investigation required by § 50.11 of this part or relevant and necessary to a determination of compliance with the reporting requirements of this part.

30 C.F.R. § 50.41.

[3] Citation No. 6670852, issued to Peabody's Air Quality No. 1 Mine, provides in part:

> Mike Middlemas, Safety Manager, refused to permit an Authorized Representative of the Secretary of Labor to inspect and copy information to determine compliance with the reporting requirements related to accidents, injuries, or illnesses at the Air Quality (Mine ID 12-02010). The requested documents include medical records. Doctor slips, worker compensation filings, sick leave request or reports, emergency medical claims forms relating to accidents, injuries, or illnesses that occurred at the mine or may

3

Administrative Law Judge Kenneth Andrews, in two separate decisions, upheld the citations and orders upon finding that each of the operators had violated section 50.41 when they failed to cooperate with a 30 C.F.R. Part 50 audit by refusing to provide the requested information. 33 FMSHRC 1306, 1323 (May 2011) (ALJ); 33 FMSHRC 1387, 1404 (May 2011) (ALJ).[4] Peabody and Massey subsequently filed petitions for discretionary review challenging the judge's decisions, which the Commission granted.

On July 1, 2011, Peabody filed an Application for Temporary Relief from the failure to abate orders. On July 15, the Commission stayed enforcement of the orders until August 5, 2011. Shortly thereafter, various miners ("Intervenors") objecting to the Secretary's audit requests collectively filed, through counsel, an unopposed motion to intervene, which was granted by the Commission. On August 4, 2011, the Commission heard oral argument on the application for temporary relief. By order dated August 5, 2011, the Commission lifted the stay ordered on July 15 and ultimately denied Petitioners' application on the basis that the conditions for the extraordinary remedy of temporary relief pursuant to section 105(b)(2) of the Mine Act, 30 U.S.C. § 815(b)(2), had not been met. Unpublished Order dated Aug. 5, 2011.

The principal questions before us are: (1) whether the Secretary possesses the authority pursuant to section 103(h) of the Mine Act, 30 U.S.C. § 813(h),[5] and 30 C.F.R. § 50.41, to

---

> have resulted from work at the mine for the period currently being audited (07/01/2009 – 06/30/2010). MSHA considers this information relevant and necessary to determine compliance with the reporting requirements of 30 CFR, Part 50.

S. Ex. G-10. The citations and orders issued to the remaining operators are essentially the same with the exception of the specific mine details. *See* 33 FMSHRC 1306, 1310 (May 2011) (ALJ); 33 FMSHRC 1387, 1391-92 (May 2011) (ALJ); S. Exs. G-11, 13. The citations issued to Peabody were later modified, to include time sheets and payroll records. Exs. G-14-15.

[4] In both decisions, Judge Andrews stated that "[s]eparate hearings were held due to the distant location of these groups of mines, but for all major purposes, counsel treated them all as one large, related case." 33 FMSHRC at 1307 n.1; 33 FMSHRC at 1389 n.1.

[5] Section 103(h) reads:

> In addition to such records as are specifically required by this chapter, every operator of a coal or other mine shall establish and maintain such records, make such reports, and provide such information, as the Secretary . . . may reasonably require from time to time to enable him to perform his functions under this chapter.

30 U.S.C. § 813(h).

4

inspect and copy records, including personal medical information, not specifically required to be maintained by the Mine Act or its implementing regulations; and (2) whether the records sought by the Secretary in the subject proceedings are relevant and necessary to determine compliance with the reporting requirements of Part 50.

For the following reasons, we affirm the judge's decisions. We hold that, pursuant to the plain language of section 103(h) of the Mine Act and the regulatory language of section 50.41, the Secretary did not exceed her authority, and that the operators are required to make available the requested records even though they are not specifically required to be maintained by the Act. We conclude that the requested records and information are relevant and necessary to the Secretary's function of verifying operator compliance with Part 50 reporting requirements. We also hold that the request does not violate any right to privacy, the Fourth Amendment right to protection against warrantless searches, or the Fifth Amendment right to due process. Lastly, we conclude that the Secretary's request does not conflict with any other federal statutes or state law.[6]

I.

**Factual and Procedural Background**

Big Ridge, Inc. operates the Willow Lake Portal Mine in Illinois, and Peabody Midwest operates the Air Quality # 1 Mine in Indiana. Peabody Tr. 52, 124, 131-32. Both mines are underground coal mines regulated by MSHA Coal District 8. Big Ridge and Peabody Midwest are subsidiaries of Peabody Energy Corporation. 33 FMSHRC at 1308.

Independence Coal operates the Justice No. 1 Mine, Inman Energy Corporation operates the Randolph Mine, and Spartan Mining Company operates the Road Fork No. 51 Mine, all located in West Virginia. *See* 33 FMSHRC at 1389-90. Knox Creek Coal Corporation operates the Coal Creek Prep Plant located in Virginia. *Id.* Process Energy operates Mine No. 1 and Road Fork Development Company operates the Love Branch South Mine, both located in

---

[6] The penalty cases associated with Docket No. WEVA 2011-402-R for Independence Coal, and Docket No. VA 2011-386-R for Knox Creek Coal, were settled on March 7, 2012, as part of the global settlement agreement between MSHA and Alpha Natural Resources, Inc. The penalty cases are Docket Nos. WEVA 2011-811 for Independence Coal, and VA 2011-532 for Knox Creek Coal. It is well-established that the fact of violation cannot be contested once the proposed penalty has intentionally been paid. *See I O Coal Co.*, 31 FMSHRC 1346, 1354 (Dec. 2009); *Dacotah Cement*, 23 FMSHRC 31, 32 (Jan. 2001); *Old Ben Coal Co.*, 7 FMSHRC 205, 209 (Feb. 1985). Therefore, the contest docket No. WEVA 2011-402-R and No. VA 2011-386-R, are now moot and are hereby dismissed.

5

Kentucky. *Id.* During the relevant time period, each of the six aforementioned companies was a subsidiary of Massey Energy Company. *Id.*

In October 2010, MSHA began a nationwide initiative to conduct 39 audits to verify operator compliance with Part 50 reporting requirements. 33 FMSHRC at 1308; 33 FMSHRC at 1390. In furtherance of that initiative, MSHA inspectors appeared at the Willow Lake and Peabody Air Quality #1 mines on more than one occasion, requesting that the operators furnish certain documents. 33 FMSHRC at 1308; Peabody Exs. A and D; S. Br. at 2. During the period between October 2010 and April 2011, MSHA made the same request to Massey regarding its six mines. 33 FMSHRC at 1390; S. Br. at 2.

In late October 2010, MSHA began issuing amended request letters to each of the mines which superseded the previous requests. 33 FMSHRC at 1308; 33 FMSHRC at 1390. The letters provided in pertinent part:

> Please have the following information and documentation available for review . . . . The documents should cover the period beginning July 1, 2009 through June 30, 2010.
>
>> 1. All MSHA Form 7000-1 Accident Reports
>>
>> 2. All quarterly MSHA Form 7000-2 Employment and Production Reports
>>
>> 3. All payroll records and time sheets for all individuals working at your mine for the covered time period
>>
>> 4. The number of employees working at the mine for each quarter
>>
>> 5. All medical records, doctor's slips, worker compensation filings, sick leave requests or reports, drug testing documents, emergency medical transportation records, and medical claims forms in your possession relating to accidents, injuries, or illnesses that occurred at the mine or may have resulted from work at the mine for all individuals working at your mine for the period of July 1, 2009 through June 30, 2010.
>
> "In your possession" means within your mine's possession or within the control, custody, or possession of another entity or person from whom you have authority to obtain the required records. If any of the required records are in the exclusive possession of any other entity or person from

6

who you do not have authority to obtain the required records, you must so
certify and identify the entity or person who has exclusive possession.

33 FMSHRC at 1308-09; 33 FMSHRC at 1391.

All mines provided MSHA with the 7000-1 and 7000-2 forms and the number of
employees. 33 FMSHRC at 1308-09; 33 FMSHRC at 1392; S. Br. at 3. However, Peabody's
counsel responded by letters dated October 28 and 29, 2010, informing MSHA that Peabody
would not provide MSHA with access to the information outlined in request numbers 3 and 5
due to privacy concerns. 33 FMSHRC at 1309. Counsel for Massey also responded and
expressed concerns about the requests for medical records. 33 FMSHRC at 1391.[7] Both
counsels indicated that they would welcome further discussion with MSHA, but conditioned
such discussion on MSHA's cooperation in furnishing information regarding how the record
demands could be narrowed to accommodate MSHA's legitimate audit concerns without
jeopardizing privacy rights of employees, or revealing confidential business information.
33 FMSHRC at 1309; Massey PDR at 6.

Due to Peabody's and Massey's refusals, MSHA issued two citations to the Peabody
petitioners and six citations to the Massey petitioners for failing to provide the requested
information for the related mines in violation of section 50.41. 33 FMSHRC at 1309-10;
33 FMSHRC at 1392; S. Br. at 3. After the operators continued to refuse to furnish the
information, MSHA issued orders pursuant to section 104(b) of the Act, 30 U.S.C. § 814(b), to
each mine for failing to abate the violations. 33 FMSHRC at 1309-10; 33 FMSHRC at 1392; S.
Br. at 3. Peabody and Massey timely contested the citations and orders. 33 FMSHRC at 1310;
S. Br. at 3. The contests were expedited and proceeded to hearings before Judge Andrews on
December 14 and 16, 2010. The Secretary agreed to postpone assessment of civil penalties until
the judge issued his decisions. Peabody Tr. 186-89.

The judge affirmed the citations and orders in separate decisions issued on May 20 and
23, 2011. He found that section 103(h) of the Act and 30 C.F.R. § 50.41 are clear in their
purpose and intent, and that each individually authorizes the Secretary to request information not
specifically required to be maintained by the Act. 33 FMSHRC at 1320-21; 33 FMSHRC at
1401-02. The judge found support in the preamble to section 50.41, which specifically addresses
the Secretary's need to access medical and employment records. 33 FMSHRC at 1321;
33 FMSHRC at 1402. In reaching his conclusion, the judge emphasized that "the complete and
accurate reporting of accidents, injuries, and illnesses occurring at mines is critically important to
the mission of MSHA to protect the health and safety of miners." 33 FMSHRC at 1317;
33 FMSHRC at 1398. He found that, given the particular information flow regarding reportable
incidents at the mines, there is a potential for relevant incidents or information to go unreported
to the mines' safety managers. 33 FMSHRC at 1315-16; 33 FMSHRC at 1396-97. He also

---

[7] Since filing its PDR on June 22, 2011, Massey has submitted the requested information
to MSHA. *See* Oral Arg. Tr. 47.

7

noted that if an operator possessed the sole power to control the flow of information to MSHA, there would be an incentive to under-report injury and illness information. 33 FMSHRC at 1316; 33 FMSHRC at 1397. The judge concluded that because legislative rulemaking had already taken place in 1977, no additional rulemaking was necessary to enable the Secretary to exercise this particular authority. 33 FMSHRC at 1322; 33 FMSHRC at 1403.

Although the judge acknowledged the highly sensitive nature of the disputed records, he found that the governmental interests of MSHA override the privacy concerns raised by the operators and its employees. 33 FMSHRC at 1320; 33 FMSHRC at 1401. The judge concluded that MSHA, as a public health agency, possesses the authority to obtain information to determine compliance with the Mine Act. 33 FMSHRC at 1321; 33 FMSHRC at 1402. He found that, when it is related to occupational safety and health, the disclosure of private medical information to MSHA is a reasonable exercise of government responsibility for the public welfare and does not violate any rights or liberties protected by the Constitution. 33 FMSHRC at 1320, 1322; 33 FMSHRC at 1401, 1403. Given that mining is a pervasively regulated industry, the judge concluded that under the clear language of section 103(h), neither Peabody nor Massey could have had a reasonable expectation of privacy in the disputed records. 33 FMSHRC at 1322; 33 FMSHRC at 1403.

The judge also distinguished the present case from *Sewell Coal Co.*, 1 FMSHRC 864 (July 1979) (ALJ), where the Secretary's request was considered by the judge to be a "wholesale warrantless search" of private company records. Judge Andrews found that unlike in *Sewell*, the Secretary requested that the companies produce the records themselves, that she limited the documents in time and scope, and that she is authorized by law to access the records. 33 FMSHRC at 1318-19, 1322; 33 FMSHRC at 1400, 1403. The judge, noting the limitations placed on the request, also rejected the Petitioners' argument that the request was unreasonable, overly broad, and burdensome and concluded that the Secretary appropriately limited the requested records. 33 FMSHRC at 1322-23; 33 FMSHRC at 1403. The judge further determined that the safeguards put in place by MSHA to prevent disclosure of private information were adequate. 33 FMSHRC at 1321; 33 FMSHRC at 1402.

## II.

### Disposition

A.    **Whether the Secretary was authorized to demand production of records not required to be maintained by statute or regulation.**

Petitioners and Intervenors argue that the Secretary may only require the production of documents that are required to be kept by statute or regulation. They assert that the plain language of section 103(h) of the Act and 30 C.F.R. § 50.41 does not grant the Secretary the broad authority to demand access to Petitioners' confidential records. Petitioners, citing *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1109 (D.C. Cir. 1993), maintain that the Secretary must

8

first engage in notice-and-comment rulemaking to create such a duty before it can be enforced. Intervenors assert that it is unreasonable for MSHA to demand production of medical records because section 50.41 does not define MSHA's ability to access such records. Peabody argues that the Secretary's interpretation is owed no deference because this is a purely legal question and does not require consideration of regulatory expertise or policy.

The Secretary responds that the judge properly accepted her interpretation of sections 103(a) and (h) of the Act, as well as section 50.41 of the regulations. She submits that her interpretation (that she may inspect and copy records not required by law to be maintained) is further supported by the preambles of proposed and final rulemaking of section 50.41. The Secretary maintains that unlike in *Sewell*, which involved a request for files that contained both relevant and non-relevant personnel and medical information, the Secretary's present request is in the nature of a *subpoena duces tecum* requiring access to only specified information. She contends that because section 50.41 plainly authorizes her request, and because section 50.41 was promulgated pursuant to notice-and-comment rulemaking, the argument that her request was not reasonable because she did not go through notice-and-comment rulemaking fails. The Secretary argues that Petitioners' interpretation would erroneously limit her authority to access only records, reports, and information specifically required to be maintained by the Act, which would hinder her ability to perform her functions as required by Congress. She states that their interpretation would also render Congress' use of the term "information" superfluous, because if Congress had intended to require operators to provide only documents they were required to maintain, it would have used the term "such records" instead of the more encompassing term "such information" in section 103(h). She asserts that Petitioners' interpretation is inconsistent with the legislative history of section 103(h) because Congress intentionally deleted from the text of the final bill the rulemaking requirement that had appeared in several drafts of the legislation. She argues that even if the language is not plain, her reasonable interpretation is due deference.

1.    30 U.S.C. § 813

In considering the question of statutory construction, our first inquiry is "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *Thunder Basin Coal Co.*, 18 FMSHRC 582, 584 (Apr. 1996). If a statute is clear and unambiguous, effect must be given to its language. *See Chevron*, 467 U.S. at 842-43; *accord Local Union 1261, UMWA v. FMSHRC*, 917 F.2d 42, 44 (D.C. Cir. 1990). Deference to an agency's interpretation of the statute may not be applied "to alter the clearly expressed intent of Congress." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (citations omitted). In ascertaining the "plain meaning" of the statutory language and Congress' intention regarding a specific question at issue, we employ the "traditional tools of statutory construction," including an examination of the statute's text, legislative history, and structure, as well as its purpose. *Id.; Local Union 1261, UMWA*, 917 F.2d at 44; *Coal Emp't Project v. Dole*, 889 F.2d 1127, 1131 (D.C. Cir. 1989); *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997).

9

At the outset, we note that the Secretary has broad authority to conduct inspections and investigations under section 103(a) of the Act. Section 103(a) provides in part that an authorized representative of the Secretary shall conduct inspections and investigations in order to obtain, utilize, and disseminate "information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments" originating in the mines. 30 U.S.C. § 813(a). It also authorizes such inspections and investigations to determine "whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under the subchapter or other requirement of this chapter." *Id.* This language makes clear that the Secretary is authorized to verify operator compliance with the Act and MSHA regulations. The Secretary's audit initiative falls squarely within this function, as it is an important tool in carrying out the duty to determine that operators are providing complete and accurate reports regarding all accidents, injuries, and illnesses occurring at our nation's mines.

The plain language of section 103(h) provides a broad Congressional grant of authority to the Secretary to carry out this audit initiative. Section 103(h) states in pertinent part:

> (h) Records and reports; compilation and publication; availability
>
> *In addition to such records as are specifically required* by this chapter, every operator of a coal or other mine shall establish and maintain such records, make such reports, and provide such *information*, as the Secretary . . . may reasonably require from time to time to enable him to perform his functions under this chapter.

30 U.S.C. § 813(h) (emphasis added). The language of section 103(h) does not limit the Secretary's access only to records that are specifically required to be maintained or prescribed by regulation, but instead gives her authority to request whatever information she deems relevant and necessary. Congress gave clear instructions that "information" that is *not* specifically required to be maintained by the Act shall, nonetheless, be provided to the Secretary to enable her to perform her functions, as long as the request is reasonable. This language effectively expands, rather than restricts, the Secretary's right of access. *See also United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 575 (3rd Cir. 1980) (because a regulation gives NIOSH authority to examine "other related records," which it reasonably regards as records related to the purpose of the investigation, the court would not limit NIOSH's examination of employee medical records to records which must be retained by specific provision of the statute or regulations). As the judge in this case determined, section 103(h) creates "a legitimate basis for enforcement of reporting requirements even without the Part 50 rules." 33 FMSHRC at 1320; 33 FMSHRC at 1401, *citing Am. Mining*, 995 F.2d at 1109.

In addition, the text of section 103(h) is consistent with, and reinforced by, other sections of the Act. For instance, sections 108(a)(1)(E) and (F) state that "the Secretary may institute a civil action for relief . . . whenever such operator or his agent . . . refuses to furnish any information or report requested by the Secretary . . . in furtherance of the provisions of this Act,

10

RSA-10

or refuses to permit access to, and copying of, such records as the Secretary . . . determines necessary in carrying out the provisions of this Act." 30 U.S.C. §§ 818(a)(1)(E), (F). Like section 103(h), sections 108(a)(1)(E) and (F) require that operators provide information to the Secretary without limiting this mandate to information an operator is legally required to maintain.

The legislative history is also instructive. According to the Joint Explanatory Statement included in the Conference Report of the Mine Act, with regard to section 103(h), ". . . the House amendment . . . authorized the Secretary to require records, reports, and other information not otherwise specified by the Act. The conference substitute conforms to the House amendment." S. Rep. No. 95-461, at 47 (1977), *reprinted in* Senate Subcomm. on Labor, Comm. on Human Res., *Legislative History of the Federal Mine Safety and Health Act of 1977*, at 1325 (1978). Thus in resolving issues regarding the scope of the Secretary's authority to require records from operators, Congress chose the House approach, which broadly authorized the Secretary to obtain records and other information not otherwise specified by the Act. Significantly, Congress rejected earlier proposed versions of this section, which had limited the Secretary's access to operators' records to those specific records which the Secretary had "prescribe[d] by regulation." S. 717, 95th Cong., at 20, *reprinted in Leg. Hist.* at 129; H.R. 4287, 95th Cong., at 20, *reprinted in Leg. Hist.* at 207.

Courts of appeals have recognized the broad scope of section 103(h). In *Energy West Mining Co. v. FMSHRC*, 40 F.3d 457 (D.C. Cir. 1994), the court affirmed the Commission's decision that MSHA could reasonably require the reporting of an accident involving a miner's personal automobile on mine property before the start of the work shift. The court stated, "[t]he Mine Act grants a broad delegation to the Secretary . . . 'to perform [her] functions under this chapter.' 30 U.S.C. § 813(h)." *Id.* at 461.

Hence, given the plain meaning of section 103, particularly read in the context of other sections and the legislative history, we conclude that the Secretary did not exceed her statutory authority by demanding the information outlined in numbers 3 and 5 of her request.

2.    30 C.F.R. § 50.41

In considering the Secretary's authority under the Part 50 regulations, we recognize that where the language of a regulatory provision is clear, the terms of that provision must be enforced as they are written, unless the regulator clearly intended the words to have a different meaning, or unless such a meaning would lead to absurd results. *Jim Walter Res., Inc.*, 28 FMSHRC 983, 987 (Dec. 2006) (quoting *Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir. 1987) (citation omitted)); *Alan Lee Good,* 23 FMSHRC 995, 997 (Sept. 2001); *Lopke Quarries, Inc.*, 23 FMSHRC 705, 707 (July 2001); *Jim Walter Res., Inc.*, 19 FMSHRC 1761, 1765 (Nov. 1997).

11

RSA-11

The purpose of Part 50 is "to implement MSHA's authority to investigate, and to obtain and utilize information pertaining to accidents, injuries, and illnesses occurring or originating in mines." 30 C.F.R. § 50.1. Consequently, operators are required to report to MSHA every accident, injury, and illness on a 7000-1 form. 30 C.F.R. § 50.20(a). They are also required to report the average number of employees working and the total employee-hours worked during the quarter on a 7000-2 form. 30 C.F.R. § 50.30 & 30-1(g). MSHA is tasked with using the information to develop rates of injury occurrence or incident rates ("IR"). 30 C.F.R. § 50.1. In particular, MSHA determines national incidence rates, averages, and severity rates, which can be compared to the rates at a particular mine. 33 FMSHRC at 1317. The IR is calculated by the total number of occupational injuries, illnesses, and accidents reported in a calendar quarter, multiplied by a constant 200,000, and divided by the total number of employee-hours worked during the quarter. 30 C.F.R. § 50.1; *see Energy West Mining Co.*, 15 FMSHRC 587, 591 (Apr. 1993); *Consol. Coal Co.*, 14 FMSHRC 956, 959 (June 1992). These incident rates provide a general picture of the safety record of a mine operator. *Energy West*, 15 FMSHRC at 591.

The text of section 50.41 reinforces the Secretary's authority, as well as the operator's responsibility, in that it spells out the role each must play in determining compliance with Part 50. As noted above, it provides that:

> Upon request by MSHA, an operator shall allow MSHA to inspect
> and copy information related to an accident, injury or illnesses
> which MSHA considers relevant and necessary to verify a report of
> investigation required by § 50.11 of this part or relevant and
> necessary to a determination of compliance with the reporting
> requirements of this part.

30 C.F.R. § 50.41.

Thus, section 50.41 requires that operators provide MSHA with access to "information" related to accidents, injuries, or illnesses occurring at their mines. The only limitation on the Secretary's authority is that the information must be "relevant and necessary" to a determination of Part 50 compliance. Like section 103(h) of the Act, section 50.41 of MSHA's regulations lacks any language restricting the Secretary's access to any particular documents.

The preambles to the proposed rule and final rule for section 50.41 provide strong support for the Secretary's broad right of access, as they discuss the very documents requested by the Secretary in this case. The preamble to the proposed rule explains the scope of authority of the Mining Enforcement and Safety Administration ("MESA") (the predecessor to MSHA) to request certain information, as well as the importance of operator cooperation:

> Section 50.41 requires operators to allow MESA to inspect or copy
> any information the agency thinks may be relevant and necessary
> for verification of reports or for determination of compliance with

12

> Part 50. In effect, it allows MESA to copy company medical
> records, employment records, and other company information.
>
> MESA believes that this provision is necessary if it is to be able to
> develop epidemiologic data essential to development of effective
> health standards. It is also necessary if MESA is to be able to
> discover instances of intentional violation of statutory or regulatory
> requirements. It will allow MESA to control the data flow, rather
> than depend upon operator filtered records.

42 Fed. Reg. 55568, 55569 (Oct. 17, 1977). The preamble to the final rule further states:

> Without inspection of records beyond those required to be kept it is
> impossible to verify the required records. The Secretary's power to
> acquire information related to h[er] functions under the Coal Act
> and the Metal Act is not limited to any particular records. Section
> 111(b) of the Coal Act and § 13 of the Metal Act explicitly
> authorize analysis of other information related to h[er] functions,
> and only the Secretary, subsequent to inspection and copying, can
> determine relevance. This is particularly important in development
> of an epidemiologic data base, where information not reported on a
> Part 50 form can help identify disease related agents or practices.

42 Fed. Reg. 65534, 65535 (Dec. 30, 1977).

The preamble to the proposed rule plainly illustrates that the Secretary intended section
50.41 to provide access to operator medical records when necessary to determine compliance,
develop epidemiologic data, and uncover instances of intentional violations of the Act. It
confirms that the term "any information" includes company medical records, employment
records, and any other company information the Secretary deems relevant and necessary. *See* 42
Fed. Reg. at 55569. The preamble to the final rule explains that barring the Secretary from
access to "records beyond those required to be kept" would make it impossible to verify the
required records. 42 Fed. Reg. at 65535. It also plainly states that the "Secretary's power to
acquire information related to h[er] functions under the . . . Act . . . *is not limited to any
particular records*." *Id.* (emphasis added).

Consistent with the judge's determination, we conclude that 30 C.F.R. § 50.41 plainly
requires that operators provide the Secretary with access to the disputed records and information
for the purpose of verifying operator compliance with Part 50.

In addition, because section 50.41 was promulgated more than 30 years ago pursuant to
notice-and-comment rulemaking, and section 50.41 grants the Secretary access to the disputed
records, we reject Petitioners' argument that additional notice-and-comment rulemaking is

13

necessary to enforce section 103(h). The very concerns raised by Petitioners here (including, as discussed below, the privacy concerns) were discussed in the preambles and, therefore, considered by the agency in making a reasoned determination on the applicability of the statute and regulations to the records discussed therein.[8]

### 3.    Commission Case Law

Petitioners assert that the decisions in *Sewell Coal*, 1 FMSHRC at 869-72, and *Peabody Coal Co.*, 6 FMSHRC 183, 186 n.5 (Feb. 1984), support their claim that the Secretary cannot require the production of documents which the statute does not require them to maintain.

Our conclusion that the Secretary did not exceed her authority under section 103 of the Mine Act or section 50.41 of her regulations by requiring the operators to disclose the disputed information is consistent with relevant precedent. In *BHP Copper, Inc.*, 21 FMSHRC 758, 759 (July 1999), an operator refused the Secretary's request to provide an injured miner's telephone number and address after a serious accident. The Commission concluded that BHP's refusal to disclose the employee's address and telephone number violated section 103(a) of the Mine Act. *Id.* at 769. While noting that its holding was fact-specific and did not address the disclosure of other information not at issue in that case, *id.* at 767 n.15, the Commission stated that nothing in section 103(a) or any other section of the Mine Act limits the Secretary's investigative powers to accessing only information required to be maintained by regulation. *Id.* at 766.

---

[8] Petitioners also argue that MSHA must undertake additional notice-and-comment rulemaking because its current position is inconsistent with an interpretation of Part 50 contained in a letter authored by a Department of Labor official. In 1987, former Associate Solicitor of Labor for Mine Safety, Edward P. Clair, responded to an inquiry regarding MSHA's authority to inspect payroll and personal files containing medical information during Part 50 audits. Joint App. for Temp. Relief Ex A.14. In the letter, Mr. Clair stated that "MSHA has a right of access to any information required to be maintained by the Mine Act or the implementing regulations in Part 50 . . . includ[ing] . . . information on accidents which the Mine Act and Part 50 require the operator to investigate and compile a report on." *Id.* at 2 (emphasis added).

The language in the Clair letter cannot trump the plain language of both section 103(a) of the Mine Act and 30 C.F.R. § 50.41. *See* Pet. Br. at 19. Moreover, Mr. Clair further explained that in Part 50 audits, MSHA "routinely seeks access to information related to accidents and injuries which the Agency believes is relevant and necessary to verification of compliance with Part 50." Joint App. for Temp. Relief Ex A.14 at 2-3. In any event, Petitioners' argument relies on their interpretation of statements in a letter written more than 20 years ago which have been explicitly renounced by the Secretary in her current litigation before the Commission. S. Br. at 20. The Secretary clearly is permitted to reconsider her views regarding the interpretation of the Mine Act. *See Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc.*, 573 F.3d 788, 793 (D.C. Cir. 2009).

14

While *BHP Copper* supports our holding, the cases Petitioners have cited are clearly distinguishable. *Sewell* is an unreviewed ALJ decision and therefore not a binding precedent. In any event, we agree with Judge Andrews that its reasoning is inapposite, because the Secretary's request here is not a "wholesale warrantless search." *See* 33 FMSHRC at 1318-19, 1322; 33 FMSHRC at 1400; *see also Sewell Coal*, 1 FMSHRC at 872. The request before us in this case is limited in time and scope, narrowly tailored to the Secretary's functions under the Act, and does not involve MSHA representatives personally rummaging through Petitioners' file cabinets or computer systems. Moreover, the 1984 *Peabody* decision, relied upon by Petitioners, is of little relevance to the issue before us because that case involved the disclosure of records the operator was required to maintain, and the Commission simply noted that the case, therefore, did not present the situation faced in *Sewell*. 6 FMSHRC at 186 n.5.

Based on the foregoing, we hold that pursuant to sections 103(a) and (h) of the Act and 30 C.F.R. § 50.41, operators are required to provide the Secretary with access to records not specifically required to be maintained by the Mine Act or regulations promulgated under the Act, as long as they are relevant and necessary to a determination of operator compliance with Part 50 reporting requirements. Because the statutory and regulatory provisions are clear, we do not need to reach the Secretary's deference argument.[9]

**B.    Whether the requested records and information are relevant and necessary.**

We conclude that the records and information requested by the Secretary in these cases are "relevant and necessary" for her to carry out her responsibilities to audit compliance with the Mine Act within the meaning of 30 C.F.R. § 50.41. As Judge Andrews stated, " . . . the complete and accurate reporting of accidents, injuries, and illnesses occurring at mines is critically important to the mission of MSHA to protect the health and safety of miners." 33 FMSHRC at 1317. Former Chief Judge Merlin described the importance of accurate reporting in *Consolidation Coal Co.*, 9 FMSHRC 727, 733-34 (Apr. 1987) (ALJ):

> . . . Part 50 is the cornerstone of enforcement under the Act. Since Part 50 statistics provide the basis for planning, training and inspection activities, accurate reporting is essential. Moreover, failure to accurately report could have extremely dangerous consequences by concealing problem areas in a mine which should be investigated by MSHA inspectors. In short, without proper compliance by the operator under Part 50, the Secretary could not know what is going on in the mines and, deprived of such

---

[9] Even if the statutory and regulatory language were not clear, we would find the Secretary's interpretation to be reasonable. The requested documents are necessary to verify operator compliance with the Act, which is crucial in carrying out the objective to greatly decrease dangerous conditions at mines.

15

information, [she] would be unable to decide how best to meet
[her] enforcement responsibilities.

In *Pero v. Cyprus Plateau Mining Corp.*, 22 FMSHRC 1361, 1364 (Dec. 2000), the Commission stated that "one of the purposes of the reporting requirements under 30 C.F.R. Part 50 is to allow MSHA 'to identify those aspects of mining which require intensified attention with respect to health and safety regulation.' 42 Fed. Reg. 55,568, 55,568 (1977)."[10]

In her effort to perform the function of verifying operator compliance with Part 50, the Secretary seeks the medical records, payroll, and time sheet information upon which the operators relied to complete the 7000-1 and 7000-2 forms covering the period from July 1, 2009, through June 30, 2010. The payroll and time sheet records are used to verify the total number of employees and the total hours worked, as reported on the 7000-2 forms. 33 FMSHRC at 1317; 33 FMSHRC at 1397. The various documents containing medical information – including medical records, doctors' slips, worker's compensation filings, sick leave requests, drug testing information, emergency medical transportation records, and medical claim forms – are used to verify that the operators have been properly and accurately reporting on the 7000-1 forms all accidents, and work-related injuries or illnesses at the mines over the course of one year. 33 FMSHRC at 1317; 33 FMSHRC at 1397-98; S. Ex. G-1.

More specifically, the medical records contain important information about the cause, severity, duration, and treatment of occupational injuries and illnesses. S. Ex. G-1. They can help MSHA determine if an operator properly designated a workplace injury as one resulting in permanent total or partial disability, days away from work, and days of restricted work activity. *Id.* The doctors' slips contain information about the severity of an injury, treatment, and expected date that an injured miner would be expected to return to work or return to full duty. *Id.* The workers compensation documents, containing information concerning workplace injuries and illnesses, will be cross-referenced with the information reported on the 7000-1 forms. *Id.* A sick leave request details an employee's absence and can indicate whether a previously unreported workplace injury occurred. *Id.* The drug testing documents are related and limited to tests taken after a workplace injury or accident has occurred. *Id.* Emergency medical transportation documents will be cross-referenced with 7000-1 forms because they identify employees who required medical assistance due to workplace injuries. *Id.* Lastly, the medical claims help identify previously unreported workplace accidents, injuries, or illnesses, and assist in establishing whether an illness fits the regulatory definition of "occupational illness." *Id.* Based on the clear correlation between the records sought and the completed Part 50 forms provided by the operators, we conclude that the requested records are relevant to MSHA's audit initiative.

---

[10] *Pero* was a discrimination case involving an employee in an operator's human resources department who challenged the company's practice of falsifying work place injury and illness information on MSHA's 7000-1 forms. *Pero*, 22 FMSHRC at 1361-62.

16

The necessity for MSHA to collect such information is illustrated by the process in which reportable information is transmitted to the safety departments and maintained by the mine operators. 33 FMSHRC at 1315-17; 33 FMSHRC at 1396-97. Company safety officials testified that although they are responsible for completing and submitting the 7000-1 and 7000-2 forms to MSHA, they do not have direct access to the information upon which they are reporting. *Id.* at 1315. They must first be informed of a reportable incident, which is generally done by the foreman, either verbally or by a foreman's accident report. 33 FMSHRC at 1315; 33 FMSHRC at 1396. They may have access to the initial medical treatment information, but this information is then turned over to and maintained by either the human resources department ("HR") or a third party. 33 FMSHRC at 1314-17; 33 FMSHRC at 1396-97; Peabody Tr. 78; Massey Tr. 95-96.[11]

If MSHA were denied the ability to audit mine operator records, it would be forced to rely solely on the information provided by the company safety officials. MSHA would not be able to verify the accuracy of the reports. This is contrary to the preamble to 30 C.F.R. § 50.41, which specified that in carrying out its mission of verifying operators' reports of accidents, injuries, and occupational illnesses, MESA (now MSHA) must "control the data flow, rather than depend upon operator filtered records." 42 Fed. Reg. at 55569.

Thus, company safety officials responsible for completing the Part 50 forms must rely on other mine employees to provide them with all pertinent information on reportable incidents at the mine. These safety officials lack direct and critical access to the actual information needed to report on these forms, and thereby lack the ability even to verify for themselves the accuracy of the information they are reporting. The potential for incidents to go unreported or misreported is a genuine and justifiable concern for MSHA. Flawed incident reporting will result in an inaccurate and misleading understanding of the true safety conditions at a particular mine.

---

[11] The operators' safety departments may follow up with the supervisor, foreman or employee to assist in completing the 7000-1 form, but the safety departments do not have access to the various medical files maintained by HR. 33 FMSHRC at 1315-17; 33 FMSHRC at 1396-97; Peabody Tr. 78. In some instances, time sheets, payroll records, worker compensation records and medical documents are within the exclusive possession and control of HR. Peabody Tr. 53, 78. It is Peabody's practice that these records may not be accessed by personnel outside of HR, including the safety department. 33 FMSHRC at 1315; Peabody Tr. at 54-56. Although the records are not necessarily off limits to Massey's safety department, Massey's HR Manager testified that he had never received a call from a safety director inquiring about the absence of a particular miner. 33 FMSHRC at 1397. There was also no evidence at either hearing suggesting that HR would take the initiative to inform the safety department of a miner's absence related to a work place injury or illness, making it less likely that the safety officials would be fully informed of all reportable information. *See* 33 FMSHRC at 1315-16; 33 FMSHRC at 1397.

17

We agree with Judge Andrews' insightful observation concerning the incentive to under-report injury and occupational illness to MSHA:

> If the total number of reportable incidents is under-reported, a mine, obviously, will appear to be safer than it actually is. If the incidence rate and severity measure are artificially low, an unsafe mine may be able to avoid enhanced MSHA scrutiny. Further, an elevated severity measure is one criterion in the initial screening for establishing a "pattern of significant and substantial violations." 30 C.F.R. § 104.2(b)(3), Ex. G-4. Once this pattern has been established, the mine may be subjected to enhanced penalties and possible forced shutdowns. 30 C.F.R. § 104.4. If given the power to solely control the information flow between itself and MSHA, an operator possesses incentives to constrict that flow and under-report incidents at the mine.

33 FMSHRC at 1316. Peabody asserts that the judge's statement represents a prejudicial error, claiming that it was error to assume mine operators under-report accidents, illnesses, and injuries. Peabody Br. at 31. We are not suggesting that all operators, or even a majority of operators, under-report accidents, injuries, and occupational illnesses. However, just as there is a need for the Internal Revenue Services to audit tax returns, there is a need to review the underlying information that serves as the basis for the 7000-1 forms submitted by mine operators.[12]

Petitioners suggest that MSHA could verify the information by interviewing individual miners. Massey PDR at 14; 33 FMSHRC at 1316; 33 FMSHRC at 1397. We disagree. Although MSHA may conduct interviews in addition to inspecting operator records, this

---

[12] Commissioner Cohen notes that the concern is borne out by events that occurred subsequent to the filing of the PDRs in these cases. As stated, *supra*, footnote 7, Massey has submitted the information requested for the compliance audit to MSHA. *See* Oral Arg. Tr. 47. Two of the Massey mines involved in this case – the Randolph Mine operated by Inman Energy and the Justice No. 1 Mine operated by Independence Coal Co. – were found by MSHA to have failed to report, or inaccurately reported, a total of 24 injuries, resulting in 1,125 lost days of work. *Peabody Energy Challenges ALJ Decision to Turn Over Documents*, 18 Mine Safety and Health News, Sept. 12, 2011, at 481. In a separate case involving a different company, Commission ALJ Thomas P. McCarthy concluded that an operator "made a conscious decision to refrain from reporting" a reportable roof fall "based on a calculated risk that it would not get caught." *Pine Ridge Coal Co., LLC*, 33 FMSHRC 987, 1024 (Apr. 2011) (ALJ). Operators which make a practice of under-reporting, as Judge Andrews noted, avoid enhanced MSHA scrutiny. Thus, they gain a competitive advantage over operators which follow the law.

18

approach alone would be insufficient to verify operator compliance.[13] Miners may be reluctant to share personal information with MSHA officials and/or reluctant or fearful to cooperate with inspectors conducting compliance audits of their employers. Such an undertaking would be cumbersome and time consuming and would likely yield insufficient information. One of the types of possible under reporting is the non-reporting of injuries and occupational diseases. If an injury or occupational disease simply is not reported by an operator, MSHA would not be able to conduct an interview because it would not know of the existence of the injured or sick miner.[14]

---

[13] MSHA's General Inspection Procedures Handbook states that during a Part 50 audit, "the operator's accident, injury, illness, employment, and hours worked documentation should be reviewed and compared against data reported to MSHA to verify that the information reported to the Agency is correct. . . . In addition, inspectors should verify compliance by using other sources including interviews with mine management, miners' representatives, and miners. In some cases, examination and comparison of state workers' compensation records to MSHA reports may be appropriate." Metal Nonmetal General Inspection Procedures Handbook, No. PH09-IV-1 at 43 (Oct. 29, 2009).

[14] Commissioner Cohen adds that the potential for the under-reporting of occupational illnesses is particularly troublesome. As noted in the legislative history of the Black Lung Benefits Act of 1972, hundreds of thousands of American coal miners have been afflicted with, and died as a result of black lung disease. S. Rep. No. 92-743, at 2-3 (1972), *reprinted in* Senate Subcomm. on Labor, Comm. on Labor and Public Welfare, Part II, *Legislative History of the Federal Coal Mine Health and Safety Act of 1969,* at 1947-48 (1975). As early as the 1870s, American and British physicians were documenting numerous cases of coal miners' lung diseases. ALAN DERICKSON, BLACK LUNG: ANATOMY OF A PUBLIC HEALTH DISASTER, 1-21 (1998). The United Mine Workers of America was calling attention to the respiratory diseases of coal miners from its founding in the 1890s. *Id.* at 34-39. But the mining industry denied the existence of any significant disease caused by the inhalation of respirable coal dust. *Id.* at 39-40, 43-54. The mining industry continued to maintain that inhalation of coal mine dust is innocuous, or causative of very little disease, and successfully prevented effective regulation of respirable dust in the mines, until the 1969 Coal Act. *Id.* at 58-86, 98-102, 108-111, 115-16, 171-75. In 2010, after 41 years of experience with the respirable dust standards enacted in the 1969 Coal Act, MSHA issued a proposed rule which would, *inter alia*, reduce respirable dust standards in the nation's coal mines. 75 Fed. Reg. 64412 (Oct. 19, 2010). In the preamble to the proposed rule, MSHA surveyed the recent medical literature, and concluded:

> The extent of knowledge on how coal dust causes adverse
> pulmonary effects has evolved greatly in the 31 [sic] years since
> the Coal Act was signed into law. Though exposures have been
> reduced, this review of the literature indicates that miners are still
> suffering unacceptable levels of disease. Under the existing
> standards, miners are still at increased risk of developing adverse
> effects such as pulmonary function deficits, obstructive and

19

We conclude that, in order to determine whether an accident, injury or illness has been properly reported, it is necessary for MSHA to consult the relevant medical and employment records pertinent to that incident.

The requested records are limited in time – "the period of July 1, 2009 through June 30, 2010" – and scope – "relating to accidents, injuries, or illnesses that occurred at the mine or may have resulted from work at the mine" – and narrowly tailored to carrying out a specific function of the Secretary under the Mine Act. *See* S. Ex. G-7. Accordingly, we conclude that not only is the Secretary's request "relevant and necessary," but it is reasonable and neither overly broad nor burdensome. Under the circumstances, we thus find it unreasonable to expect the Secretary, whose duty it is to ensure compliance with the Act, to rely solely on the representations made by company officials when carrying out the important duty of verifying company reporting.[15]

---

> restrictive diseases including chronic bronchitis, COPD, emphysema, and simple [coal workers pneumoconiosis] and [progressive massive fibrosis] from a working lifetime exposure to respirable coal mine dust.

*Id.* at 64468-69. The finding of miners suffering "unacceptable levels of disease" 41 years after the passage of the Coal Act is borne out by the results of the autopsies performed on the 29 miners killed in the Upper Big Branch Mine explosion on April 5, 2010. According to MSHA's Report of Investigation of this explosion, "most of the victims had evidence of varying degrees of black lung in the form of CWP, emphysema and fibrosis. . . . The incidence of disease found in these miners clearly demonstrates that dust control practices at UBB and other mines where these miners worked did not provide adequate protection against black lung." MSHA, Report of Investigation, Fatal Underground Mine Explosion April 5, 2010, at 147-48 (Dec. 6, 2011). In light of the continued prevalence of black lung disease, it is certainly reasonable for MSHA to be concerned about under-reporting of occupational illnesses on the 7000-1 form.

[15] We also disagree with Peabody's argument that the 15 minute abatement time set by MSHA in the subject citations was objectively unreasonable. At the hearing, Peabody's senior HR manager and its safety manager both testified that if Peabody had been given additional time to produce the records, they still would not have complied with the request. Peabody Tr. 90-91, 120. Thus, regardless of the abatement time, the outcome would have been the same. Based upon the testimony of the company officials, it is apparent that from the outset Peabody intended to challenge the legality of the Secretary's informational request. *Id.* Under the circumstances, we do not find the 15 minute abatement time unreasonable.

20

**C. Whether Petitioners' constitutional challenges have merit.**

**1. Right to privacy**

The Intervenors, a group of miners, argue that they as individuals possess a strong and legally protected personal privacy interest in maintaining the confidentiality of their medical records. They maintain that their personal privacy interests are not lost merely because mine operators have no reasonable expectation of privacy in a mine's working areas. Petitioners further assert that MSHA's procedures for safeguarding the records obtained are inadequate and that the judge's contrary findings are erroneous.

Courts have yet to establish with certainty whether the Constitution confers to individuals a right to privacy regarding disclosure of their private information. *See Whalen v. Roe*, 429 U.S. 589, 598-600 (1977) (suggesting that such a right exists)*; Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 456 (1977) (acknowledging the existence of a right to informational privacy)*; Nat'l Aeronautics & Space Admin. v. Nelson*, 131 S.Ct. 746, 751 (Jan. 2011) ("NASA") (recognizing, without deciding, that there may exist an informational right to privacy); *but see AFGE, AFL-CIO v. Dep't of Hous. & Urban Dev.*, 118 F.3d 786, 791 (D.C. Cir. 1997) (expressing grave doubts as to the existence of a constitutional right to informational privacy, and stating that the Supreme Court has yet to resolve the issue). However, in recognizing that such a right may exist, courts have held that the right must yield to informational requests by the government when the requests are reasonably related to a proper governmental interest and there are safeguards in place to protect from disclosure of information. *See Whalen*, 429 U.S. at 597-98; *NASA*, 131 S.Ct. at 759, 761; *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 621 (1989).

The challenged portions of the Secretary's audit contain reasonable requests for accident, injury, and illness-related information that further MSHA's interest in regulating and ensuring the health and safety of the nation's miners. Lending additional support is the preamble to the final rule, which specifically addresses the privacy concerns surrounding the Secretary's authority to access sensitive information:

> Some parties objected to § 50.41, asserting that it invades employees' privacy rights respecting medical data and improperly authorizes inspection and copying of records not specifically required to be maintained, including trade secrets and other internal company information. Many feared disclosure of any information copied.

> The patient-physician confidentiality privilege is not absolute. Where disclosure of patient data is related to a valid purpose, disclosure has been held not to be violative of privacy rights.

21

42 Fed. Reg. at 65535. Thus, the issue of privacy protection for medical data was raised and considered by MSHA's predecessor agency when promulgating section 50.41. It was ultimately decided that, under the circumstances, disclosure would not violate miners' privacy rights. We agree.

The courts have recognized that the privacy interests of employees in their medical records may need to yield to the public interest being furthered by governmental agencies responsible for protecting employee health. As Commissioner Duffy points out in his dissent, slip op. at 32-33, n.1, "[t]here can be no question that [employees'] medical records [fall] well within the ambit of materials entitled to privacy protection" (citing *United States v. Westinghouse*, 638 F.2d at 577). The *Westinghouse* court went on to say that "even material which is subject to protection must be produced or disclosed upon a showing of proper governmental interest." *Id.* The court in *Whalen* further stated that:

> *[D]isclosures of private medical information to* doctors, to hospital personnel, to insurance companies, and to *public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient.* Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy.

*Whalen,* 429 U.S. at 602 (emphasis added) (footnote omitted).

Although we recognize the Intervenor miners' sensitivity to the release of their records without their consent, the Secretary's clearly articulated need for this information to carry out her important functions under section 103 of the Mine Act and the Part 50 regulations, as well as her commitment to safeguard the information, must prevail against the claimed individual privacy interests. Thus, the governmental interest in regulating occupational safety and health in a notoriously dangerous industry outweighs the privacy interests of any individual miner and plainly justifies MSHA's audit requests.

In addition, MSHA has put in place certain protocols to safeguard the miners' personal information.[16] The protocols include the secure transport of personal information, filing

---

[16] Because MSHA will not store and retrieve the requested information by individual miner names, it is not considered to be held in a "system of records" under the Privacy Act. S. Supp. Br. at 18-19. *See* 5 U.S.C. § 552a(a)(5); *see also Henke v. Dep't of Commerce,* 83 F.3d 1453, 1460 n.12 (D.C. Cir. 1996); *Baker v. Dep't of the Navy,* 814 F.2d 1381, 1384 (9th Cir. 1987); *Shannon v. Gen. Elec. Co.,* 812 F. Supp. 308, 321 (N.D.N.Y. 1993); *Krieger v. DOJ,* 529 F. Supp. 2d 29, 44-46 (D.D.C. 2008); *Crumpton v. U.S.,* 843 F. Supp. 751, 755-56 (D.D.C. 1994), *aff'd on other grounds sub nom. Crumpton v. Stone,* 59 F.3d 1400 (D.C. Cir. 1995). Consequently, MSHA is not required to adhere to the Privacy Act's confidentiality protocols.

22

procedures, locked storage, limited access to authorized users, access control system, and the destruction and disposal of information pursuant to the General Record Schedule NC1-433-85-1, or court order. S. Ex. G-5. We find that the protocols are adequate and must be viewed in light of the agency's attempt to meet valid, good-faith concerns about securing personal information.[17]

In summary, the preamble to section 50.41, the statutory and regulatory limitations placed on the Secretary's request, MSHA's clear need for the information, and the safeguards established to protect the information, are compelling. Therefore, as the ALJ found, 33 FMSHRC at 1320-21, to the extent that any such privacy right exists, we conclude that the Secretary's records request, narrowly tailored to further MSHA's compelling governmental interest, does not violate that right.

### 2.    Fourth Amendment arguments

Petitioners and Intervenors submit that the Fourth Amendment's protection against warrantless searches provides employers with a reasonable expectation of privacy in records that are not required to be maintained by law, and provides employees with an expectation of privacy in their personal medical records. The Secretary, citing *RSM, Inc. v. Buckles*, 254 F.3d 61, 69 (4th Cir. 2001), responds that her request in this case is in the nature of a subpoena duces tecum, thus satisfying Fourth Amendment requirements that it be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonable. She further argues that, in the event her request is deemed a warrantless inspection, it satisfies the three-prong test for such inspections set forth in *Donovan v. Dewey*, 452 U.S. 594, 599 (1977).

The threshold question in deciding this issue is whether the operators and miners have a reasonable expectation of privacy concerning the records requested by MSHA. As the Supreme Court noted in *Oliver v. United States*, 466 U.S. 170, 177 (1984):

> Since *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the touchstone of [Fourth] Amendment analysis has been the question whether a person has a

---

[17] The Commission was very concerned about the protection of miners' privacy in this case and requested special briefing on specified privacy issues. Order, July 15, 2011. At oral argument, Commissioners engaged in extensive dialogue with the Secretary's counsel concerning privacy issues and requested additional information, which the Secretary subsequently provided. Oral Arg. Tr. 51-53, 68-75; Letters from Samuel Lord to Michael McCord, August 5 and 11, 2011. Although Commissioner Duffy, in his dissent, takes issue with what he characterizes as the Secretary's "on the fly" attempts to address the miners' privacy rights, slip op. at 43, the fact remains that sufficient privacy protections now exist and were in place prior to the Secretary gaining access to the records. In addition, the operators were not assessed penalties during the formation of the safety protocols. Under the circumstances, the tardiness of the protections is insufficient to invalidate the audit initiative.

23

> "constitutionally protected reasonable expectation of privacy." . . .
> The Amendment does not protect the merely subjective expectation
> of privacy, but only "those expectation[s] that society is prepared
> to recognize as 'reasonable'."

Consequently, "[w]e must examine the nature of the particular documents sought to be protected
in order to determine whether there is a legitimate 'expectation of privacy' concerning their
contents." *United States v. Miller*, 425 U.S. 435, 442 (1976).[18]

In *Donovan*, the Supreme Court made clear that the mining industry is pervasively
regulated and that warrantless nonconsensual mine inspections conducted by the Secretary under
the Mine Act are fully consistent with the Fourth Amendment. 452 U.S. at 605. Because of this
pervasive regulation, mine operators have an extremely low expectation of privacy with regard to
their mines and records related to mine safety and health. This lowered expectation is reinforced
by the language of section 103(h), which expressly states that "[i]n addition to such records as
are specifically required by this chapter, every operator . . . shall . . . provide such information, as
the Secretary . . . may reasonably require from time to time to enable [her] to perform [her]
functions." Additionally, in 30 C.F.R. § 50.41, the Secretary required each operator to allow
MSHA to inspect and copy information related to accidents, injuries, or illnesses which are
"relevant and necessary" for verifying investigation reports or determining compliance with
reporting requirements. As a result of this pervasive regulation, mine operators are fully aware
that the Secretary is authorized to require access to such information without obtaining an
administrative search warrant.

Moreover, while there are limits on the government's authority in this area, they are well
respected by MSHA's narrowly focused, clearly explained, and limited request for information in
this case. In *BHP*, the Commission "recognize[d], as did the Court in *Donovan*, that the bounds
of the Secretary's authority are not without limits," but emphasized that "section 103 provides
the 'certainty and regularity of its application' that is a substitute for a warrant." 21 FMSHRC at
767, quoting 452 U.S. at 603. In *BHP*, we relied in particular on section 103(a) as a limit to the
Secretary's investigatory authority, and noted the Court's statement in *Donovan* that "[t]he
discretion of Government officials to determine what facilities to search and what violations to
search for is . . . directly curtailed by the regulatory scheme." *Id.*, quoting 452 U.S. at 605. Of
course, this "regulatory scheme" includes 30 C.F.R. § 50.41. As noted earlier, *supra,* at 14, we
agree with the judge that this request is clearly distinguishable from the *Sewell* case, in that no
inspector is seeking authority to rummage through the operators' files. 33 FMSHRC at 1318.
Accordingly, we conclude that the mine operators had no legitimate expectation of privacy with
regard to the documents in question and that the Secretary's actions comported with the Fourth
Amendment.

---

[18] The Supreme Court's recent decision in *United States v. Jones*, 132 S.Ct. 945, 2012
WL 171117 (2012), does not change the expectation of privacy analysis in a case like the present
one.

24

We disagree with the arguments of Commissioner Duffy, our dissenting colleague, who maintains that the Secretary's audit violated the Fourth Amendment. Commissioner Duffy concedes that under *Donovan* the mining industry is pervasively regulated so that operators have a low expectation of privacy. Slip op. at 36. Nevertheless, citing *United States v. Biswell*, 406 U.S. 311 (1972), and *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970), he contends that the Secretary can conduct warrantless searches for documents related to mine accidents, injuries, or illnesses only if those documents are "required to be generated and maintained by the enabling statute or regulations duly promulgated pursuant to that statute." Slip op. at 32, 37. He further contends that the Secretary must undertake additional rulemaking to specifically identify the documents that she is entitled to have access to in order to carry out her functions under the Act. *Id.* at 41. He asserts that the term "may reasonably require from to time to time" in section 103(h) of the Mine Act must mean to require by means of a duly promulgated rule. *Id.*

First, our colleague's reliance on *Biswell* and *Colonnade* is misplaced. These cases involved statutes that explicitly limited the government's inspection authority to records "required to be kept." *See Biswell*, 406 U.S. 311; *Colonnade Catering*, 397 U.S. at 73 n.1. The Court did not address the question of the government's inspection authority regarding records *not* legally required to be retained, and thus the cases do not stand for the proposition that a warrantless right of access is necessarily limited to records specifically required to be maintained by statute or regulation. Because the Mine Act grants the Secretary authority to inspect "records" and "information," "[i]n *addition to* such records as are specifically required" to be kept, *see* 30 U.S.C. § 813(h) (emphasis added), *Biswell and Colonnade* are inapposite, as the statutory basis for the search here is broader than in the two cases decided by the Court.

Furthermore, because reliance on these cases forms the foundation of his theory that a statutory or regulatory requirement that records be maintained is the only justification for an exception to the general warrant requirement, Commissioner Duffy's argument that additional rulemaking is necessary in order to cure this alleged constitutional problem fails as well.[19]

---

[19] Our colleague argues that the language of the preamble is not binding on mine operators and thus cannot be relied upon by the Secretary to create a right to obtain information. Slip op. 40, n.4. However, the preamble did not itself create a right to obtain information, but rather explained how the Secretary intended to interpret and implement the regulatory language. *See Sec'y of Labor v. Cannelton Indus., Inc.,* 867 F. 2d 1432, 1438 (D.C. Cir. 1989) (preamble to Secretary's regulation used by court to explain the regulation); *Wyoming Outdoor Council v. United States Forest Serv.,* 165 F.3d 43, 53 (D.C. Cir. 1999) ("the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules"). As such, it served to put mine operators on notice that the statute and section 50.41 gave the Secretary broad authority to seek "relevant and necessary" information. This is yet another reason why mine operators should have had no reasonable expectation of privacy with regard to such information.

*Biswell* and *Colonnade* do not support his contention that the language in section 103(h) that an operator must provide such information as the Secretary "may reasonably require from time to time" means information the Secretary "requires by means of a rule," slip op. at 41. This is because, as we previously noted, in both *Biswell* and *Colonnade*, the information the government wished to acquire was already required to be maintained by statute, and the Court never explicitly stated that this was a prerequisite to the inspections at issue. In any event, courts generally have held that use of the phrase "from time to time" refers to discretionary actions of an agency, *American Canoe Ass'n v. EPA*, 30 F.Supp.2d 908, 923 (E.D.Va. 1998), *citing Natural Res. Defense Council v. Thomas*, 885 F.2d 1067, 1075 (2d Cir. 1989); *Natural Res. Defense Council v. EPA*, 770 F.Supp. 1093, 1105 (E.D.Va. 1991), *aff'd*, 16 F.3d 1395 (4th Cir. 1993), which would therefore not require a rule.

Because the 1977 rulemaking directly addressed the Secretary's authority and need to gain access to certain kinds of information not required to be generated or maintained under the statute, mine operators were clearly placed on notice that the Secretary could seek backup documents and other information "necessary and relevant" to verification and compliance determinations. Operators had no reasonable expectation of privacy with regard to that information. No additional rulemaking was necessary, and the Secretary's audit did not violate the Fourth Amendment.

The dissent's reliance on Sixth Circuit case law in this area, slip op. at 38-39, is misplaced. *Marshall v. Nolichuckey Sand*, 606 F.2d 693 (6th Cir. 1979), was, as our colleague acknowledges, decided prior to the Supreme Court's ruling in *Donovan*.[20] Consequently, that court's approval of warrantless inspections limited only to the "active workings" of coal mines, and its assertion that a warrant is required for the inspection of offices and other areas, was superceded by *Donovan*, which upheld warrantless inspections by MSHA with no such qualification. 452 U.S. at 606. The *Donovan* court relied on the broad authority provided by section 103(a) which requires "inspections of each underground coal or other mine *in its entirety* at least four times a year, and of each surface coal or other mine *in its entirety* at least two times a year." 30 U.S.C. § 813(a) (emphasis added.).

The *Nolichuckey Sand* court's assertion was based on *United States v. Consolidation Coal Co.*, 560 F.2d 214, 217 (6th Cir. 1977), *vacated and remanded*, 436 U.S. 942 (1978), *judgment reinstated*, 579 F.2d 1011 (1978) ("*Consol*"). *Consol* in turn relied on a district court decision, *Youghiogheny and Ohio Coal Co. v. Morton*, 364 F.Supp 45 (S.D. Ohio 1973). However, *Youghiogheny* never mentioned "active workings," in upholding warrantless searches

---

[20] Although the dissent states that the Court in *Donovan* cited to *Nolichuckey Sand* approvingly, slip op. at 38, the Court merely noted that it was one of three cases in which Courts of Appeals had upheld the warrantless inspection provisions of the Mine Act as they applied to quarry operations. 452 U.S. 598 n.5.

26

of coal mines. *Id.* at 52.[21] In Judge Wiseman's concurring opinion in *United States v. Blue Diamond Coal Co.*, 667 F.2d 510, 521 (6th Cir. 1981), also relied on by our colleague, the court determined that suppression of certain records seized from the mine office was not appropriate, and noted that: "in light of *Donovan* and today's decision, it is apparent that certain dicta in [*Consol*] no longer reflect[s] accurately the current state of the law." Morever, even the *Consol* court acknowledged that the mine offices involved were "part of coal mine premises within the meaning of the Act," and that it was "reasonable to assume that mine operators have a reduced expectation of privacy in their business offices than less highly scrutinized enterprises." 560 F.2d at 219, 220.[22]

We also conclude that the miners do not have a reasonable expectation of privacy with regard to the documents sought by the Secretary in these audits. The Supreme Court in *Miller* held that a bank depositor had no protected Fourth Amendment interest in his bank records, such as checks and deposit slips, that were business records of the banks and not the depositor's private papers. The Court's decision stated unequivocally that:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

425 U.S. at 443. As in *Miller*, the records in this case are maintained by third parties (the mine operators) for their own business purposes and among their own business records.

*Miller* emphasized that courts generally recognize that the Fourth Amendment does not prohibit the collection of information revealed to a third party and conveyed by him or her to government authorities. *Id.* Generally, following *Miller*, an individual only has a Fourth

---

[21] The phrase "active workings" is found in Title II of the Mine Act, which contains requirements pertaining to respirable dust. For instance, section 202(a) requires operators to take samples of "the amount of respirable dust in the mine atmosphere to which each miner in the active workings of such mine is exposed." 30 U.S.C. § 842(a). Section 202(g) instructs the Secretary to make frequent spot inspections of "the active workings of coal mines for the purpose of obtaining compliance with the provisions of this title." 30 U.S.C. § 842(g).

[22] Commissioner Duffy further asserts that the revised request for records could presumably require operators to turn over records held by its agents, i.e., doctors, clinics, insurers, etc., from whom they have authority to obtain the required documents. Slip op. at 42, n.5. However, neither party has presented any facts that would necessitate the Commission's consideration of this issue, and we reject any invitation to do so based on a record devoid of evidence on this question.

Amendment expectation of privacy in documents that he or she owns or possesses. This includes medical records demanded by the government. *See, e.g., Young v. Murphy*, 90 F.3d 1225, 1236 (7th Cir. 1996) (holding that patient failed to establish a Fourth Amendment claim to investigators' examination of his nursing home records); *Webb v. Goldstein*, 117 F. Supp. 2d. 289, 295-96 (E.D.N.Y. 2000) (holding that parolee had no privacy interest in his prison medical records); *Romano v. City of New York*, 2009 WL 1941912 (E.D.N.Y. (2009)) (holding that plaintiff had no protected Fourth Amendment interest in his medical records allegedly seized at the office of his medical practitioner, as he could state no interest in the property seized at premises not under his control).[23]

Moreover, as the government agency responsible for protecting the *health* and *safety* of the nation's miners, MSHA's request for the miners' medical records can hardly be described as an "inquiry that *unnecessarily* touch[es] upon intimate areas of [a miner's] personal affairs," as asserted by the dissent, slip op. at 44, *citing Miller*, 425 U.S. at 444 n.6 (emphasis added). *See also Westinghouse*, 638 F.2d at 580. This is particularly so when the records, limited to work-related injuries and illnesses, provide an accurate picture of the health and safety conditions the miners are subject to while in the mines. Accordingly, we conclude that the Secretary's audit request does not violate the operators' or intervenors' Fourth Amendment rights.

### 3.     Fifth Amendment arguments

Intervenors further assert that the Secretary's failure to fully consider the privacy issues when promulgating 30 C.F.R. § 50.41 was arbitrary and capricious and violates their Fifth Amendment right to due process.

The Due Process Clause of the Fifth Amendment guarantees that no person shall "be deprived of life, liberty, or property, without due process of law." The fundamental requirement of procedural due process is the opportunity to be heard "at a meaningful time and in a meaningful manner" appropriate to the nature of the case. *Capital Cement Corp.*, 21 FMSHRC 883, 887 (1999) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)); *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971); *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The timing and manner of the hearing depend upon the "appropriate accommodation of the competing interests involved." *Id.* (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) (citations omitted)).

---

[23] These cases refute the dissent's view, slip op. at 44-45, that the court's holding in *Miller* does not apply to medical records.

We find the Intervenors' due process argument unavailing.[24]  The general public, including miners, had the opportunity to challenge the promulgation of section 50.41 during the notice-and-comment proceeding over 30 years ago.  The parties also retain the right, as they have done here, to challenge the Secretary's application of the rule in each instance where it is applied.  All parties involved in this proceeding, including Intervenors, have had a meaningful opportunity to protect their rights and interests by fully presenting their case before the Commission through oral argument and briefs.  We find no violation of the right to due process protected by the Fifth Amendment.

**D.    Whether other federal statutes or state laws bar disclosure of the records and information.**

Petitioners state that the Secretary's authority to require them to produce the disputed records is further limited by other federal and state statutes, including the Americans with Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), the Genetic Information Non-Discrimination Act of 2008 ("GINA"), the Illinois AIDS Confidentiality Act, and by Illinois' and Indiana's recognition of a common law tort for the invasion of the right to privacy.

We conclude that none of the aforementioned federal statutes impedes the Secretary's authority to request the disputed information.  Specifically, under the ADA, any information obtained about an employee's medical condition, as a result of an employer's requirement that an employee submit to a medical examination or as a result of the employer conducting voluntary examinations, must be treated as a confidential medical record and collected and maintained on separate forms and in separate medical files.  42 U.S.C. § 12112(d)(3)(B), (4)(C); 29 C.F.R. §§ 1630.14(b)(1), (c)(1), (d)(1).  Although there are exceptions to the confidentiality requirement, Petitioners correctly maintain that MSHA does not fall within any of the three enumerated exceptions found at 29 C.F.R. § 1630.14.  However, section 1630.15(e) provides that "[i]t may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation . . . . " 29 C.F.R. § 1630.15(e).  Thus, because the disputed information is required to be released to the Secretary pursuant to section 103(h) of the Mine Act and 30 C.F.R. § 50.41, and is necessary to ensure compliance with the Act, we do not see the ADA as a roadblock.  *See also* EEOC *Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R. Pt. 1630 App. 1630.15(e) (2000); *accord Bay v. Cassens Transport Co.*, 212 F.3d 969, 974 (7th Cir. 2000) ("The ADA does not override health and safety requirements established under other Federal laws") (citation omitted).

---

[24]  We also disagree with the dissent's assertion that the criteria and scope of the request is based more on "the level of curiosity of the various auditors" as opposed to an industry-wide system for records generation or retention.  Slip op. at 47.  The record shows that all of the operators selected to take part in the audit received identical requests and were asked to produce the same records.  There is no issue here of a varying "level of curiosity" on the part of the auditors.

29

Similarly, the FMLA, 29 U.S.C. § 2601 et seq., requires that all medical information obtained by employers pursuant to its provisions must be maintained in strict accordance with the ADA's Title I confidentiality provisions found at 29 C.F.R. § 1630.14(b). *See* 29 C.F.R. § 825.500(g). However, disclosure is required to provide relevant information upon request by government officials investigating compliance with the FMLA or other pertinent law. *See* 29 C.F.R. § 825.500(g)(3). Because MSHA inspectors are government officials investigating compliance with "[an]other pertinent law," i.e., the Mine Act, disclosure of the disputed records does not violate the FMLA.

Subject to some exceptions, GINA requires that employers treat and maintain an individual's genetic information as a confidential medical record under section 102(d)(3)(B) of the ADA. 42 U.S.C. § 2000ff-5(a). Although the exceptions outlined in section § 2000ff-5(b) of GINA do not apply to MSHA, covered entities under the Health Insurance Portability and Accountability Act ("HIPAA") that already possess a right of access pursuant to 45 C.F.R. § 164.512(b)(1)(i), are specifically exempted by GINA's disclosure prohibition. 42 U.S.C. § 2000ff-5(c). Because MSHA is a covered entity under HIPAA, it is permitted access to miners' medical information under GINA. *See* 45 C.F.R. § 164.512(b)(1)(i). Furthermore, section 1635.11(a)(5) of GINA's regulations state that "[t]his part does not–[l]imit the statutory or regulatory authority of . . . the Mine Safety and Health Administration to promulgate or enforce workplace safety and health laws and regulations." 29 C.F.R. § 1635.11(a)(5).

In addition, state law is insufficient to prevent operator compliance with the Secretary's audit initiative. Section 506 of the Mine Act provides that states may have concurrent jurisdiction with MSHA and that state law is not superseded by the Act "except insofar as such State law is in conflict with this chapter or with any order issued or any mandatory health or safety standard." 30 U.S.C. § 955(a).

30

**IV.**

**Conclusion**

For the reasons set forth herein, we conclude that the judge correctly ruled that Petitioners violated 30 C.F.R. § 50.41 by refusing to permit the Secretary access to the related payroll and medical information requested as part of the Part 50 audit. Accordingly, the citations and orders are affirmed.[25]

_____
Mary Lu Jordan, Chairman

_____
Michael G. Young, Commissioner

_____
Robert F. Cohen, Jr., Commissioner

_____
Patrick K. Nakamura, Commissioner

_____

[25] Docket Nos. WEVA 2011-402-R and VA 2011-386-R are dismissed as moot for the reasons stated herein.

31

Commissioner Duffy, dissenting:

These proceedings raise in stark relief and taut contention a number of fundamentally worthy interests and values. For example, it is the Secretary's responsibility to see to it that all reportable accidents, injuries, and illnesses are correctly recorded and those records maintained and made available to her so that she can evaluate the effectiveness of her enforcement program and determine whether current safety and health standards are adequate to protect miners. Likewise, operators have a right to know with certainty what is required of them in meeting their obligations under the Mine Act and in meeting their fiduciary duties to their employees with respect to the collection, maintenance, and release of sensitive personal information. Lastly, and most importantly, miners have a right to confidentiality and security with respect to their intimate health information. Each of these interests needs to be taken into account in arriving at a balance that fosters the purposes of the Mine Act while accommodating fundamental rights of privacy and due process.

The Secretary's actions in these cases fall woefully short of achieving that balance, and for that reason I would reverse the judge's decisions and vacate the citations and orders at issue. I reach this conclusion with respect to broader considerations of law and public policy arising from MSHA's auditing initiative which precipitated these enforcement actions, and with respect to the deficiencies inherent in the issuance of the particular citations and orders before us. In short, for the reasons articulated below, the Secretary's actions are wrong in both a general and particular sense.

As for the general deficiencies of the auditing initiative, it must be rejected as illegitimate because it cannot be reconciled with fundamental and manifest constitutional principles relating to privacy and due process. Supreme Court jurisprudence respecting the scope and legitimacy of warrantless access to private records demands that such records must first be required to be generated and maintained pursuant to enabling legislation or implementing regulations. Neither of those predicates obtains in these circumstances as the Secretary readily admits. Consequently, the Secretary is not authorized to demand records that have not been required to be maintained, either by the Mine Act or the regulations set forth in 30 C.F.R. Part 50.

Even if I were to grant the Secretary the benefit of the doubt as to the legitimacy of her auditing initiative, I would nevertheless reverse the judge and vacate all of the citations and orders issued as being void *ab initio*. The enforcement actions here are invalid because the Secretary issued the citations and orders in the midst of muddled and contradictory signals as to what records were required to be surrendered, and, more fatally, without first having adopted a responsible and constitutionally valid protocol for safeguarding the privacy rights of the miners at these particular mines.[1] Indeed, such a protocol was not finalized and made public until the very

_____

[1] In reviewing these cases I am proceeding under the presumption that "[t]here can be no question that an employee's medical records, which may contain intimate facts of a personal

32

eve of the hearings in these cases and was still undergoing public explanation and clarification during and after oral argument before this Commission. Slip op. at 22 n.17. Therefore, regardless of the merits of the Secretary's newly derived policy asserting her right of access to records not required to be generated and maintained by the Act or the regulations, that policy was incomplete, confusing, and inherently deficient when the demands for records were made and the enforcement actions were taken at these particular mines.

Since I conclude that the enforcement actions in these cases must be vacated on the grounds that the auditing policy and the means by which it was specifically carried out against these operators were both constitutionally deficient, it is necessary to set forth the background necessary to those conclusions. I stress at the outset that the constitutional infirmities I find with respect to the auditing initiative affect both the operators and the miners who have taken issue with the program in these proceedings. The miners have a personal and proprietary interest in the medical records to which the Secretary seeks access that matches if not exceeds that of the operators. Therefore, the following discussion encompasses the constitutional implications of the auditing initiative for both the operators and the miners.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describe the place to be searched, and the person or things to be seized.

U.S. Const. amend. IV.

Fourth Amendment protections against warrantless searches have been extended beyond private residences to commercial premises. *New York v. Burger,* 482 U.S. 691, 699-700 (1987). For example, warrantless inspections conducted by the Occupational Safety and Health Administration ("OSHA") have been held unreasonable in the absence of the employer's consent. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313-15 (1978). The protection against unreasonable searches has been extended to the inspection of records whereby, as a general proposition, such inspections must be in accordance with a formal subpoena, which itself is subject to judicial review as to its reasonableness before sanctions for noncompliance can be imposed. *See v. Seattle*, 387 U.S. 541 (1967):

> Official entry upon commercial property is a technique commonly adopted by administrative agencies at all levels of government to enforce a variety of regulatory laws; thus, entry may permit inspection of the structure in which a business is housed, as in this

nature, are well within the ambit of materials entitled to privacy protection." *United States v. Westinghouse*, 638 F.2d 570, 577 (3rd Cir. 1980).

33

case, or inspection of business products, or a perusal of financial books and records . . . .

> . . . . The agency has the right to conduct all reasonable inspections of such documents *which are contemplated by statute,* but it must delimit the confines of a search by designating the needed documents in a formal subpoena. In addition, while the demand to inspect may be issued by the agency, in the form of an administrative subpoena, it may not be made and enforced by the inspector in the field, and the subpoenaed party may obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply.

*Id.* at 543-45 (emphasis added).

As a general proposition, then, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967). Accordingly, notwithstanding the unequivocal demands placed on the policing power by the Fourth Amendment, the Supreme Court has carved out careful exceptions when it comes to particular industries. Thus, the Court has allowed warrantless administrative inspections of certain establishments on the grounds that they have been pervasively regulated to the extent that their expectations of privacy have been reduced and that the nature of their activities has persuaded Congress that requiring a warrant would frustrate a substantial governmental purpose, such as frequent and unannounced inspections. *See, e.g., United States v. Biswell,* 406 U.S. 311 (1972) (firearms dealers); *Colonnade Catering Corp. v. United States,* 397 U.S. 72 (1970) (alcoholic beverage industry).

However, lest we lose sight of the principles undergirding the Supreme Court's limited departure from its general intolerance for nonconsensual, warrantless entry onto commercial premises, the Court in both *Biswell* and *Colonnade* was careful to point out that access to records during a warrantless physical inspection of the premises is limited to those records specifically required to be maintained by statute and regulation. In *Biswell,* the statute at issue

> authorizes official entry during business hours into "the premises (including places of storage) of any firearms or ammunition . . . dealer . . . for the purpose of inspecting or examining (1) any *records or documents required to be kept* . . . and (2) any firearms or ammunition kept or stored by such . . . dealer . . . at such premises."

34

406 U. S. at 311-12 (quoting 18 U.S.C. § 923(g)) (emphasis added) (alteration in original). In *Colonnade*, the authorizing statute provided:

> The Secretary or his delegate may enter during business hours the premises . . . of any dealer for the purpose of inspecting or examining any *records or other documents required to be kept* . . . under this chapter or regulations issued pursuant thereto . . .

397 U.S. at 73 n.1 (quoting 26 U.S.C. § 5146(b)) (emphasis added).

These caveats were necessary to reconcile those rare instances where warrantless physical inspections of selected commercial premises would be tolerable notwithstanding the restrictive principles adopted for the vast majority of enterprises in *See v. Seattle, supra*. Thus, the Supreme Court has established that in order to justify an exception to the general prohibition against warrantless access to records and the requirement for a subpoena to compel the surrender of such records, there must first be a statutory or regulatory requirement that the records be generated and maintained. That law or regulation, by its specificity as to which documents must be generated and maintained, serves as a necessary and acceptable substitute for the specificity of a subpoena.[2]

In contradistinction to the experience of general industry under the OSHA statute, the Mine Act has been interpreted by the Supreme Court to permit warrantless nonconsensual searches of mines, both coal and noncoal, and both surface and underground. *Donovan v. Dewey*, 452 U.S. 594 (1981). The Court distinguished circumstances under the Mine Act from those under the OSHA statute by finding a substantial federal interest that would be significantly frustrated by a warrant requirement. *Id.* at 602-03. The Court further held that a warrant is not required for MSHA inspections because the mining industry's long history of pervasive regulation has lowered the expectation of privacy among mine operators. *Id.* at 603-04.

---

[2] In support of her auditing initiative, the Secretary cites access to records cases arising under the OSHA statute (S. Br. at 28), but those cases actually underscore the principle that, absent a warrant, the Secretary has no absolute right of access to documents not required to be maintained by statute or regulation. In *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1241 (D.C. Cir. 1980), *cert. denied*, 453 U.S. 913 (1981), access to medical records was predicated on a regulation that required employers to monitor the lead content in employees' blood and to maintain those monitoring records for inspection by authorized representatives of OSHA and the National Institute for Occupation Safely and Health ("NIOSH"). In *General Motors Corp. v. NIOSH*, 636 F.2d 163, 166 (6th Cir. 1980), *cert. denied*, 454 U.S. 877 (1981), access to records was sought by means of a subpoena duces tecum that was made subject to district and circuit court review. The Mine Act does not grant the Secretary similar subpoena powers except in conjunction with public hearings called to investigate mine accidents. *See* 30 U.S.C. § 813(b).

35

In distinguishing the relative expectations of privacy as between mine operators and those employers governed by the OSHA statute, the Court determined that the Mine Act "in terms of the certainty and regularity" of its inspection program (four yearly inspections of underground mines and two yearly inspections of surface mines), as opposed to OSHA's random and unpredictable inspection program, "provides a constitutionally adequate substitute for a warrant" so that the mine operator "cannot help but be aware that he 'will be subject to effective inspection.'" *Id.* at 603 (quoting *Biswell*, 406 U.S. at 316). The Court went on to explain, however, that such "awareness" was owing to the specificity of the regulatory program, including its regulatory requirements:

> [T]he standards with which a mine operator is required to comply are all specifically set forth in the Act or in Title 30 of the Code of federal regulations. Indeed, the Act requires that the Secretary inform mine operators of all standards proposed pursuant to the Act. Thus, rather than leaving the frequency and purpose of inspections to the unchecked discretion of Government officers, the Act establishes a predictable and guided federal regulatory presence. Like the gun dealer in *Biswell*, the operator of a mine "is not left to wonder about the purposes of the inspector or the limits of his task."

*Id.* at 604 (quoting *Biswell*, 406 U.S. at 316) (citation omitted).

The Supreme Court's decision in *Donovan* as it applies to the physical inspection of a minesite resonates strongly with the legislative history of the Mine Act. In explaining the breadth of an MSHA inspector's right of entry "to, upon, or through" any mine, the Senate Committee Report states:

> Section [103(a)] authorizes the Secretary . . . to enter upon, or through any mine for the purpose of making any inspection or investigation under this Act. This is intended to be an absolute right of entry without need to obtain a warrant. . . . . Safety conditions in the mining industry have been pervasively regulated by Federal and State law. . . . . The Committee notes that despite the progress made in improving the working conditions of the nation's miners . . . mining continues to be one of the most hazardous occupations. Indeed, in view of the notorious ease with which many safety and health hazards may be concealed if advance warning of inspection is obtained, a warrant requirement would seriously undercut the Act's objectives.

S. Rep. No. 95-181, at 27 (1977), *reprinted in* Senate Subcomm. on Labor, Comm. on Human Res., *Legislative History of the Federal Mine Safety and Health Act of 1977*, at 615 (1978).

With respect, therefore, to the right of entry for purposes of conducting a physical inspection of a mine and its facilities, Congress and the Supreme Court have most decidedly circumscribed the Fourth Amendment rights of mine operators on the grounds of longstanding and pervasive federal oversight of mining and the need to exercise an element of surprise to assure that hazards are discovered and corrected. That unbridled right of access does not, however, extend to any and all records in a mine operator's possession.

*Donovan* did not specifically address access to records, but since it is a direct outgrowth of the Supreme Court's decisions in *Biswell* and *Colonnade*, it must be assumed that, insofar as access to records is concerned, the restrictions placed upon those agencies charged with enforcing laws relating to firearms (*Biswell*) and liquor (*Colonnade*) must also apply here to MSHA: the access is limited to those records that are required to be generated and maintained by the enabling statute or regulations duly promulgated pursuant to that statute. It should also be stressed that the urgency that may attend a physical inspection of a mine in search of safety and health hazards in no way attends the audits sought to be conducted here, particularly since the Secretary admits that she has no reason to believe that these operators have misreported or doctored their accident, injury, and illness experience as reflected in those records actually required to be maintained under the Act and Part 50. Peabody Tr. 25. Therefore, just as *Biswell* and *Colonnade* restricted a warrantless right of access only to records required to be maintained by statute or regulation, so also their progeny, *Donovan,* must be construed to limit MSHA's access to records required to be maintained by the Act or Title 30.

Unlike my colleagues, I view *Donovan* as inextricably linked to *Biswell* and *Colonnade,* such that their principles regarding access to records apply to the Secretary in her enforcement of the Mine Act. *Biswell* and *Colonnade* provide the basis for the Court's rationale for ultimately distinguishing the Mine Act from the OSHA statute and for reaching different conclusions on warrantless access at minesites versus general industry work sites. My colleagues argue that section 103(h) of the Mine Act is broader than the record-keeping statutes at issue in *Colonnade* and *Biswell*. Slip op. at 25. However, that, by itself, does not answer the question of whether the Secretary's designation of miners' medical records as subject to her section 103(h) authority permits the Secretary to demand the production of those records without a warrant. In *Donovan*, the Supreme Court explained that a warrant was not required in *Biswell* because the authorizing legislation "provided a sufficiently comprehensive *and predictable* inspection scheme." *Donovan*, 452 U.S. at 600 (emphasis added) (citing *Biswell*, 406 U.S. at 316). With regard to the element of "predictability," the Court in *Biswell* allowed for warrantless inspections of gun dealerships because, due to the specificity of the statute at issue, "[t]he dealer is not left to wonder about the purposes of *the inspector or the limits of his task.*" 406 U.S. at 316 (emphasis added).

In contrast, as the Court explained in *Donovan*, in *Barlow's* it invalidated OSHA's warrantless inspections, despite their being authorized by the OSHA statute, because the OSHA statute "does not provide any standards to guide inspectors either in their selection of establishments to be searched or *in the exercise of their authority to search.*" *Donovan*, 452 U.S.

37

at 601 (emphasis added). The Court concluded that a statute that "simply provides that such searches must be performed 'at reasonable times, and within reasonable limits and in a reasonable manner'" did not comport with the principles embodied in the Fourth Amendment. *Id.* As the Court highlighted in *Barlow's* and other cases, a warrant may be necessary to protect against the "unbridled discretion [of] executive and administrative officers" so as to assure that "reasonable legislative or administrative standards for conducting an . . . . inspection are satisfied with respect to a particular [establishment]." *Barlow's*, 436 U.S. at 320-23; *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 538 (1967).

Two Sixth Circuit decisions, one issued prior to *Donovan* and one issued after, provide compelling authority for concluding that the inspection regime under the Mine Act necessarily falls within the rubric of *Biswell* and *Colonnade* and for the proposition that only records required to be maintained by the Mine Act or by duly promulgated regulations can be made subject to warrantless inspection. In *Marshall v. Nolichuckey Sand Co.*, 606 F.2d 693 (6th Cir. 1979), a decision cited favorably by the Supreme Court in *Donovan*, the Sixth Circuit explained why the decision in *Barlow's* did not preclude warrantless searches of mines: "On the contrary, Justice White made it clear that requiring a warrant for OSHA inspection does not doom warrantless search provisions in other regulatory statutes. 'The reasonableness of a warrantless search, however, will depend upon the specific enforcement needs and privacy guarantees of each statute.'" *Id.* at 696 (quoting *Barlow's*, 436 U.S at 321). Among the privacy guarantees the Sixth Circuit identified in the Mine Act, was the fact that the Mine Act "permits warrantless inspections only of the 'active workings' of coal mines. A warrant is required for the inspection of offices and other areas where the operator has a general expectation of privacy." *Id.* (citing *United States v. Consol. Coal Co.*, 560 F.2d 214, 217 (6th Cir. 1977), *vacated and remanded*, 436 U.S. 942, *judgment reinstated*, 579 F.2d 1011 (1978)).

In the post-*Donovan* case, *United States v. Blue Diamond Coal Co.*, 667 F.2d 510 (6th Cir. 1982), the mine operator sought to suppress in a criminal proceeding documents that had been seized by the government during an investigation of the Scotia Coal Mine disaster. The documents in question were mine examination records that were required to be maintained by regulation and were located on a table in the mine office where mine inspectors had always had ready access to them. *Id.* The Sixth Circuit denied the request to suppress the evidence on the grounds that the inspector entered the mine office during reasonable hours and went only to areas where the records were maintained for purposes of government inspection. *Id.*

In a concurring opinion, Judge Wiseman (District Judge, sitting by designation) more thoroughly distinguished the case at hand from the Court's decision in *Consolidation Coal*:

> The agents in *Consolidation Coal* sought "evidentiary indicia of compliance" with section 202 of the Act, 30 U.S.C. § 842. Section 842(a) required the transmittal of dust samples to the monitoring agency, but it did not require operators to make records of any sort available for inspection on the premises. This necessarily means

38

that the items seized in *Consolidation Coal* were not records maintained in compliance with the Act, and thus the defendant retained a significant expectation of privacy as to their contents. On the other hand, all the books seized in the instant case were maintained for public inspection, as required by statute. 30 U.S.C. § 863(d)(1), (f), (g), (w). Consequently, defendants in the instant case had no expectation of privacy in regard to the contents of the records seized. . . .

Although Consolidation Coal Co. was engaged in a closely regulated business, the searches in that case required warrants because the governmental action impinged upon privacy interests that the company still retained, despite its pervasive regulation. *Consolidation Coal* is fully consistent with *Marshall v. Barlow's, Inc.*, as this Court found in its response to the Supreme Court's remand for reconsideration in light of that case. It is also consistent with the Supreme Court's *Donovan* decision. The entries in the instant case required no warrant, however, because defendants had no general expectation of privacy in either the premises entered or the records sought.

Warrants are necessary to check the "unbridled discretion" of government agents as to when, where, and whom to search. That discretion was sufficiently limited in this case, because the agents were only authorized to search for records maintained for MESA[3] inspection in areas freely accessible to MESA agents and other members of the public.

*Id.* at 522 (citations and footnote omitted).

Here, the Secretary's rejection of a rulemaking proceeding in favor of an ad hoc approach to obtaining miner medical records removes her chosen regulatory scheme from the ambit of *Donovan* to that of *Barlow's*. Consequently, a warrant is required before she can make the individual demands for miner medical records that she seeks, or, more efficiently, she must set forth requirements for the generation, maintenance, and release of such records through notice and comment rulemaking.

---

[3] MESA, the Mine Enforcement and Safety Administration, was MSHA's predecessor agency under the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. 801 et seq. (1972).

39

Although section 103(h) of the Mine Act does not require that the records being sought in these cases be maintained by mine operators (a fact the Secretary clearly acknowledges), it does authorize the Secretary to impose such a requirement:

> In addition to such records as are *specifically required by this Act*, every operator of a coal or other mine shall establish and maintain such records, make such reports, and provide such information as the Secretary . . . may reasonably require from time to time to enable him to perform his functions under this Act.

30 U.S.C. § 813(h) (emphasis added).

Notwithstanding the Secretary's arguments to the contrary (S. Br. at 22-23), 30 C.F.R. § 50.41 does not serve to implement the authority of section 103(h) of the Act in a manner that passes constitutional muster, given the dictates of *See*, *Biswell*, *Colonnade*, and *Donovan*, *supra*. To purport that Section 50.41 requires mine operators to provide private medical records to the Secretary, without first requiring that those records be generated and maintained, is inimical to the principles governing access to records, even at those premises that the Supreme Court has held to be subject to warrantless physical inspections. Furthermore, in light of the fundamental doctrine that statutes and regulations must be interpreted so as to avoid a conflict with the Constitution, it would be impermissible to find that 30 C.F.R. § 50.41 by its terms can eliminate the predicate requirement that records sought by the Secretary must first be required to be generated and maintained by mine operators pursuant to a specific provision of the Mine Act or the regulations. *See, e.g.*, *Chamber of Commerce v. Federal Election Commission*, 69 F.3d 600, 604-05 (D.C. Cir. 1995), where the court denied that *Chevron* deference was warranted when the FEC's definition of a key term in the enabling legislation was possibly violative of the First Amendment: "We are obliged to construe the statute to avoid constitutional difficulties if such a construction is not plainly contrary to the intent of Congress."[4]

---

[4] The Secretary's reliance upon language in the Preamble to Part 50 that asserts her right to inspect and copy documents that she determines to be relevant to the task of verifying those reports operators are required to maintain is also misplaced and has an even more attenuated relationship to the authority granted to the Secretary in section 103(h) of the Mine Act than does §50.41. *See* S. Br. at 16-17. A preamble cannot impose an obligation on mine operators that is not set forth in the regulation it purports to summarize. *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536-39 (D.C. Cir. 1986):

> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent proceedings. . . . A properly adopted substantive rule establishes a standard of conduct which has the force of law . . . .

40

Taking *Biswell* and *Colonnade* at their clear prescriptive force, the Secretary may not as a constitutional matter, seek to implement the authority of section 103(h) by fiat. She must do so by means of notice-and-comment rulemaking— the only legitimate way of assuring that a proper rationale has been adopted that justifies the exception to the rule prohibiting warrantless access to records that are inherently private and sensitive. Thus, the term "may reasonably require from time to time" has to mean "require" by means of a duly promulgated rule, not by a demand by the inspector in the field. It cannot be read to legitimize demands for the release of records that can change from one inspection to the next, one mine to the next, or one MSHA district to the next. Indeed the arbitrariness of the auditing initiative is fully demonstrated by the history of these particular cases.

On October 19, 2010, when the Secretary first notified the Peabody Petitioners of her need for records beyond those required to be generated and maintained under the Act and under Part 50, the request, broad and ill-defined, included a demand for the surrender of:

> Medical records in your possession for all persons employed for the period of July 1, 2009 through June 30, 2010, as listed below:
>
> > Worker compensation filings, FMLA releases and records, sick leave records, tests including drug tests, studies, medical reports, medical histories, treatment notes, fact sheets, transfer records, EMT or ER notes, ambulance reports, explanation of benefits (EOB), UB 92s, HICFs, nursing notes, chest x-rays.

Peabody Hearing, Ex. C-A.

The request was so broad as to include all medical records whether or not they were related to accidents, injuries, and illnesses that arose from events or conditions at the mine.

_____

> A general statement of policy, on the other hand, does not establish a 'binding norm.' It is not finally determinative of the issues or rights to which it is addressed.

*Id.* at 537 (quoting *Pacific Gas & Elec. Co. v. FPC*, 506 F2d 33, 38 (D.C. Cir. 1974)) (alteration in original). My colleagues assert that the preamble does not "create a right to obtain information," slip op. at 25 n.19, yet they also acknowledge that only the preamble comes close to specifying some of "the very documents requested by the Secretary in this case." *Id.* at 12.

41

Thereafter, on October 28, 2010, in response to the operator's objection to the breadth of the first request, the Secretary revised her request and demanded:

> All medical records, doctor's slips, worker compensation filings, sick leave requests or reports, drug testing documents, emergency medical transportation records, and medical claims forms in your possession relating to accidents, injuries, or illnesses that occurred at the mine or may have resulted from work at the mine for all individuals working at your mine for the period of July 1, 2009 through June 30, 2010.

*Id.*, Ex. C-D.

While the revised request is somewhat more focused than the first request, it is still subject to broad interpretation, particularly with regard to the phrase "or may have resulted from work at the mine." There are no criteria for determining whether or not an illness or condition such as hearing loss, dermatitis, or back pain should be attributed to activities or conditions at the minesite, or rather to activities or conditions away from the minesite. Likewise, the request, insofar as it refers to "all individuals working at your mine," rather than to "all individuals employed by you," would seem to hold the operator accountable for the medical records of employees of independent contractors who have no employment relationship with the operator. Moreover, since the request seems to have originated with those MSHA employees charged with conducting the audits at issue, there is no assurance that future requests won't gravitate toward the open-ended and amorphous form of the original request quoted above.[5]

---

[5] The revised request for records also included records held by third parties, presumably doctors, clinics, and insurers, from whom the operators have authority to obtain the records or, if such authority does not exist, the identity of those third parties. However, MSHA's authority to inspect stops at the mine gate so it is inconceivable that the agency could demand production of records from these third party agents. Nor can the provisions of Part 50 be stretched and manipulated to authorize a requirement that mine operators secure the records from those third party agents. Moreover, since Part 50 does not require that operators maintain at the minesite the records at issue here, the Secretary's auditing initiative is self-defeating. Operators can simply avoid having to comply with the inspectors' demands by making sure that the records in question are not stored at their minesites. Recently, in *Mining and Property Specialists*, 35 FMSHRC 2961, 2962 (Dec. 2011), the Secretary stated that a requirement that records be maintained at a minesite cannot be met by storing those records at a central headquarters for several local mines because the headquarters is not a "mine" for purposes of the Act, thus precluding the Secretary's right of access. The converse is also true: if a regulation does not require that files be maintained at a minesite, the Secretary cannot demand that they be accessible to her nonconsensual warrantless demand if they are kept at a location not subject to her right of entry. The solution to the Secretary's dilemma is obvious: promulgate a rule that requires the records that she seeks to be maintained at the minesite.

42

The Secretary attempts to assure the Commission that it can trust that her requests will be reasonable, but also asserts in the preamble to Part 50, 42 Fed. Reg. 65535 (Dec. 30, 1977), and in her arguments throughout this litigation, that only she can determine the relevance of the information she seeks. Moreover, while she pays lip service to the operators' and the miners' rights to judicial review of her demands for warrantless access to documents not required to be maintained by the Mine Act or Part 50, I find that to be undermined by her concomitant argument that she is owed great deference on the matters of reasonableness and relevance. *See* S. Br. at 15. Under such circumstances, judicial review becomes something of an empty exercise with a predetermined outcome.

Moreover, it has not been established with the level of assurance that matters of confidentiality require that the Secretary has taken all steps to ensure that the inherent privacy rights of miners have been protected and that she has adequately responded to their concerns. In fits and starts, the MSHA auditing initiative has been massaged as this litigation has proceeded in an attempt to address – on the fly – the miners' privacy rights. However, when constitutional issues are implicated in a regulatory scheme, *ad hoc*, seat-of-the-pants adjustments and assertions of deference owed to the regulator's good intentions are not enough.

The fact remains that at the time these citations and orders were issued, the Secretary had no policy in place that specifically and comprehensively addressed the collection of the miners' personal medical information, the limitations on access by MSHA personnel and others to that information, the means by which the information would be stored, the length of time the information would be retained by MSHA, the uses to which the information would be put, the sanctions that would be imposed for the unauthorized disclosure of the information, and the procedures by which miners would be notified as to the release of the information and their opportunity to have input into how the information would be utilized.

The Secretary should not be allowed to attempt to remedy these glaring deficiencies *post hoc* simply for the sake of administrative convenience or to salvage the citations and orders at issue. When fundamental constitutional rights are placed in potential jeopardy by the Secretary's ill-defined and shape-shifting initiative, it is not legally permissible to allow her a procedural "mulligan." A protocol for protecting the miners' interests in their personal and confidential records is required and, by the dictates of the Supreme Court's pronouncements outlined above, that protocol must take the form of a regulation promulgated through notice-and-comment rulemaking. The Secretary's failure to adopt that course before resorting to the enforcement actions taken here provides sufficient grounds for vacating these particular citations and orders as void *ab initio*, notwithstanding the broader illegitimacy of the auditing initiative.[6]

---

[6] Despite my colleagues views to the contrary, slip op. at 22 n.17, I respectfully insist that the Secretary's post hoc attempt to cobble together a protocol for addressing the miners' fundamental and compelling privacy concerns is inadequate. *Compare* S. Ex. G-5 *with* 29 CFR 1910.1020 (Rules of Agency Practice and Procedure Concerning OSHA Access to Medical Records). Indeed, the Secretary was still fine-tuning her efforts even during and after oral

43

The miners cite the case of *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010), for the proposition that a mere administrative demand, however well intentioned, for confidential records held by a third party that intrudes upon the reasonable expectations of privacy of individuals may well impinge upon the Fourth Amendment rights of those individuals. Interv. Br. at 13. I find that argument compelling in the circumstances presented here. *Warshak* dealt with personal and business e-mail communications; here we are dealing with much more intimate information, the unauthorized disclosure of which could be embarrassing, even devastating.

My colleagues cite *United States v. Miller*, 425 U.S. 435 (1976), as grounds for rejecting the miners' assertion of a right to privacy regarding their medical records. Slip op. at 27. That reliance is unavailing. *Miller* involved business documents such as cancelled checks and deposit slips that were voluntarily generated and provided to a bank by an individual under criminal investigation. *Id.* at 442 ("All of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business."). Furthermore, the Court in *Miller* set forth a crucial caveat that the majority ignores: "We are not confronted with a situation in which the Government, 'through unreviewed executive discretion,' has made a wide-ranging inquiry that unnecessarily 'touch[es] upon intimate areas of an individual's personal affairs.'" *Id.* at 444 n.6 (quoting *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 78-79 (1974) (Powell, J., concurring). That caveat provided the rationale by which the court in *Warshak*, *supra*, distinguished its own holding from *Miller*:

> But *Miller* is distinguishable. First, *Miller* involved simple business records, as opposed to the potentially unlimited variety of "confidential communications" at issue here. Second, the bank depositor in *Miller* conveyed information to the bank so that the bank could put the information to use "in the ordinary course of business."

631 F.3d at 288. The personal medical records of these miners most certainly qualify as "intimate areas of an individual's personal affairs" – even more so than the e-mails at issue in *Warshak* – and as such are fully deserving of Fourth Amendment protection. Moreover, the miners do not voluntarily elect to invest the operators with the authority to keep the medical records. They are automatically created as a condition of employment and for the attendant purpose of securing insurance coverage.

---

argument in this case. Moreover, even if one were to accept that the Secretary's failure to have the protocols in place when these citations and orders were issued was mere "tardiness" and not grounds for invalidating the audit initiative, *id.*, that does not gainsay the conclusion that the *citations themselves* are illegitimate for having been issued without benefit of the protocols, however insufficient and unvetted they might be.

44

There is no question that mine operators must make available to MSHA inspectors those records specifically required to be generated and maintained by the Act or by duly promulgated regulations set forth in Title 30 of the Code of Federal Regulations.[7] For example, in 1987, the Associate Solicitor of Labor for Mine Safety and Health, Edward Clair, issued an opinion letter stating, "[I]t is our position that MSHA has a right of access to any information required to be maintained by the Mine Act or the implementing regulations in Part 50," basing his opinion on the "key factor" that authorized access depends upon "whether the information is required to be maintained under the Mine Act or implementing regulations." Peabody Hearing, Ex. C-I.

Likewise, this Commission and the courts have upheld MSHA's right to inspect reports required to be maintained by the Mine Act. *Peabody Coal Co.* 6 FMSHRC 183 (Feb. 1984) (operator's accident investigation report); *Youghiogheny & Ohio Coal Co. v. Morton*, 364 F. Supp. 45 (S.D. Ohio 1973) (concluding that "maps, books, and records which are maintained for and in compliance with the Mine Safety Act" must be produced upon an inspector's demand).

The seminal judicial pronouncement on MSHA's right of access to records not required to be generated or maintained by the Act or the regulations was former Chief Administrative Law Judge Broderick's decision in *Sewell Coal Co.*, 1 FMSHRC 864 (July 1979) (ALJ). In that decision the judge held that MSHA inspectors were not authorized to inspect "records not specifically required to be kept by law." *Id.* at 871. Of fundamental importance to Judge Broderick (and what must be of fundamental importance in these proceedings as well) was the "cardinal rule" of statutory construction that required him to interpret the Act "so as to avoid conflict with the Constitution." *Id.*

The Secretary discounts the influence that should be accorded *Sewell* by arguing that it is an unreviewed decision. For purposes of sound authority, if the decision is correct, and it is, it makes no difference whether it was reviewed or not. Indeed, even while noting that *Sewell* was an unreviewed decision, the Commission majority in *BHP Copper, Inc.*, 21 FMSHRC 758 (July

---

[7] In that sense, MSHA Form 7000-1--Mine Accident, Injury and Illness Report, required by 30 CFR § 50.20 – not the audit initiative – corresponds to the selected prescription drug forms required to be generated, maintained, and submitted to the New York Public Health Department in *Whalen v. Roe*, 429 U.S. 589 (1977), cited by the majority at 21-22, supra. Both records were subjected to extensive public comment and input through, respectively, calculated legislative and rulemaking processes. In the case of *Whalen*, the statute challenged as violative of privacy rights was "manifestly the product of an orderly and rational legislative decision. It was recommended by a specially appointed commission which held extensive hearings on the proposed legislation, and drew on experience with similar programs in other States." *Id.* at 597. That procedurally careful provenance, respectful of the privacy rights at stake, provided the basis for the Supreme Court's acceptance of an otherwise intrusive injection of the state into the doctor-patient relationship. That attention is missing here and renders the audit initiative incompatible with *Whalen*.

45

1999), gave Chief Judge Broderick's decision wide berth by taking pains to distinguish the request for a miner's telephone number during an accident investigation in *BHP* from an inspector's attempt to access medical records in *Sewell* (*id.* at 767 n.15,) and ultimately based its decision on the Secretary's duty to investigate accidents under section 103(a) of the Mine Act, not her right of access to records under section 103(h). *Id.* at. 765 n.12; *see also Peabody*, 6 FMSHRC at 186 n.5 ("Because this case involved only a request for records specifically required by the Act to be maintained, it does not present the situation faced in *Sewell* . . . . There the inspector sought to personally review accident, injury and illness and medical and compensation records at the mine. Those records were contained in individual personnel files which also contained other data not required to be maintained by the Mine Act.").

Moreover, the Secretary can point to no cases since *Sewell* was issued more than three decades ago where she has taken enforcement action to compel surrender of medical records not required to be generated and maintained by the Act or Part 50. That would seem to underscore the continuing potence of the Chief Judge's logic in *Sewell*.

The judge below and the Secretary on appeal attempt to distinguish *Sewell* from the present case by noting that in *Sewell* the inspector sought to inspect the records himself, whereas here the inspectors simply asked the operators to inspect the records and turn over those documents referred to in the demand letters. 33 FMSHRC at 1318; 33 FMSHRC at 1400; S. Br. at 19. The practical effect of both approaches is the same— the Secretary is able to secure nonconsensual, warrantless access to private records not required to be maintained by the Mine Act or Part 50. It is a distinction without a difference. More importantly, from the perspective of the miners whose confidential records are at stake, it doesn't matter whether the "rummager" is the inspector or the mine operator's agent acting on orders from the inspector. In the absence of a regulatory standard governing the maintenance and release of these medical records, the infringement on miners' expectations of privacy is the same— particularly in circumstances where the operator's agent is apprised of the potential for civil penalties of up to $7500 per day for failure to comply with the inspector's demand. *See* 30 C.F.R. § 100.5(c).[8]

In addition to the conflicts with Fourth Amendment principles, the auditing initiative is also violative of the due process rights of operators and the miners employed at mines made subject to the audits.

---

[8] The conclusion reached by the court in *Warshak*, *supra*, where the government was found to violate the Fourth Amendment when, without a warrant, it compelled an internet service provider ("ISP") to turn over e-mails from one of its subscribers, is directly on point here: "It only stands to reason that, if government agents compel an ISP to surrender the contents of a subscriber's emails, those agents have thereby conducted a Fourth Amendment search, which necessitates compliance with the warrant requirement absent some exception." 631 F.3d at 286.

46

Section 103(h) of the Mine Act and Part 50 of Title 30 are of universal application to all mines— from underground coal mines employing 500 miners to mom and pop gravel quarries employing five miners. Operators, regardless of size, status, or location, are entitled to be regulated by binding norms that apply equally to all operations. Moreover, those binding norms must, by the dictates of the Mine Act and the Administrative Procedures Act, be specifically and unambiguously set forth in regulations adopted in consequence of public notice and comment.[9] The demands made in these cases, ostensibly in contemplation of imposing pattern of violation sanctions (Oral Arg. Tr. 46), lack that universality and specificity. For example, there is nothing to prevent a demand for the prior one year's medical records at one mine in one MSHA district versus a demand for the prior two years' medical records at a different mine in a different MSHA district. The criteria and scope of the requests seem to be dependent more upon the level of curiosity of the various auditors than by any standard, industry-wide system for records generation and retention. There is no predictability, no notice of what can be required to be maintained and released.

Section 103(h) refers to "every operator of a coal or other mine" as having the responsibility to provide information to the Secretary, but the auditing initiative does not apply to all operators. It could only be applicable across the board if all operators were required to generate and maintain the medical and employment records being sought. By imposing the obligation to turn over records not specifically required to be maintained by regulation, the auditing initiative effectuates disparate treatment of those operators and the miners they employ who by fiat are brought within the ambit of the auditing initiative. Since the Secretary is not alleging that the operators in these proceedings were suspected of under reporting accidents, injuries, or illnesses in those documents that are specifically required to be maintained by the standards set forth in Part 50, the disparate treatment here cannot be justified as having been imposed for good cause, an essential component in determining whether a warrantless search of records is justified in general terms. *See v. Seattle, supra.*

Once a mine is randomly subjected to an audit of the kind contemplated in these cases, it can be assumed that the records would have to be maintained and made available prospectively, notwithstanding the lack of a regulatory mandate to do so, in order to avoid criminal sanctions under section 110(f) of the Mine Act, 30 U.S.C. § 820(f), or other laws applicable to the maintenance of records in contemplation of potential litigation. This disparate treatment as between mines inside and outside the MSHA auditing initiative raises additional due process concerns that have not been taken into account by the Secretary in imposing this initiative on a random basis with the potential for vacillating requirements from mine to mine and request to request. Furthermore, without formal standards setting forth the types of records that may be demanded and the time periods for which the demand can be made, the auditing initiative will

---

[9] *See American Mining Congress v. MSHA*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) ("[C]learly some agency creation of a duty is a necessary predicate to any enforcement against an operator for failure to keep records.").

47

continue to be an arbitrary moving target which this Commission and its judges will be continuously asked to review for "reasonableness."

To be sure, the Secretary has made a strong case justifying her need to inspect these types of records in order to verify the accuracy of records that are explicitly required by the regulations, and to determine whether accident, injury, and illness statistics at a given mine are so appreciably high that they should be factored into a decision to impose the severe sanction of a pattern of violation notice. However, Congress and its standard-setting surrogates, the regulatory agencies, must tailor their statutes and regulations to the immutable patterns provided by the Constitution. We cannot stretch and trim the Constitution to fit the current fashion. Regulatory strategies, no matter how well intentioned, must not serve to contort those inherent rights and privileges intrinsic to a constitutionally protected society.

I cannot emphasize enough that I agree in principle with my colleagues that the Secretary can have access to the private medical records of miners that she seeks here, but she cannot gain that access by fiat. The auditing initiative, in order to avoid conflict with fundamental constitutional principles, must be subjected to the protections and the safeguards that only public notice-and-comment proceedings can provide. The requirement for rulemaking does not place an undue burden on the Secretary. Indeed she is currently engaged in developing rules for imposing pattern of violations sanctions on mine operators pursuant to the authority of section 104(e) of the Act. 30 U.S.C. § 824(e); 76 Fed. Reg. 5719 (Feb. 2, 2011). Since the auditing initiative is apparently intended to provide data to aid in the decision on whether to impose the pattern of violations sanction, it is only appropriate that this crucial component be added to the agenda of the rulemaking proceeding. The Fourth Amendment permits no other way.

We pride ourselves on being a government of laws and not of men. Accordingly, no matter how attractive and efficient a regulatory initiative may be in the abstract, if it implicates fundamental rights of privacy and due process, if it imposes new obligations not found in current regulations, and if it constitutes a radical departure from decades of prior practice and policy, it must be promulgated subject to the full scrutiny and input of those who must live with and under it.

Accordingly, I would reverse the judge and vacate all citations and orders issued in these cases.

Michael F. Duffy, Commissioner

48

Distribution:

Robin Rosenbluth, Esq.
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Blvd., Room 2228
Arlington, VA   22209

W. Christian Schumann, Esq.
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Blvd., Room 2220
Arlington, VA   22209-2296

Samuel Lord, Esq.
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Blvd., 22nd Floor West
Arlington, VA   22209-2247

Daniel W. Wolff, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC   20004-2595

Thomas C. Means, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC   20004-2595

Alexander Macia, Esq.
Spilman, Thomas & Battle, PLLC
300 Kanawha Blvd. East
P.O. Box 273, Charleston, WV   25321

James A. Lastowka, Esq.
McDermott Will & Emery LLP
600 13th Street NW
Washington, DC   20005-3096

Arthur G. Sapper, Esq.
McDermott Will & Emery LLP
600 13th Street NW
Washington, DC    20005-3096

Administrative Law Judge Kenneth Andrews
Federal Mine Safety & Health Review Commission
Office of the Administrative Law Judges
7 Parkway Ctr.
875 Greentree Rd., Suite 290
Pittsburgh, PA 15220

Administrative Law Judge Janet Harner
Federal Mine Safety & Health Review Commission
Office of the Administrative Law Judges
7 Parkway Ctr.
875 Greentree Rd., Suite 290
Pittsburgh, PA 15220