Nos. 12-2316 and 12-2460 (consolidated)

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

BIG RIDGE, INC., PEABODY MIDWEST MINING, LLC,

and

JERAD BICKETT, et al.,

Petitioners,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

and

SECRETARY OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION,

Respondents.

_____

ON PETITIONS FOR REVIEW OF A DECISION
OF THE FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

_____

BRIEF FOR RESPONDENT THE SECRETARY OF LABOR

_____

M. PATRICIA SMITH
Solicitor of Labor

HEIDI W. STRASSLER
Associate Solicitor

W. CHRISTIAN SCHUMANN
Counsel, Appellate
  Litigation

ROBIN ROSENBLUTH
Senior Attorney

U.S. Department of Labor
Office of the Solicitor
1100 Wilson Boulevard
Suite 2200
Arlington, Virginia 22209-2296
Telephone: (202) 693-9333
rosenbluth.robin@dol.gov

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................. ii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE ............................................................... 1

    A.    Nature of the Case and Statutory and Regulatory Framework .................... 1

    B.    Course of Proceedings and Disposition Below ................................ 5

SUMMARY OF THE ARGUMENT ....................................................... 13

ARGUMENT

    I.    .............................................................................. 16

    STANDARDS OF REVIEW ........................................................ 16

        1.    Statutory Interpretation ..................................................... 16

        2.    Regulatory Interpretation .................................................... 18

        3.    The Secretary's Interpretations In This Case Are Entitled
            To Full Deference ........................................................... 19

    II.    THE COMMISSION PROPERLY READ SECTIONS 103(a)
        AND 103(h) OF THE MINE ACT AS AUTHORIZING THE
        INFORMATION REQUESTS ..................................................... 24

    III.    THE COMMISSION PROPERLY READ SECTION 50.41 AS
         AUTHORIZING THE INFORMATION REQUESTS .................................. 40

    IV.    THE INFORMATION REQUESTS DO NOT VIOLATE
         PEABODY'S FOURTH AMENDMENT RIGHTS ................................... 48

V.     THE INFORMATION REQUESTS DO NOT VIOLATE
       MINERS' PRIVACY RIGHTS ..........................................................................59

       1.     Miners' Fourth Amendment Rights ........................................................59

       2.     Miners' Constitutional Right To Informational Privacy ......................62

       3.     Other Federal and State Privacy Rights ...............................................69

       4.     State Laws ..............................................................................................75

VI.    THE INFORMATION REQUESTS DO NOT VIOLATE
       THE FIFTH AMENDMENT ...........................................................................77

VII.   THE INFORMATION REQUESTS DO NOT VIOLATE
       THE PAPERWORK REDUCTION ACT .......................................................82

CONCLUSION .....................................................................................................................84

CERTIFICATE OF COMPLIANCE ...................................................................................85

CERTIFICATE OF SERVICE ............................................................................................86

ADDENDUM

# TABLE OF AUTHORITIES

CASES

Page

*AFGE v. HUD*, 118 F.3d 786 (D.C. Cir. 1997)......................................................65, 68

*Ali v. Achim*, 468 F.3d 462 (7th Cir. 2006),
    *cert. dismissed*, 552 U.S. 1085 (2007)....................................................17

*American Mining Congress v. MSHA,* 995 F.2d 1106 (D.C. Cir. 1993) ....................39

*Altria Group, Inc. v. Good*, 555 U.S. 70 (2008)............................................76

*Barry v. City of New York*, 712 F.2d 1554 (2d Cir.),
    *cert. denied*, 464 U.S. 1017 (1983) ..........................................................65

*Bay v. Cassens Transport Co.*, 212 F.3d 969 (7th Cir. 2000) ...................................73

*BHP Copper, Inc.*, 21 FMSHRC 758 (1999) ...................................................22, 34, 51

*Boyd v. Secretary of the Navy*, 709 F.2d 684 (11th Cir. 1983),
    *cert. denied*, 464 U.S. 1043 (1984) ..........................................................67

*Brock v. Emerson Electric Co.,* 834 F.2d 994 (11th Cir. 1987)................................56

*California v. Ciraolo*, 476 U.S. 207  (1986)................................................60

*Cement Div., National Gypsum Co.*, 3 FMSHRC 822 (1981) ......................................4

*Chevron USA v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ............................................................17, 19, 22, 23

*Civil Aeronautics Board v. United Airlines, Inc.*,
    542 F.2d 394 (7th Cir. 1976) ...........................................................19, 14

*Clinchfield Coal  Co.*, 11 FMSHRC 2120 (1989)..............................................80

*Coffman v. Indianapolis Fire Department*, 578 F.3d 559 (7th Cir. 2009).................62

*Consolidation Coal Co.*, 11 FMSHRC 966 (1989)............................................22

*Consolidation Coal Co. v. FMSHRC*, 824 F.2d 1071 (D.C. Cir. 1987) ........................4

*Contreras v. City of Chicago*, 119 F.3d 1286 (7th Cir. 1997)...............................53, 56

*Dimeo v. Griffin*, 943 F.2d 679 (7th Cir. 1991) (en banc)...........................................60

*Donovan v. Dewey*, 452 U.S. 594 (1981)....................................2, 35, 48-52, 54, 55, 57

*Donovan v. Lone Steer*, 464 U.S. 408 (1984).............................................................58

*DOJ v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749 (1989) ...............66

*Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411 (10th Cir. 1984)............45

*Employers Insurance of Wausau v. Browner,* 52 F.3d 656 (7th Cir. 1995),
    *cert. denied*, 516 U.S. 1042 (1996) .................................................................79

*Energy West Mining Co. v. FMSHRC*, 40 F.3d 457 (D.C. Cir. 1994)......17, 24, 26,  63

*Energy West Mining Co. v. FMSHRC,* 111 F.3d 900 (D.C Cir. 1997).................80, 81

*Ex Parte Young*, 209 U.S. 123 (1908) ................................................................77, 78

*Exelon Generation Co., LLC v. Local 15, International Brotherhood of
    Electrical Workers, AFL-CIO*, 676 F.3d 566 (7th Cir. 2012) .................................18

*Fidelity Federal Savings and Loan Association*, 458 U.S. 141 (1982) ......................43

*Florida v. Riley,* 488 U.S. 445 (1989) .........................................................................62

*Freeman United Coal Co.*, 6 FMSHRC 1577 (1984) .................................................22

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995)....................................................76

*Garden Creek Pocahontas Co.*, 11 FMSHRC 2148 (1989).........................................22

*General Electric Company v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010),
    *cert. denied*, 131 S.Ct. 1259 (2011) ................................................................79

*General Motors Corp. v. NIOSH,* 636 F.2d 163 (6th Cir. 1980),
    *cert. denied,* 454 U.S. 877 (1981) ............................................................64, 76, 77

*Green v. Berge*, 354 F.3d 675 (7th Cir. 2004)............................................................62

*Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997) ...................................................33

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1 (2000) ............................................................................................18

*Henke v. United States Dep't of Commerce*, 83 F.3d 1453 (D.C. Cir. 1996) .............67

*Hibbing Taconite Co.*, 28 FMSHRC 143 (2006) (ALJ) ................................................22

*JEM Broadcasting Co. v. FCC*, 22 F.3d 320 (D.C. Cir. 1994) ....................................46

*Johnson v. Moundsvista, Inc.,* 2002 WL 2007833 (D. Minn. Aug. 28, 2002) .............74

*Joy Technologies, Inc. v. Secretary of Labor*, 99 F.3d 991 (10th Cir. 1996),
*cert. denied*, 520 U.S. 1209 (1997) .........................................................................45

*Kahn v. United States*, 548 F.3d 549 (7th Cir. 2008) ................................................17

*LeRoy v. Illinois Racing Board*, 39 F.3d 711 (7th Cir. 1994),
*cert. denied* 515 U.S. 1131 (1995) ..........................................................................33

*Legacy Emanuel Hospital and Health Center v. Shalala,*
97 F.3d 1261 (9th Cir. 1996) ..................................................................................28

*Lesser v. Espy*, 34 F.3d 1301 (7th Cir. 1994) ...........................................................52

*Louisiana Chemical Association v. Bingham*, 550 F. Supp. 1136
(W.D. La. 1982), *aff'd* 731 F.2d 280 (5th Cir. 1994) ...............................................44

*MacKenzie Medical Supply, Inc. v. Leavitt*, 506 F.3d 341 (4th Cir. 2007) .........38, 39

*Manalapan Mining Co.*, 18 FMSHRC 1438 (1996) (ALJ) ...........................................22

*Marshall v. Stoudts Ferry Prep.*, 602 F.2d 589 (3d Cir. 1979) ..................................81

*Martin v. OSHRC*, 499 U.S. 144  (1991) ...................................................................18

*Maryland v. Louisiana*, 451 U.S. 725 (1981) .............................................................76

*Matter of Establishment Inspection of Skil Corp.*,
846 F.2d 1127 (7th Cir. 1988) ................................................................................34

*McLaughlin v. Taft Boradcasting Co., 849 F.2d 990 (6th Cir. 1988)* ........................56

*Monterey Coal Co. v. FMSHRC*, 743 F.2d 589 (7th Cir. 1984) ..................................32

*Moriarty ex re. Local Union No. 727 v. Svec*, 429 F.3d 710 (7th Cir. 2005) ..............82

*Mourning v. Family Publications Service, Inc.*, 411 U.S. 356 (1973)........................41

*Murray v. Pittsburg Board of Education,* 759 F. Supp. 1178 (W.D. Pa. 1991) ..........69

*Nacco Mining Co.,* 9 FMSHRC 1541 (1987) ...............................................................38

*NARA v. Favish*, 541 U.S. 157 (2004).........................................................................66

*National Aeronautics and Space Administration v. Nelson,*
    131 S.Ct. 746 (2011) ...............................................................................63, 65, 68

*National Association of Home Builders v. Defenders of Wildlife,*
    551 U.S. 644 (2007) ...........................................................................................70, 71

*National Cable & Telecommunications Ass'n v. Brand X Internet,*
    545 U.S. 967 (2005) ...................................................................................................22

*National Public Radio, Inc. v. Federal Communications Commission,*
    254 F.3d 226 (D.C. Cir. 2001)...................................................................................39

*New York v. Burger*, 482 U.S. 691 (1987) ..........................................................48, 53

*NMA v. MSHA,* 512 F.3d 696 (D.C Cir. 2008)............................................................46

*North Fork Coal Co. v. FMSHRC,*  691 F.3d 735 (6th Cir. 2012)..............................17

*Northern Illinois Steel Supply Co. v. Secretary of Labor,*
    294 F.3d 844 (7th Cir. 2002) ....................................................................................19

*Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923 (7th Cir. 2004) ......76, 77

*Oliver v. United States*, 466 U.S. 170 (1984) ............................................................48

*Pattison Sand Co. v. FMSHRC,* 688 F.3d 507 (8th Cir. 2012)....................................17

*Pero v. Cyprus Plateau Mining Corp.*, 22 FMSHRC 1361 (2000) ........................25, 63

*Pfizer, Inc. v. Heckler*, 735 F.2d 1502 (D.C. Cir. 1984)...............................................18

*Phillips Petroleum Co. v. Lujan*, 963 F.2d 1380 (10th Cir. 1992) ..............................83

*PLIVA, Inc. v. Mensing*, 131 S.Ct. 2567 (2011)...........................................................76

*Posadas v. National City Bank of New York*, 296 U.S. 497 (1936) ...........................70

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ...................................71

*RAG Cumberland Resources, LP v. FMSHRC*, 272 F.3d 590 (D.C. Cir. 2001)..........17

*Rakas v. Illinois*, 439 U.S. 128 (1978).........................................................................59

*RCA Global Communications, Inc. v. FCC*, 758 F.2d 722 (D.C. Cir. 1985) .........28, 31

*Reisman v. Caplin*, 375 U.S. 440  (1964) ....................................................................79

*RSM, Inc. v. Buckles,* 254 F.3d 61 (4th Cir. 2001) .....................................................58

*Russello v. United States*, 464 U.S. 16 (1983).................................................27, 39, 55

*Schachter v. Whalen*, 581 F.2d 35 (2d Cir. 1978)........................................................65

*Sealed Case (Medical Records)*, 381 F.3d 1205 (D.C. Cir. 2004) ...............................76

*Secretary of Labor v. Excel Mining, LLC*, 334 F.3d 1 (D.C. Cir. 2003).....................17

*Secretary of Labor v. Ohio Valley Coal Co.*, 359 F.3d 531 (D.C. Cir. 2004)..............18

*Secretary of Labor v. Western Fuels-Utah, Inc.*, 900 F.2d 318 (D.C. Cir. 1990) .......45

*See v. City of Seattle*, 387 U.S. 541 (1967) .................................................................58

*Sewell Coal Co.*, 1 FMSHRC 864 (1979)......................................................................54

*Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735  (1996) ................................23

*Solid State Circuits, Inc. v. EPA*, 812 F.2d 383 (8th Cir. 1987) ................................79

*State of Illinois v. Shalala,* 4 F.3d 514 (7th Cir. 1993) ...............................................43

*Stataros v. New York City Taxi and Limousine Commission*,
    198 F.3d 317 (2d Cir. 1999)......................................................................................69

*Thoms v. ABF Freight System, Inc.*, 31 F.Supp.2d 119 (E.D. Wis. 1998).................73

*Thunder Basin Coal Co. v. FMSHRC*, 56 F.3d 1275 (10th Cir. 1995).......................26

*Thunder Basin Coal Co. v. Reich,* 510 U.S. 200 (1994)..........................................5, 78

*Time Warner Cable v. Doyle,* 66 F.3d 867 (7th Cir. 1995),
    *cert. denied,* 516 U.S. 1141 (1996) ........................................................17

*Traynor v. Turnage,* 485 U.S. 535 (1988) ....................................................70

*Tucson Women's Clinic v. Eden,* 379 F.3d 531 (9th Cir. 2004) ............................65, 69

*Udall v. Tallman,* 380 U.S. 1 (1965) ..........................................................18

*UMWA v. Maple Creek Mining, Inc.,* 29 FMSHRC 583 (2007)..................................78

*United States v. Biswell,* 406 U.S. 311 (1972) ...............................................51

*United States v. Consolidation Coal Co.,* 560 F.2d 214 (6th Cir. 1977),
    *vacated and* remanded, 436 U.S. 942 (1978),
    *judgment reinstated,* 579 F.2d 1011 (1978).....................................54, 55

*United States v. Johnson,* 529 U.S. 53 (2000)..........................................27

*United States v. Jones,* __ U.S. __, 132 S.Ct. 945 (2012)...........................60

*United States v. Miller,* 425 U.S. 435 (1976) ......................................30, 59

*United States v. Morton Salt Co.,* 338 U.S. 632 (1950) ...............................56

*United States v. Nadar,* 542 F3d 713 (9th Cir. 2008),
    *cert. denied,* 129 S.Ct. 879 (2009) .......................................72

*United States v. Westinghouse Elec. Corp.,*
    638 F.2d 570 (3d Cir. 1980)..............................................26, 64, 65, 68

*United Steelworkers of America v. Marshall,* 647 F.2d 1189 (D.C. Cir. 1980),
    *cert. denied,* 453 U.S. 913 (1981) .....................................47, 64, 66

*United Transportation Union-Illinois Legislative Board v. Surface
    Transportation Board,* 183 F.3d 606 (7th Cir. 1999) ...............................19

*University of Medicine and Dentistry of New Jersey v. Corrigan,*
    347 F.3d 57 (3d Cir. 2003), *cert. denied,* 542 U.S. 937 (2004) ......................35

*U.S. v. Jamieson-McKames Pharmaceuticals, Inc.,*
    651 F.2d 532 (8th Cir. 1981), *cert. denied,* 455 U.S. 1016 (1981).....................49

*U.S. v. Pitt-Des Moines, Inc.*, 168 F.3d 976 (7th Cir. 1999) .......................................27

*U.S. v. Sicilia*, 475 F.2d 308, (7th Cir. 1973) .................................................................38

*U.S. Steel Mining Co.*, 25 FMSHRC 550  (2003) (ALJ) ...............................................22

*Watt v. Alaska* 451 U.S. 259 (1981) ..........................................................................70

*Western States Cattle Co., Inc. v. Edwards*, 895 F.2d 438 (8th Cir. 1980)..........50, 53

*Whalen v. Roe*, 429 U.S. 589 (1977)..........................................................64, 65, 66, 68

*Young v. Murphy,* 90 F.3d 1225 (7th Cir. 1996)..............................................................59

*Youghiogheny Ohio Coal Co. v. Morton,* 364 F. Supp. 45 (S.D. Ohio 1973)...............54

## STATUTES AND CODES

Privacy Act:
5 U.S.C. 552a(a)(5) ....................................................................................................67

Freedom of Information Act:
5 U.S.C. 552b(c)(4).....................................................................................................47
5 U.S.C. 552b(c)(6).................................................................................................47, 66
5 U.S.C. 552b(c)(7)(C)...............................................................................................66

Administrative Procedure Act:
5 U.S.C. 553(c) ............................................................................................................46

Small Business Regulatory Enforcement Fairness Act:
5 U.S.C. 601, et seq. ...................................................................................................82
5 U.S.C. 601 (2011) - Executive Order No. 12,866 (1994)........................................82
5 U.S.C. 601 (2011) - Executive Order No. 13,272 (2003)........................................82

Occupational Safety and Health Act:
29 U.S.C. 657(c)(1).....................................................................................................28

Mine Safety and Health Act of 1977:
30 U.S.C. 801 *et seq.*...................................................................................................1
  Section 2(c), 30 U.S.C. 801(c) ..................................................................................1
  Section 3(h), 30 U.S.C. 802(h) ................................................................................54
  Section 101(a), 30 U.S.C. 811(a) ...........................................................................

Section 103(a), 30 U.S.C. 813(a) ........................................................................1, 2
Section 103(c), 30 U.S.C. 813(c) ......... 2, 9, 13, 14, 16, 19, 20, 23, 24, 25, 32, 33, 36,
                          40, 50, 51, 52, 54, 55, 56, 60, 72, 75
Section 103(d), 30 U.S.C. 813(d) ......................................................................2, 52
Section 103(e), 30 U.S.C. 813(e) ....................................................................30, 31
Section 103(f), 30 U.S.C. 813(f) ...........................................................................27
Section 103(g)(2), 30 U.S.C. 813(g)(2)...................................................................27
Section 103(h), 30 U.S.C. 813(h) .... 1, 2, 3, 7, 8, 9, 11, 13, 14, 16, 19, 20, 23, 24, 25,
                          26, 27, 29, 30, 32, 33, 34, 35, 36, 37, 39,
                          40, 50, 52, 53, 55, 60, 71, 72, 73, 75
Section 103(j), 30 U.S.C. 813(j) .......................................................................3, 52
Section 104(a), 30 U.S.C. 814(a) .............................................................................4
Section 104(b), 30 U.S.C. 814(b) ...........................................................4, 8, 78, 80
Section 104(e), 30 U.S.C. 814(e) ....................................................................4, 57
Section 104(e)(4), 30 U.S.C. 814(e)(4) .................................................................27
Section 105(c), 30 U.S.C. 815(c) ..........................................................................14
Section 105(d), 30 U.S.C. 815(d) ....................................................................5, 78
Section 106, 30 U.S.C. 816 ......................................................................................5
Section 106(a)(1), 30 U.S.C. 816(a)(1)............................................................36, 82
Section 108, 30 U.S.C. 818 ............................................................................14, 58
Section 108(a)(1)(C), 30 U.S.C. 818(a)(1)(C)..........................................................5
Section 108(a)(1)(E), 30 U.S.C. 818(a)(1)(E)...........................5, 10, 13, 33, 81
Section 108(a)(1)(F), 30 U.S.C. 818(a)(1)(F) .....................................5, 10, 13, 33, 81
Section 110(a), 30 U.S.C. 820(a) ....................................................................5, 78
Section 110(b), 30 U.S.C. 820(b) ....................................................................5, 78
Section 110(i), 30 U.S.C. 820(i) .................................................................5, 79, 80
Section 113(d), 30 U.S.C. 823(d) .............................................................................5
Section 202 (g), 30 U.S.C. 842(g)..........................................................................55
Section 506, 30 U.S.C. 955 ...........................................................................12, 75
Section 506(a), 30 U.S.C. 955(a) ...........................................................................75
Section 508, 30 U.S.C. 957 .............................................................................2, 40

Paperwork Reduction Act:
44 U.S.C. 3501 *et seq.* .......................................................................................82
44 U.S.C. 3518(c)(1)(B)(ii) ..............................................................................82, 83

## REGULATIONS

5 C.F.R. 930.301 ....................................................................................................67
5 C.F.R. 1320.4(a)(2)..............................................................................................83
5 C.F.R. 1320.4(c) ............................................................................................83, 84
29 C.F.R. 825.500(g) ........................................................................................71, 74
29 C.F.R. 825.500(g)(3)..........................................................................................74

29 C.F.R. 1630.14(b) ................................................................................71
29 C.F.R. 1630.14(c) ................................................................................71
29 C.F.R. 1630.14(c)(1) ............................................................................74
29 C.F.R. 1630.15(e) ......................................................................72, 73, 74
30 C.F.R. Part 50 ..................................4, 5, 10, 12, 14, 25, 37, 48, 52, 68
30 C.F.R. 50.2(e) ........................................................................................3
30 C.F.R. 50.2(f) .........................................................................................3
30 C.F.R. 50.2(g) ........................................................................................3
30 C.F.R. 50.2(h)(2) ..............................................................................3, 41
30 C.F.R. 50.10 ...............................................................................3, 41, 52
30 C.F.R. 50.20 ...........................................................................................3
30 C.F.R. 50.20-1 through 50.20-6 .......................................................3, 41
30 C.F.R. 50.30 .....................................................................................3, 42
30 C.F.R. 50.40 ...........................................................................................3
30 C.F.R. 50.41 .................. 1, 3, 8, 10, 11, 14, 16, 20, 23, 24, 40, 42, 43, 44, 50, 53, 57,
                                                                    60, 71, 72, 73, 74, 75
30 C.F.R. 104.2(b)(3) ....................................................................4, 52, 57, 83
30 C.F.R. 104.3 ...................................................................................52, 83
30 C.F.R. 104.4 .......................................................................................57
45 C.F.R. 164.512(b) .............................................................................61, 72
45 C.F.R. 164.512(b)(1)(v)(C) ..................................................................61
45 C.F.R. 164.512(b)(1)(v)(D) ..................................................................61

## RULES

Fed. R. Evid. 501 ....................................................................................76
Fed. R. Evid. 1101(c) ..............................................................................77

## LEGISLATIVE HISTORY

U.S. House of Representatives Hearing Before the Committee on Education
    and the Workforce, 112 Cong. 2d Sess. 66 (March 27, 2012).................36

S. 717, 95th Cong., 1st Sess. 20, *reprinted in* Senate Subcommittee on Labor,
Committee on Human Resources, 95th Cong., 2d Sess., *Legislative History of
the Federal Mine Safety and Health Act of 1977, ("Leg. Hist.")* at 129; H.R.
4287, 95th Cong., 1st Sess. 20, *Leg. Hist.* at 207 .................................38, 39

## OTHER AUTHORITIES

42 Fed. Reg. 55569 (Oct. 17, 1977) ...........................................................43

42 Fed. Reg. 65534 (Dec. 30, 1977) ..........................................................43

42 Fed. Reg. 65535 (Dec. 30, 1977) ....................................................43, 46

65 Fed. Reg. 82624 (Dec. 28, 2000) ..........................................................61

65 Fed. Reg. 82670 (Dec. 28, 2000) ....................................................61, 72

http://www.msha.gov/POV/povmines.asp .............................................9, 57

http://www.msha.gov/mshainfo/mshainf2.htm .........................................42

http://www.merriam-webster.com/dictionary/record ..................................29

http://www.merriam-webster.com/dictionary/information .........................29

http://www.merriam-webster.com/dictionary/from%20time%20to%20time .............31

Random House Webster's Unabridged Dictionary (2d ed. 2001) ..............................37

2A N. Singer, Statutes and Statutory Construction
    §46.06, pp. 181-186 (rev. 6th ed. 2000) ...................................................28

Webster's Third New International Dictionary (2002) ...............................................37

JURISDICTIONAL STATEMENT

The jurisdictional summaries in the briefs of petitioners Big Ridge, Inc.,
and Peabody Midwest Mining, LLC  (collectively "Peabody") and Jerald
Bickett and other individual miners (collectively "Bickett") are complete and
correct.

STATEMENT OF THE ISSUES

1.  Whether the Commission properly read Sections 103(a) and 103(h) of
the Mine Act as authorizing the Secretary's information requests.

2.  Whether the Commission properly read 30 C.F.R. § 50.41 as authorizing
the information requests.

3.  Whether the information requests violate Peabody's Fourth Amendment
rights.

4.  Whether the information requests violate miners' privacy rights.

5.  Whether the information requests violate the Fifth Amendment.

6.  Whether the information requests violate the Paperwork Reduction Act.

STATEMENT OF THE CASE

A.  *Nature of the Case and Statutory and Regulatory Framework*

The Mine Act was enacted to improve and promote safety and health in the
Nation's mines.  30 U.S.C. § 801.  In enacting the Mine Act, Congress stated
that "there is an urgent need to provide more effective means and measures
for improving the working conditions and practices in the Nation's * * *
mines * * * in order to prevent death and serious physical harm, and in order

to prevent occupational diseases originating in such mines."  30 U.S.C. §
801(c).  Titles II and III of the Act establish interim mandatory health and
safety standards.  Section 101(a) of the Act authorizes the Secretary to
promulgate improved mandatory health and safety standards for the
protection of life and prevention of injuries in coal and other mines.  30
U.S.C. § 811(a).  Section 508 of the Act authorizes the Secretary to
promulgate regulations as she deems necessary to carry out any provision of
the Act.  30 U.S.C. § 957.

Under Section 103(a) of the Mine Act, inspectors from MSHA, acting on
behalf of the Secretary, "shall make frequent inspections and investigations"
of mines "for the purpose of obtaining, utilizing, and disseminating
information relating to health and safety conditions, the causes of accidents,
the causes of diseases and physical impairments originating in such mines,"
"gathering information with respect to health and safety standards," and
"determining whether there is compliance with the mandatory health or
safety standards or with * * * other requirements of [the Act]."  30 U.S.C. §
813(a).   Section 103(a) confers on the Secretary the right to enter mines
without a warrant.  *Donovan v. Dewey*, 452 U.S.  594, 602-03 (1981).

Section 103(d) of the Mine Act requires operators to investigate the causes
of accidents, maintain records of accidents, and provide such information to
MSHA.  30 U.S.C. § 813(d).  Section 103(h) of the Act states that "in addition
to such records as are specifically required by this chapter," operators "shall

establish and maintain such records, make such reports, and provide such information, as the Secretary * * * may reasonably require from time to time to enable h[er] to perform h[er] functions under this chapter." 30 U.S.C. § 813(h).

Section 103(j) of the Mine Act and 30 C.F.R. § 50.10 require operators to immediately notify MSHA when an accident occurs. 30 U.S.C. § 813(j). Accidents causing an injury that has a reasonable potential to cause death must be reported within 15 minutes. 30 U.S.C. § 813(j); 30 C.F.R. § 50.10.

30 C.F.R. § 50.20 requires operators, in the event of an "accident," "occupational injury," or "occupational illness," to complete and submit to MSHA an MSHA Mine Accident, Injury, and Illness Report Form 7000-1 (JA-27). Whether an event is reportable, and when and how the event is reported, depend, *inter alia*, on the cause of any injury, the injury's severity, the treatment administered, and the time spent recovering from the injury. *See* 30 C.F.R. §§ 50.2(e), (f), (g), (h)(2), 50.20-1 through 50.20-6.

30 C.F.R. § 50.30 requires operators to complete and submit to MSHA a Quarterly Employment and Coal Production Report Form 7000-2 (JA-29). 30 C.F.R. § 50.40 requires operators to maintain and make available for inspection copies of submitted 7000-1 and 7000-2 forms at mine offices. 30 C.F.R. § 50.41 requires operators to allow MSHA "to inspect and copy information related to an accident, injury, or illnesses which MSHA considers

relevant and necessary * * * to a determination of compliance with the reporting requirements [of Part 50]."

Section 104(a) of the Mine Act provides for the issuance of citations and orders for violations of the Act, standards, or regulations promulgated under the Act.  30 U.S.C. § 814(a).  Section 104(b) of the Act provides that miners shall be withdrawn from the affected area of a mine when an operator fails to abate a violation within the time specified by the Secretary in a citation. 30 U.S.C. § 814(b).  Section 104(e) of the Act provides for enhanced enforcement against operators who have a pattern of "significant and substantial" violations, including mandatory issuance of withdrawal orders whenever new significant and substantial violations are found.  30 U.S.C. § 814(e).[1]  MSHA considers an operator's accident, injury, and illness record in determining whether to place an operator on potential pattern status.  30 C.F.R. § 104.2(b)(3); JA-29.

Section 108 of the Mine Act provides that the Secretary may seek injunctive relief when an operator "refuses to admit" the Secretary into the mine, "refuses to permit the investigation of an accident or occupational disease occurring" in the mine, "refuses to furnish any information or report

---

[1] Under Commission case law, a violation is properly designated significant and substantial "if, based upon the particular facts surrounding that violation, there exists a reasonable likelihood that the hazard contributed to will result in an injury or illness of a reasonably serious nature." *Cement Div., National Gypsum Co.*, 3 FMSHRC 822, 825 (1981).  *See Consolidation Coal Co. v. FMSHRC*, 824 F.2d 1071, 1085 (D.C. Cir. 1987) (citing *National Gypsum*).

4

requested by the Secretary," or "refuses to permit access to, and copying of, such records as the Secretary * * * determines necessary in carrying out the provisions of the Act." 30 U.S.A. §§ 818(a)(1)(C), (E), and (F).

Section 110(a) of the Mine Act provides that operators shall be assessed civil penalties for violations of the Act. 30 U.S.C. § 820(a). Section 110(b) of the Act provides that operators may be assessed a penalty or daily civil penalties for failing to correct violations. 30 U.S.C. § 820(b).

Under Sections 105(d) and 113(d) of the Mine Act, a mine operator may contest a citation, order, or proposed civil penalty before the Commission, an independent adjudicatory agency established under the Act to provide trial-type administrative hearings and appellate review in cases arising under the Act. 30 U.S.C. §§ 815(d) and 823(d). *See Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 204 (1994). Under Section 110(i) of the Act, the Commission reviews all penalties proposed by the Secretary according to six criteria, including negligence and the appropriateness of the penalty to the size of the business of the operator. 30 U.S.C. § 820(i). *See also Thunder Basin*, 510 U.S. 200 at 208. Final Commission action is subject to judicial review by an appropriate United States Court of Appeals. 30 U.S.C. § 816.

B. *Course of Proceedings and Disposition Below*

As part of an initiative to conduct compliance audits under 30 C.F.R. Part 50, MSHA, on October 28, 2010, requested that Big Ridge, Inc. ("Big Ridge") have certain documents available for review relating to the Willow Lake

Portal Mine in Illinois and that Peabody Midwest Mining LLC ("Peabody

Midwest") have certain documents available for review relating to the Air

Quality #1 Mine in Indiana.  RSA-5; JA-56, 61.[2]  Big Ridge and Peabody

Midwest are subsidiaries of Peabody Energy Corporation.  RSA-5.

The requests, which were temporally limited to the period from July 1,

2009, through June 30, 2010, requested that Peabody have available for

MSHA's review:

1. All MSHA Form 7000-1 Accident Reports

2. All Quarterly MSHA Form 7000-2 Employment and Production Reports

3. All payroll records and time sheets for individuals working at the mine
   for the covered time period

4. The number of employees working at the mine for each quarter

5. All medical records, doctor's slips, worker compensation filings, sick
   leave requests or reports, drug testing documents, emergency medical
   transportation records, and medical claims forms in the [operators']
   possession *relating to accidents, injuries, or illnesses that occurred at
   the mine, or may have resulted from work at the mine*, for all
   individuals working at the mine for the period of July 1, 2009 through
   June 30, 2010.

RSA 6-7; JA 32-35. (emphasis added)[3]

---

[2]   "RSA" refers to the required short appendix that is appended to Peabody's
brief.  "JA" refers to the stipulated joint appendix.

[3]   Before making the information requests at issue in this case, MSHA made
broader information requests to Peabody.   The Secretary did not take any
enforcement action relating to Peabody's non-compliance with the broader
requests.

Peabody refused to make available the information listed in categories three and five.  RSA-7.  As a result, on November 9, 2010, MSHA issued two Section 104(a) citations to Peabody.  RSA-7; JA-36, 37.  After Peabody continued to refuse to make the information available, the Secretary issued two Section 104(b) orders for failing to abate the violations.  RSA-7; JA-10, JA-38, AR-393.

Peabody timely contested the citations and orders, and the Secretary agreed to expedite the proceedings.  RSA-7.  A hearing was held on December 14, 2010.  RSA-7.  The Secretary agreed not to propose penalties for the violations until after the judge's decision was issued.  Oral Argument at p. 44-45, SSA-32-33.[4]

On May 20, 2011, the ALJ issued a decision.  JA-6.   Concluding that the requested information was reasonably necessary for MSHA to determine compliance with requirements of the Act and regulations, the judge held that, under the plain meaning of Section 103(h) of the Mine Act, Peabody was required to provide the information.  JA-15.  Particularly given the Secretary's compelling need to determine compliance with the Act's record-keeping requirements, the judge also found that, even if Section 103(h) were ambiguous, the Secretary's interpretation of Section 103(h) as authorizing the information document requests was reasonable.   JA-22.

---

[4]   "SSA" refers to the Secretary of Labor's Supplemental Appendix.

The judge also read 30 C.F.R. § 50.41 as plainly authorizing the Secretary's requests.  JA-21.

The judge found that the governmental interests in promoting miner safety and health outweighed the operators' privacy interests in the information. JA-20.  The judge also found that, given the mining industry's pervasive regulation and the language of Section 103(h), Peabody could not have had a reasonable expectation of privacy in the information.  JA-22.  The judge stressed that the Secretary was not demanding to search through the operators' files, and that the requests were limited by both content and time. *Id.*  The judge found that the information requests were neither overly broad nor burdensome, nor unreasonable.  JA-19, 23.

After the judge issued his decision, the Secretary, on June 13, 2011, advised Peabody that within seven days she would begin assessing daily civil penalties under Section 104(b) of the Act if the information was not provided. JA-92.  Peabody did not provide the information, and on June 23, 2011, MSHA began assessing daily civil penalties against Peabody Midwest, but not Big Ridge.[5]  The issue of whether the daily civil penalties are appropriate

---

[5]  The Secretary began assessing daily civil penalties against Peabody Midwest because the Air Quality Mine would have qualified for additional regulatory scrutiny for having a potential pattern of violations but for its previously calculated "severity measure" (a numerical measure of a mine's injury and illness history) that was based on pre-audit information provided to MSHA by Peabody.  See JA-93.  The Secretary decided not to assess daily civil penalties against Big Ridge because, by that time, Willow Lake's accident and employment data for the 12-month period ending June 30, 2011, already indicated that the mine had a potential pattern of violations.  *See*

is pending before the Commission in another proceeding.  JA-92-95.  On agreement of the parties, that proceeding has been stayed pending resolution of this case.

  Peabody petitioned the Commission for review of the judge's decision, and the Commission granted review.  While the matter was pending before the Commission, certain individual miners intervened in the proceeding.  AR-855-A, 855-C.

  On May 24, 2012, the Commission, through a four-member majority, affirmed the judge's decision.  RSA-1.  Recognizing that the Secretary's audit initiative "is an important tool in carrying out the [Secretary's] duty to determine that operators are providing complete and accurate reports regarding all accident, injuries, and illnesses occurring at our nation's mines," the Commission held that the Secretary's requests for information fell squarely within her authority under Section 103(a) of the Act to obtain information relating to the causes of accidents and illnesses, and to determine whether there is compliance with the Mine Act and Mine Act standards.  RSA-10.

  Rejecting Peabody's argument that the Secretary is only authorized to obtain records that operators are required to keep under the Act, the Commission held that Section 103(h) of the Act plainly authorizes the Secretary to request records that are not specifically required to be

---

http://www.msha.gov/POV/povmines.asp (November 30, 2011, letter notifying Big Ridge that it was on potential pattern of violations status).

maintained under the Act, as long as the request is reasonable. *Ibid.*  The Commission determined that the language of Section 103(h) is consistent with and reinforced by other sections of the Act -- including Sections 108(a)(1)(E) and (F), which provide for injunctive relief when operators fail to provide information to the Secretary without limiting the mandate to information an operator is legally required to maintain.  In addition, the Commission held that the legislative history of the Act supported its plain meaning reading.  RSA-10-11.

Although concluding that Section 103(h) standing alone authorized the information requests, (RSA-10), the Commission held that 30 C.F.R. § 50.41 also plainly requires operators to provide the Secretary with access to the information requested to verify compliance with Part 50.  RSA-11-14.  In doing so, the Commission noted that the preambles to the proposed and final rule discuss the very types of documents requested.  RSA-13.

The Commission found a "clear correlation" between the records sought and the completed Part 50 forms operators are required to provide MSHA.  RSA-16.  Based both on evidence concerning the particular process in which reportable information is transmitted and maintained by Peabody -- in which safety officials responsible for completing forms lack direct and critical access to the actual information they are reporting -- and on the general incentive for operators to underreport injuries and illness to avoid enhanced MSHA scrutiny and enforcement actions,  the Commission found that the potential

10

for misreporting and underreporting is a genuine and justifiable concern for MSHA because it could result in a misunderstanding of the true safety conditions at a mine.  RSA-17.

Given that the requests were limited in time to a one-year period, and limited in scope to records relating to accidents, injuries, or illnesses that occurred at the mine or resulted from work at the mine, the Commission found that the requests were not only relevant and necessary, but reasonable and neither overly broad nor burdensome.  RSA-20.

While recognizing the sensitive nature of the records, the Commission found that the governmental interest in regulating occupational safety and health in a notoriously dangerous industry outweighs miners' privacy interests.  After considering MSHA's "clearly articulated need" for the information, the statutory and regulatory limits placed on her requests, the narrow tailoring of the requests, the Secretary's commitment to safeguard the information, and the Secretary's protocols that are in place to protect the information, the Commission majority affirmed the judge's finding that the Secretary's requests do not violate any right to privacy in the information. RSA-22.

Given the pervasive regulation of the mining industry, the limits to the Secretary's authority set forth by Section 103(a) of the Act, the authority of the Secretary under Section 103(h), and Section 50.41 -- which the Commission found specifically put operators on notice that they may be

required to provided the requested information -- the majority held that Peabody did not have a reasonable expectation of privacy in the records and rejected its Fourth Amendment claim.  RSA-23-26.  The Commission also found that miners do not have a Fourth Amendment expectation of privacy in the records because they are maintained by Peabody.  RSA-27.

Recognizing that miners had the right to challenge the Secretary's requests in this proceeding, and noting that the general public, including miners, had the opportunity to challenge the Secretary's Part 50 regulations when they were promulgated thirty years ago, the majority rejected the intervenor-miners' argument that their Fifth Amendment due process rights were violated when the Secretary promulgated the Part 50 regulations.  RSA-28-29.

Finally, the Commission rejected the argument that disclosing the requested documents would be inconsistent with the Americans with Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), or the Genetic Information Non-Discrimination Act of 2008 ("GINA").   The Commission found that those federal statutes did not preclude the release of the documents.  RSA-29-30.  Noting that Section 506 of the Act provides that the Mine Act supersedes inconsistent state law, the majority also rejected the argument that releasing the documents would violate state law.  RSA-29-30.

One Commissioner dissented from the decision.  RSA-32-48.

## *SUMMARY OF THE ARGUMENT*

Accurate information concerning accidents, illness, and injuries originating in mines is the cornerstone to the Secretary's ability to protect the safety and health of the Nation's miners. Section 103(h) of the Mine Act, which complements the Secretary's authority under Section 103(a) of the Act to conduct warrantless inspections and investigations of mines, states that,"[i][n addition to such records as are specifically required by the chapter," operators shall "provide such information as the Secretary * * * may reasonably require from time to time to enable h[er] to perform her functions."   Because the Secretary's information requests in this case are reasonably required to enable her to verify operators' compliance with reporting obligations, the requests are authorized by Section 103(h).

Nothing in the language of Section 103(h), or elsewhere in the Act, limits the Secretary's right to request "information" under Section 103(h) to information that she has required operators to keep and maintain through rulemaking. Peabody's interpretation to that effect should therefore be rejected. Peabody's interpretation should also be rejected because it reads the term "information" and the phrase "from time to time" out of Section 103(h). And, contrary to Peabody's argument, the term "information" encompasses recorded information.

Peabody's interpretation should also be rejected because it is inconsistent with other provisions of the Act, including Sections 108(a)(1)(E) and

13

108(a)(1)(F), which authorize the Secretary to seek injunctive relief against an operator that "refuses to furnish any information or report requested by the Secretary" or "refuses to permit access to, and copying of, such records as * * * the Secretary determines are necessary to carry out any provision of [the Act]." The substantive right that the Secretary may enforce via an injunction proceeding under Section 108 is conferred in Sections 103(a) and 103(h). And the fact that the Secretary does not have general subpoena authority under the Act does not negate her authority to require operators to provide information under Section 103(h).

Even if the Secretary were required to engage in rulemaking before making the information requests in this case, she did so almost thirty years ago when she promulgated 30 C.F.R. § 50.41. Section 50.41 requires operators to allow MSHA to inspect the information because it is "relevant and necessary" to a determination of compliance with their reporting obligations under Part 50. Contrary to petitioner's argument, requests under Section 50.41 must be reasonably required by the Secretary to perform her functions, and any assertion that a request is not reasonably required by the Secretary is reviewable by the Commission.

Given the pervasive regulation of the mining industry, and the Secretary's authority as set forth in Sections 103(a) and 103(h) of the Act and Section 50.41 -- all of which put operators on notice that they may be required to provide the requested medical and payroll information -- Peabody did not

14

have a reasonable expectation of privacy in the information.  Its Fourth
Amendment argument therefore fails.  Because the records were in the
possession of mine operators, the miners' Fourth Amendment argument also
fails.  In any event, given the pervasive regulation of the mining industry and
operators' established obligation to report miners' injuries and illnesses to
MSHA -- including information about miners' medical treatment for such
injuries and illnesses -- miners do not have an expectation of privacy in the
documents that society is willing to recognize as reasonable for Fourth
Amendment purposes.  Even if they did, the information requests are
permissible under the "special needs" exception to the warrant requirement.

   Because of the Secretary's compelling need for the information to protect
miner safety and health, miners' reduced expectation of privacy in the
records, and the statutory and MSHA safeguards in place to protect the
information, the requests do not violate miners' constitutional rights to
informational privacy.  The requests also do not violate miners' rights to
privacy as protected by the ADA or the FMLA.  Those statutes do not repeal
the Mine Act provisions that authorize MSHA to access the documents.
Indeed, regulations under both statutes permit disclosure to the Secretary.
To the extent that any state law would prohibit disclosure, it is preempted by
the Mine Act.

   Nor do the information requests violate the Fifth Amendment.  Because
contested penalties under the Mine Act are only due and payable after review

by the Commission and a Court of Appeals, they pass constitutional muster.
The Fifth Amendment concerns are particularly unjustified in the context of
daily civil penalties under the Act because the imposition of such penalties is
discretionary with the Commission.   Finally, there is no merit to the
National Mining Association's ("NMA's") argument that the information
requests violate the Paperwork Reduction Act -- an argument that, in any
event, was not raised below and that the Court is without jurisdiction to
consider.

## ARGUMENT

### I.

*Standards of Review*

Determination of whether the Secretary was authorized to require
Peabody to provide the requested information requires the Court to review
the Secretary's interpretation of Sections 103(a) and 103(h) of the Mine Act,
30 U.S.C. §§ 813(a) and 813(h), as authorizing the requests.  If the Court
disagrees that the Secretary was adequately authorized under Sections
103(a) and 103(h) of the Act standing alone to request the information,
resolution of this case will also require the Court to review the Secretary's
interpretation of 30 C.F.R. § 50.41.

1.  *Statutory Interpretation*

"If the intent of Congress is clear, that is the end of the matter, for the
court, as well as the agency, must give effect to the unambiguously expressed

intent of Congress." *Ali v. Achim*, 468 F.3d 462, 468 (7th Cir. 2006), *cert. dismissed*, 552 U.S. 1085 (2007) (citing and quoting *Chevron USA v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984)). Courts use the traditional tools of statutory construction in determining whether the meaning of a statutory provision is plain. *Time Warner Cable v. Doyle*, 66 F.3d 867, 877 (7th Cir. 1995), *cert. denied*, 516 U.S. 1141 (1996). If, after looking at the language and structure of the statute as a whole, the plain meaning of a provision cannot be discerned, the Court may look to the origin, purpose, and legislative history of the statute to discern its meaning. *Kahn v. United States*, 548 F.3d 549, 556 (7th Cir. 2008).

If a provision does not have a plain meaning, the Secretary's interpretation is owed deference and is entitled to affirmance as long as it is reasonable. *Pattison Sand Co. v. FMSHRC,* 688 F.3d 507, 512 (8th Cir. 2012); *Energy West Mining Co. v. FMSHRC*, 40 F.3d 457, 460 (D.C. Cir. 1994) (deferring to the Secretary's interpretation of Section 103(h)); *Secretary of Labor v. Excel Mining, LLC*, 334 F.3d 1, 6 (D.C. Cir. 2003) (all affording the Secretary's interpretation *Chevron* deference). *See also*, *North Fork Coal Co. v. FMSHRC*, 691 F.3d 735, 742-42 (6th Cir. 2012) (affording *Skidmore* deference). "Where, as here, the Secretary and the Commission agree, there is no question but that [the Court] must accord deference to their joint view." *RAG Cumberland Resources, LP v. FMSHRC*, 272 F.3d 590, 596 (D.C. Cir. 2001).

2. *Regulatory Interpretation*

It is well established that if a regulation's meaning is plain, the regulation cannot be construed to mean something different from that plain meaning. *Exelon Generation Co., LLC v. Local 15, International Brotherhood of Electrical Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012); *Pfizer, Inc. v. Heckler*, 735 F.2d 1502, 1509 (D.C. Cir. 1984) (citing *Udall v. Tallman*, 380 U.S. 1, 16 (1965)).  When the language of a provision is plain, that is the meaning of the provision, and the sole function of the courts is to enforce the language as written.  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms") (internal citation and quotation marks omitted).

It is also well established that if a regulation's meaning is not plain, an adjudicatory body should give great deference to the interpretation of the agency entrusted with enforcing the regulation, and the agency's interpretation must be accepted as long as it is not plainly erroneous or inconsistent with the language or the purpose of the regulation.  *Martin v. OSHRC*, 499 U.S. 144, 148-49 (1991); *Exelon Generation*, 676 F.3d at 570; *Secretary of Labor v. Ohio Valley Coal Co.*, 359 F.3d 531, 534 (D.C. Cir. 2004).

3.  *The Secretary's Interpretations In This Case Are Entitled To Full Deference*

If the meaning of the statutory provisions in this case is not plain, Peabody asserts that the Secretary's interpretations are not owed *Chevron* deference because the question of whether the Secretary has the authority to request information that operators are not required to maintain is jurisdictional.   P-Br. at 12, 48 (*citing Northern Illinois Steel Supply Co. v. Secretary of Labor*, 294 F.3d 844, 847 (7th Cir. 2002)).   Contrary to Peabody's characterization, the question presented in this case -- whether Sections 103(a) and 103(h) of the Mine Act authorize the Secretary to require mine operators, over whom she undisputedly has jurisdiction, to "provide [] information" that the Act or regulations do not specifically require mine operators to maintain -- is not the type of jurisdictional question on which this Court has declined to give the Secretary deference.   *Compare Northern Illinois Steel*, 294 F.3d at 847 (involving the question of whether an entity was a mine "operator" and covered by the Mine Act).   The question in this case is not one of coverage in the first place, but rather involves the Secretary's authority over entities over which she undisputedly has jurisdiction, and is the type of question on which this Court has recognized deference is owed the administering agency.   *See Civil Aeronautics Board v. United Airlines, Inc.*, 542 F.2d 394, 402 (7th Cir. 1976) (holding that an agency's interpretation concerning the scope of a statutory provision authorizing it to inspect records was entitled to deference).   *See also United Transportation Union-Illinois Legislative Board*

19

*v. Surface Transportation Board*, 183 F.3d 606, 612 (7th Cir. 1999)
(distinguishing between questions of an agency's jurisdiction --- questions on
which the agency is not owed deference -- and questions of the extent of an
agency's authority over things over which it has jurisdiction, questions on
which the agency is owed deference).

  Also unconvincing is Peabody's assertion that the Secretary's statutory and
regulatory interpretations are not entitled to deference because, during the
course of this litigation, the Secretary has taken inconsistent positions on the
meaning of Section 103(h).  P-Br. at 49.  She has not.

  Throughout this litigation, the Secretary has interpreted Sections 103(a)
and 103(h) of the Act, and Section 50.41, as authorizing her to inspect records
that operators have in their possession but are not required to keep.  *See*
Secretary's Posthearing Brief at p. 2, SSA-23  ("The Secretary discussed [in
her pre-hearing memorandum] how both the plain meaning of the Mine Act
and appellate court precedent permit MSHA to access records that are not
specifically required to be kept by an operator under the Mine Act. . . .  She
incorporates the arguments made in that memorandum into this post-
hearing brief.")  *See also* the Secretary's Pre-hearing Bench Memorandum at
pp. 13-17, SSA-2-6, and the Secretary's Response Brief  to Commission at pp.
7-22, SSA-43-58 (both asserting that Sections 103(a) and (h) of the Act and
Section 50.41 authorize the requests).

Also contrary to Peabody's characterization (P-Br at 49), the Secretary has consistently maintained -- both before the ALJ and before the Commission -- that the 1987 letter from former counsel Edward Clair to the Vice President of the National Stone Association on the Part 50 audit program reserved MSHA's right to access the information. *See* Posthearing Brief at pp. 14-15, SSA-55-56 (stating that the letter "does not support Peabody's argument" and instead "*reserved* MSHA's right under section 50.41 to access information related to accidents and injuries that is relevant and necessary to determining Part 50 compliance," and that the "letter supports MSHA's position that it may, and in fact routinely does, consult the medical and employment records needed to determine compliance"), and Secretary's Response Brief to the Commission at pp. 19-20, SSA-55-56 (stating that, "[c]ontrary to [Peabody's] interpretation of Mr. Clair's letter, the letter *reserved* MSHA's right under Section 50.41 to access information related to accidents and injuries that is relevant and necessary to determining Part 50 compliance").

Indeed, as the Secretary's assertions before the Commission pointed out, the letter stated:

> "[I]t is our position that as long as these audits do not constitute the "wholesale" warrantless search proscribed by *Sewell*, they are entirely permissible.

JA-77. As discussed below, the audits in this case do not constitute "wholesale" warrantless searches. Accordingly, contrary to Peabody's

characterization, Mr. Clair's statements in the letter are consistent with the Secretary's interpretation in this case.

Moreover, before the Commission, the Secretary did not, as Peabody asserts (P-Br. at 49) repudiate the letter. Instead, as an alternative argument, the Secretary asserted that "even if Mr. Clair's letter could be interpreted in the manner suggested by Peabody [ ], the Secretary years ago renounced any such interpretation." Secretary's Response Brief at p. 20, SSA-56. The Secretary then pointed out that at least since March 1998, when the Secretary issued the citation in *BHP Copper, Inc.*, 21 FMSHRC 758 (1999), she has interpreted her authority under the Act to include the authority to request information that operators are not specifically required to maintain. *Ibid.* To support her interpretation, she also pointed out numerous instances over the years in which the she has verified Part 50 compliance through information in medical records. *Ibid.* (citing *Freeman United Coal Co.*, 6 FMSHRC 1577 (1984); *Garden Creek Pocahontas Co.*, 11 FMSHRC 2148 (1989); *Consolidation Coal Co.*, 11 FMSHRC 966 (1989); *Manalapan Mining Co.*, 18 FMSHRC 1438 (1996) (ALJ); *U.S. Steel Mining Co.*, 25 FMSHRC 550 (2003) (ALJ); *Hibbing Taconite Co.*, 28 FMSHRC 143 (2006) (ALJ)).

Of course, as the Commission recognized, even if the Secretary's statutory interpretation in this case represented a change, "change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *National Cable &*

*Telecommunications Ass'n v. Brand X Internet*, 545 U.S. 967, 982 (2005) ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework."); *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996).

Peabody's suggestion that the Secretary's statutory and regulatory interpretations in this case are not entitled to deference because she has changed her position as to whether the Privacy Act applies to the information, and assertedly was unable to fully articulate her position on privacy protections at oral argument on Peabody's request for temporary relief before the Commission, also fails. *See* P-Br. 49-50. The Secretary's statements concerning the protection to be afforded the documents do not detract from her consistent interpretation that she is entitled to the documents under Section 103(a), Section 103(h) and Section 50.41.[6]

Also contrary to Peabody's assertion (*See* P-Br. at 49), the fact that the Secretary initially issued an information request that was broader than the information requests at issue in this case, and that an MSHA inspector assertedly stated that the requests were authorized under the Health

---

[6]  Specifically, at the argument, counsel for the Secretary asked for additional time to answer Commissioners' questions concerning whether the Secretary would agree to implement redaction procedures for personally identifiable information contained in audit information in her possession; whether MSHA would redact personally identifiable information in documents that might be circulated to another government agency if, for example, the information indicated that occupational pneumoconiosis had been greatly underreported; and the precise protocol for destroying the information. Oral Argument at pp. 71-75, SSA-35-39.

Insurance Portability and Accountability Act of 1996 ("HIPAA"), does not

detract from the fact that the Secretary has consistently interpreted

Sections 103(a) and 103(h) and Section 50.41 to authorize the requests.

Finally, Peabody's assertion that the Secretary's interpretations are not

entitled to deference because they raise serious Fourth Amendment

constitutional questions (P-Br. at 48-49) fails.  As discussed *infra*, they do

not.

## II.

### THE COMMISSION PROPERLY READ SECTIONS 103(a) AND 103(h) OF THE MINE ACT AS AUTHORIZING THE INFORMATION REQUESTS

Accurate information concerning accidents, injuries, and illnesses

originating in mines is the cornerstone to preventing death, injury, and

occupational diseases originating in mines.  The Secretary uses accident,

injury, and illness data for a variety of reasons -- including to identify and

intensify attention on mines with hazardous safety and health trends, to

determine what measures should be taken to prevent future injuries and

illnesses originating in mines by, *inter alia*, promulgating improved safety

and health standards, to exercise her authority to take enhanced enforcement

action against especially hazardous mines, and to focus education and

training efforts.  *See* RSA-15 (the Commission recognized that "Part 50 is the

cornerstone of enforcement under the Act"); *Energy West Mining,* 40 F.3d at

461 (noting that the Secretary uses Part 50 information "to determine

whether measures might be taken to prevent additional injuries of the same kind"); *Pero v. Cyprus Plateau Mining Corp.*, 22 FMSHRC 1361, 1364 (2000) ("[O]ne of the purposes of the reporting requirements under 30 C.F.R. Part 50 is to allow MSHA to identify those aspects of mining which require intensified attention with respect to health and safety regulation"). *See also* Hearing Tr. at pp. 20-24, SSA-15-19.

Section 103(a) of the Mine Act authorizes the Secretary to conduct warrantless inspections and investigations of mines, *inter alia*, to obtain "information relating to health and safety conditions, the causes of accident, and the causes of diseases and physical impairments originating in such mines," to "gather information with respect to health and safety standards," and to "determine whether there is compliance with the mandatory health or safety standards or with * * * other requirements of [the Act]." 30 U.S.C. § 813(a).

Section 103(h) of the Mine Act states:

> *In addition to* such records as are specifically required by this chapter, every operator of a coal or other mine shall establish and maintain such records, make such reports, and *provide such information*, as the Secretary or the Secretary of Health and Human Services *may reasonably require from time to time* to enable h[er] *to perform h[er] functions* under this chapter * * * .

30 U.S.C. § 813(h) (emphases added).

The Secretary and the Commission read Section 103(h) as complementing the Secretary's inspection and investigation authority under Section 103(a), and as plainly meaning that operators must provide the Secretary

25

information that she "reasonably require[s]" "to enable h[er] to perform h[er]

functions" under the Act.  RSA-10.  Even if the meaning of Section 103(h) is

not plain, the Court should accept the Secretary's interpretation because it is

consistent with the language of Section 103(h), the statutory scheme of the

Mine Act, the legislative history of Section 103(h), and the purpose of Section

103(h).

 Under Peabody and NMA's interpretation, operators would only be required

to provide information that the Secretary's regulations specifically require

operators to maintain.  *E.g.,* P-Br. at 25.  Nothing in Section 103(h) limits the

Secretary's authority to require operators to provide information in such a

manner.  Insofar as Peabody and NMA's  interpretation reads a requirement

into Section 103(h) "that has no basis in the statute's language," it should be

rejected.  *Thunder Basin Coal Co. v. FMSHRC*, 56 F.3d 1275, 1280 (10th Cir.

1995).  *See also Energy West,* 40 F.3d at 461 (Section 103(h) "grants a broad

delegation to the Secretary to require mine operators to provide information

necessary to enable the Secretary to perform [her] functions under this

chapter.  . . . That section contains little limitation on the type of information

to be provided." (internal quotation marks omitted)); *United States v.*

*Westinghouse Elec. Corp.*, 638 F.2d 570, 575 (3d Cir. 1980) (because a

regulation gave NIOSH authority to review "records required by the Act and

regulations, and other related records," the court declined to limit NIOSH's

examination of medical records to records that the statute or regulations required the petitioner to maintain).

In the first part of Section 103(h), Congress required operators to furnish records that are "specifically required." In the second part of Section 103(h), Congress required operators to maintain records, make reports, and provide information without qualifying that requirement with the phrase "specifically required" or any similar phrase. If in the second part of Section 103(h) Congress had intended to limit the information operators are required to provide to "specifically required" information, it would have said so. It did not. *United States v. Johnson*, 529 U.S. 53, 53 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.")

Moreover, in other sections of the Mine Act in which Congress intended that the Secretary be required to promulgate regulations in order to act pursuant to the authority granted under the Act, Congress stated such an intent explicitly. *See, e.g.*, 30 U.S.C. §§ 813(c), 813(f), 813(g)(2), 814(e)(4). It must be presumed that the absence of such a statement in Section 103(h) was intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983); *US v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 983 (7th Cir. 1999).

Further, in the recordkeeping provision of the Occupational Safety and Health Act, the sister statute to the Mine Act, Congress explicitly required employers "to make, keep and preserve and make available to the Secretary * * * such records regarding his activities relating to this Act as the Secretary * * * *may prescribe by regulation* as necessary or appropriate for the enforcement of this Act * * * ."  29 U.S.C. § 657(c)(1) (emphasis supplied).  If Congress had intended to impose such a limitation under the Mine Act, it would have included such a limitation in the Mine Act.  *Cf., Legacy Emanuel Hospital and Health Center v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996) (rejecting an argument that no "no significance should attach to Congress' use of different terms in adjacent Medicare provisions" because "the use of different language by Congress creates a presumption that it intended the terms to have different meanings).

Petitioners' interpretation of Section 103(h) as only requiring operators to provide records, reports, and information that operators are required to maintain also should be rejected because it would render Section 103(h)'s reference to "information" superfluous.  *See* 2A N. Singer, Statutes and Statutory Construction § 46.06, pp. 181-186 (rev. 6th ed. 2000) (a statutory or regulatory scheme should be read as a whole so that "no part will be inoperative or superfluous, void or insignificant * * *." (citation omitted)).  *Accord RCA Global Communications, Inc. v. FCC*, 758 F.2d 722, 733 (D.C. Cir. 1985).  *Merriam Webster's* online dictionary ("*Merriam Webster's*")

defines the term "information" to mean: "2 a (1): knowledge obtained from investigation, study, or instruction * * *  (3): FACTS, DATA." *Merriam Webster's* online dictionary located at http://www.merriam-webster.com/dictionary/information. *Merriam Webster's* defines the term "record" to mean "3(a)(1): a body of known or recorded facts about something or someone especially with reference to a particular sphere of activity . . . (2): a collection of related items of information (as in a database) treated as a unit.") Id. at http://www.merriam-webster.com/dictionary/record. Thus, information operators are required to maintain is encompassed by the term "record." If Congress had intended to only require operators to provide information they were required to maintain, Congress would not have also used the more encompassing term "information" in Section 103(h).

Peabody's assertion that the Secretary's interpretation "relegates the term 'records' to the cast-off lot of surplusage" (P-Br. at 27) states the matter exactly backwards. Under the Secretary's (and Peabody's) interpretation, the term "records" is given effect and refers to "recorded facts" that the Act or the Secretary has required operators to "establish and maintain." *See* 30 U.S.C. § 813(h) ("in addition to such records as are specifically required by this chapter every operator * * * shall establish and maintain such records . . . as the Secretary may reasonably require * * * .") Under the Secretary's (but not Peabody's) interpretation, the term "information" is also given effect and refers to information, including both recorded facts that operators are

29

Nor does the Secretary's interpretation wrongly "recast records as information." *See* P-Br. at 29.  Consistent with common practice and understanding, the term "information" includes recorded information. Indeed, in this case, the very letters  from Peabody's Senior Counsel, C. Michelle Mitchell-Bromfman, to MSHA in which Peabody stated that it would not allow review of the requested documents repeatedly referred to the requests as requests for "information."  JA-68 (Peabody "will not make available on a blanket basis for MSHA's review the information listed in categories 3 and 5" and "MSHA has no apparent legal right to review the information listed in categories 3 and 5"); JA-71 (same).  At the hearing, Peabody's Senior Manager of Human Resources, Robert Gossman, also referred to the requested records as "information." *E.g.*, Hearing Tr. at pp. 60-61, SSA-20-21. *See also, e.g., United States v. Miller*, 425 U.S. 435, 444 (1976) (referring to records of depositors' bank transactions as "information").

Peabody's suggestion that the term "information" in Section 103(h) does not include records is also inconsistent with its assertion that Section 103(e)'s requirement that "[a]ny *information* obtained by the Secretary  * * *  be

-- which by its terms only applies to "information" -- would not apply to such (or any) records.

Peabody's interpretation also impermissibly reads the phrase "from time to time" out of Section 103(h). *Merriam Webster's* defines the idiom "from time to time" to mean "once in a while; occasionally." *Id.* at http://www.merriam-webster.com/dictionary/from%20time%20to%20time. "From time to time" suggests case-by-case requests -- exactly what this case involves. For this reason also, the operators' interpretation should be rejected. *See RCA Global*, 758 F.2d at 733 ("To hold otherwise would effectively excise the exemption from the statute, a result the most fundamental principles of statutory construction will not permit.")

Peabody and NMA fail in attempting to support their interpretation by arguing that Congress' directive in Section 103(h) that "every operator" shall provide information indicates that the Secretary must proceed through "broadly applicable rules, not ad hoc decrees." *See* P-Br. at 28. Section

103(h)'s directive to "every operator" is most logically read as merely indicating that "every operator" is obligated to comply with a reasonable request by the Secretary for information when the Secretary "from time to time" makes such a request to that operator.

Moreover, contrary to Peabody and NMA's suggestion (e.*g.*, P-Br. at 28; NMA-Br. at 13), there is nothing arbitrary about permitting the Secretary to require an operator to furnish information on an as-needed basis.  Under Section 103(a), the Secretary has the authority to conduct frequent inspections and investigations of mines.  Just as the Secretary may reasonably conduct an additional inspection or an investigation of a particular mine to obtain additional information about the mine -- even if she does not conduct additional inspections or investigations of all mines -- so is it reasonable for the Secretary, as part of an inspection or investigation under the Act, to request information from an operator about a mine when she does not request all operators to furnish the information.  *See Monterey Coal Co. v. FMSHRC*, 743 F.2d 589, 593 (7th Cir. 1984) ("surely there can be little doubt that, even without [the Mine Act's express provisions for spot inspections of hazardous mines and for inspections in response to miners' complaints], the government [under Section 103] could frequently inspect hazardous mines and inspect mines in response to miners' requests").

In addition to being inconsistent with the language of Section 103(h), Peabody's and NMA's interpretation should be rejected because it is

other provisions of the Mine Act.  *See Halverson v. Slater*, 129 F.3d 180, 184-85 (D.C. Cir. 1997) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, *as well as the language and design of the statute as a whole."* (emphasis in original)*)*.

Section 108(a)(1)(E) of the Act authorizes the Secretary to seek injunctive relief against an operator that "refuses to furnish any information or report requested by the Secretary * * *  in furtherance of the provisions of this Act." 30 U.S.C. § 818(a)(1)(E).  Section 108(a)(1)(F) authorizes the Secretary to seek injunctive relief against an operator that "refuses to permit access to, and copying of, such records as the Secretary * * * determines necessary in carrying out the provisions of this Act."  30 U.S.C. § 818 (a)(1)(F).  Nothing in either Section 108(a)(1)(E) or Section 108(a)(1)(F) limits the Secretary's authority to seeking relief against operators that refuse to furnish records, reports, or information to information that is specifically required by the Act or regulation.  The fact that Sections 108(a)(1)(E) and 108(a)(1)(F) authorize the Secretary to seek injunctive relief against operators who refuse to provide material that the Act does not require them to maintain indicates that some substantive provision or provisions in the Act confer on the Secretary a right to such material.  That right is conferred on the Secretary in Sections 103 (a) and 103(h).

Moreover, interpreting Section 103(h) to only authorize the Secretary to obtain information that the Act or the regulations specifically require the operator to maintain would hinder the Secretary's ability to perform the functions Congress required her to perform under the Act. *See BHP Copper*, 21 FMSHRC at 767 (discussing the Secretary's accident investigation function). The Secretary cannot reasonably be expected to anticipate all the information she may need to perform her functions in every situation that may arise, and Congress cannot have expected the Secretary to promulgate regulations requiring operators to maintain all such information. *See Matter of Establishment Inspection of Skil Corp.*, 846 F.2d 1127, 1133 (7th Cir. 1988) (interpreting Section 15(b) of the Consumer Product Safety Act and stating that "[t]he Commission's task of identifying unsafe consumer products would be impeded if it could inspect only documents specified in its rules, unless the `specification' were so broad as to constitute a blanket authorization to inspect relevant documents").

Although it is true, as Peabody and the NMA point out (*e.g.*, P-Br. at 16-18), that the Mine Act does not give the Secretary general subpoena authority, that does not negate the fact that Section 103(h) gives her authority to require operators to "provide [ ] information" -- authority that is generally as broad as subpoena duces tecum authority, at least for information in which an operator does not maintain a reasonable expectation of privacy. Given Congress' recognition that the mining industry "did not fit

neatly" under the Occupational Safety and Health Act because "the mining industry is among the most hazardous in the country" (*Donovan v. Dewey*, 452 U.S. at 602-03 (internal citations and quotation marks omitted)), it is difficult to imagine that Congress would have not given the Secretary authority to obtain documentary evidence from mine operators that was at least the equivalent of the subpoena duces tecum authority granted the Secretary under the OSH Act. *Cf. University of Medicine and Dentistry of New Jersey v. Corrigan*, 347 F.3d 57, 64 (3d Cir. 2003), *cert denied*, 542 U.S. 937 (2004) ("It is beyond cavil that the very backbone of an administrative agency's effectiveness in carrying out the congressionally mandated duties of industry regulation is the rapid exercise of the power to investigate the activities of the entities over which it has jurisdiction and the right under the appropriate conditions to have district courts enforce its subpoenas.") It did so through Section 103(h).

Nor, as Peabody and NMA assert (*e.g.* NMA-Br. at 28), is the fact that the Secretary has asked Congress for general subpoena authority inconsistent with her interpretation in this case. Subpoena authority would authorize the Secretary to obtain documents not only from mine operators, but also from third parties. It would also authorize the Secretary to require operators and third parties to testify under oath.[7]

---

[7]  Contrary to Peabody's assertion (P-Br. at 19), Assistant Secretary for Mine Safety and Health Joseph A. Main's testimony during a recent Congressional oversight hearing on the Upper Big Branch Mine Disaster is not inconsistent

Peabody unconvincingly asserts that the audit was not authorized in this case because it was not conducted by an "authorized representative" of the Secretary. P-Br. at 19-20 (citing Section 103(a) of the Act as permitting authorized representatives to inspect and investigate). This argument was never raised before the Commission and therefore the Court has no jurisdiction to consider it. *See* 30 U.S.C. § 816(a)(1) ("No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.") In any event, the record evidence indicates that the assertion is factually incorrect. *See* JA-36, 37 (citations indicating Peabody refused to permit an Authorized Representative of the Secretary to

---

with the Secretary's interpretation in this case. In response to Congressman George Miller's statement concerning MSHA's inability to get access to a secret second set of books that was in possession of the operator and the Secretary's need for subpoena authority, Mr. Main stated:

> I can tell you this. With regard to the question that was asked about the two sets of books, we can go ask the mine operator to produce books. It is not required to be legally maintained under the Mine Act. And they can say no. And what we do beyond that is what we are creative enough to do. We do not have the ability to demand those *through such a subpoena power.*

Learning From the Upper Big Branch Tragedy, U.S. House of Representatives Hearing Before the Committee on Education and the Workforce, 112 Cong. 2d Sess. 66 (March 27, 2012) (emphasis added).

Peabody's citation to the testimony omits the critical highlighted language, which makes clear Assistant Secretary Main was only responding that the Secretary could not obtain the secret book through a subpoena power. Mr. Main did not testify that the Secretary could not obtain the secret book through Section 103(h).

inspect and copy the information).   Further, the persons conducting the audits were authorized by the Secretary to do so.

Peabody's assertion that the requests were not authorized by Section 103(a) because the audits are not "inspections" or "investigations" is equally unconvincing.  *See* P-Br. at 20-21.  The Secretary's information requests asked Peabody to have the information available "for review."  JA-32, 34. MSHA did not, as Peabody suggests (P-Br. at 20), ask that MSHA be allowed to carry off the records.[8]   "Review" means "to go over or examine critically or deliberately."  *Webster's Third New International Dictionary* (2002) ("Webster's")  at 1944.  As Peabody recognizes, the term "inspect" means to "critically *view* or *examine"* something.  P-Br. at 20 (citing Random House Webster's Unabridged Dictionary 987 (2d ed. 2001) (emphasis by Peabody)). Plainly, the requests were for an "inspection" of the information so that MSHA could "critically" "examine" the records to determine if Peabody had complied with its Part 50 reporting obligations.

The requests were also part of an investigation.  *Webster's* defines the word "investigation" to mean "the act or process of investigating: detailed examination."  *Webster's* at  1189.  In turn, the term "investigate" means to "*observe or study closely:* inquire into systematically (emphasis added)".  *Id.* Insofar as the Secretary's audit involves a "detailed examination" of injuries

---

[8]   Section 103(h) requires operators to "provide [] information" to the Secretary. The Secretary interprets that provision as requiring operators to make copies of records she may request.  It does not require operators to let her "carry off" or "seize" the original records as Peabody's assertions suggest.

and illnesses at the mines and involves "observ[ing] or study[ing] closely" operators' record-keeping compliance, it is clearly an "investigation." *See also*, *U.S. v. Sicilia*, 475 F.2d 308, (7th Cir. 1973) (referring to an audit as a type of investigation); *MacKenzie Medical Supply, Inc. v. Leavitt*, 506 F.3d 341, 350 (4th Cir. 2007) ("an audit certainly must be considered to be a subset of an "investigation" (interpreting Paperwork Reduction Act)); *Nacco Mining Co.,* 9 FMSHRC 1541, 1547-48 (1987) ("both [inspections and investigations] can encompass an examination of present and past events and existing and expired conditions and circumstances" (internal citations and quotations omitted).

Peabody and NMA's interpretation is also inconsistent with the legislative history of Section 103(h).  Several of the draft bills mandated that operators "keep and preserve, and make available to the Secretary . . . such records regarding h[er] activities . . . as the Secretary . . . may *prescribe by regulation* as necessary or appropriate for the enforcement of this Act or for developing information regarding the causes and prevention of occupational accidents and illnesses."  S. 717, 95th Cong., 1st Sess. 20, *reprinted in* Senate Subcommittee on Labor, Committee on Human Resources, 95th Cong., 2d Sess., *Legislative History of the Federal Mine Safety and Health Act of 1977, ("Leg. Hist."*) at 129; H.R. 4287, 95th Cong., 1st Sess. 20, *Leg. Hist.* at 207. Section 103(h) of the Mine Act, the provision that was enacted, contains no such limitation.  The fact that Congress consciously deleted the rulemaking

requirement is strong evidence that Congress did not intend that the Secretary would be required to resort to rulemaking to obtain records, reports, and information reasonably necessary to perform her functions under the Mine Act. *Russello*, 464 U.S. at 63 ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended."); *National Public Radio, Inc. v. Federal Communications Commission,* 254 F.3d 226, 231 (D.C. Cir. 2001) (same).[9]

Nor, as Peabody asserts (P-Br. at 25) is *American Mining Congress v. MSHA,* 995 F.2d 1106, 1109 (D.C. Cir. 1993) to the contrary. In the cited part of the decision, the D.C. Circuit stated, "Although the Secretary might conceivably create some "requirements ad hoc, clearly some agency creation of a duty is a necessary predicate to any enforcement against an operator for failure to *keep* records" (emphasis added). Contrary to Peabody's assertion,

---

[9]   As Peabody points out, the Conference Report stated that a provision in the "Senate bill authorizing the Secretary and the Secretary of Health, Education, and Welfare to publish rules and regulations as they deemed necessary to carry out their responsibilities *under the Act* was deleted because both the House and Senate Bills provide such authority elsewhere" (P-Br. at 26 citing *Leg. Hist.* at 1325 (emphasis added)). The reference to the deleted provision, however, was not a reference to the "prescribe by regulation" provision that was originally included in what became Section 103(h). The language the Conference Report referred to that was deleted as surplusage could not have required the Secretary to resort to rulemaking to obtain information necessary to perform her functions under the Act because nothing in the Mine Act as enacted so requires.

in these cases the Secretary did not cite it for failing to *keep* records -- she cited it for failing to *provide* information that was in its possession.

In sum, the plain meaning of Section 103(h), which complements the Secretary's inspection and investigation authority under Section 103(a), authorizes the Secretary's information requests.  If the meaning of Sections 103(a) and Section 103(h) is not plain, the Secretary's interpretation is entitled to deference because it is reasonable.

III.

THE COMMISSION PROPERLY READ SECTION 50.41 AS<br/>AUTHORIZING THE INFORMATION REQUESTS

Even if, as Peabody and NMA assert, the Secretary was required to engage in rulemaking before making a specific information request under Section 103(h), she did so.

Over thirty years ago, pursuant to her broad grant of authority to "issue such regulations as [she] deems appropriate to carry out any provision  [of the Act]", 30 U.S.C. § 957, the Secretary promulgated Section 50.41.  Section 50.41 authorizes MSHA, upon request, to "inspect and copy information related to an accident, injury or illnesses which MSHA considers  * * * relevant and necessary to a determination of compliance with the reporting requirements of this part."  30 C.F.R. § 50.41.  It is well established that "[w]here the empowering provision of a statute states simply that the agency may `make . . . such rules and regulations as may be necessary to carry out the provisions of the Act,' . . . the validity of the regulation promulgated

thereunder will be sustained so long as it is `reasonably related to the purpose of the enabling legislation.'" *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369 (1973) (internal citations omitted). Because of the Secretary's critical need for accurate accident, injury, and illness information to protect miner safety and health, it is self-evident that Section 50.41 is "reasonably related" to the purpose of the Mine Act and must be sustained.

By its terms, Section 50.41 plainly requires Peabody to allow MSHA access to all of the requested information that it has in its possession.   Indeed, the Commission found that the documents were relevant and necessary for the Secretary to determine Peabody's compliance with its Part 50 reporting requirements.  RSA 15-20.  The hearing testimony and affidavit of MSHA Acting Director of Accountability Peter Montali, as well as common sense, support that finding. RSA-15-20; JA-24; Hearing Tr. at 14-22, SSA-10-17.

The reporting requirements of Part 50 depend on the occurrence of one of three types of reportable incidents: an "accident," an "occupational injury," or an "occupational illness."  Those terms are terms-of-art under Part 50. Whether and when an incident is reportable depends on the details of the incident, including the cause of any injury, the injury's severity, the treatment administered, and the time spent recovering from the injury.  *See* 30 C.F.R. §§ 50.2 (h)(2), 50.10, 50.20-1 through 50.20-6.

The Commission found, and petitioners do not dispute, that the requested information contains "important information about the cause, severity, duration, and treatment of occupational injuries and illnesses."  RSA-16. As explained in Mr. Montali's affidavit and his hearing testimony, all of the medical and payroll records requested by the Secretary contain information that is relevant to some or all of the above concerns.  JA-24, Hearing Tr. at 14-19, SSA-10-19.  Indeed, it is common sense that, to determine whether an incident was accurately reported, it would be "relevant and necessary" to consult the medical records pertinent to that incident.  It is also common sense that, to determine whether an operator has accurately reported the average number of persons working and the total employee-hours worked in a period on a Form 7000-2, the Secretary must consult payroll records and timesheets.  *See* 50 C.F.R. § 50.30.  Accordingly, NMA's assertion that Section 50.41 failed to provide notice that operators, upon request, would be required to provide access to the requested information defies common sense. *See, e.g.*, NMA-Br. at 12.

Any ambiguity in the language of the regulation is resolved by the preambles to the proposed and final rules.  The preamble to the proposed rule states that Section 50.41 "allows MESA[10] to copy company medical records,

---

[10]    MESA refers to the Mining Enforcement Safety Administration, the agency that administered the predecessor statutes to the Mine Act as part of the Department of the Interior.  *See* www.msha.gov/MSHAINFO/MSHAINF2.HTM.

employment records, and other company information" that it "thinks may be relevant and necessary for verification of reports or for determination of compliance with Part 50."  42 Fed. Reg. 55569 (Oct. 17, 1977).  The preamble to the final rule explains that preventing the Secretary from accessing "records beyond those required to be kept" would make it impossible for the Secretary to verify operators reporting, and that "the Secretary's power to acquire information related to h[er] functions * * * is not limited to any particular records."  42 Fed. Reg. 65534, 65535 (Dec. 30, 1977).

Contrary to Peabody and NMA's suggestion (*e.g.*, P-Br. at 30), the Commission did not read the preambles as imposing a requirement on operators to maintain medical records.  *See* RSA-12, 25 n.19.  The Commission merely noted that the preambles are consistent with the Secretary's plain meaning reading of Section 50.41 as requiring operators, when requested, to allow MSHA to inspect and copy all relevant medical, payroll, and timesheet records that they may have in their possession.  *See* RSA-25 n.19.  The Commission's reliance on the preambles as support for the Secretary's reading was entirely proper.  *E.g., Fidelity Federal Savings and Loan Association v. de la Cuesta,* 458 U.S. 141, 158 (1982) (looking to preamble to dispel any ambiguity in regulation); *State of Illinois v. Shalala,* 4 F.3d 514, 516-17 (7th Cir. 1993) (same).

Because Section 50.41 plainly requires operators to provide the types of information requested in this case, NMA's assertion that the requests were

unreasonable because notice-and-comment rulemaking would have "allow[ed] responsible mine operators to develop and implement a filing system to alleviate the burden of a surprise document demand[]" fails. *See* NMA-Br. at 19. Based on the plain language of Section 50.41, responsible mine operators would have known that MSHA might demand the requested documents, and could have implemented a filing system to alleviate any asserted burden resulting from the information requests. Indeed, it is fundamentally illogical for NMA to assert that the rule is overly burdensome because it notifies operators that, if MSHA requests, they are required to provide access to records that operators voluntarily keep, but does not impose on them the additional obligation of maintaining and keeping such records. *See Louisiana Chemical Association v. Bingham*, 550 F. Supp. 1136, 1139-40 (W.D. La. 1982), *aff'd,* 731 F.2d 280 (5th Cir. 1994) ("To construe this section as not providing for OSHA access in circumstances in which critical information is already in existence, (records voluntarily created by employer)" because the Secretary did not "impose the obligation on employers to actually make such records is illogical.")

Nor, as Bickett suggests (B-Br. 22-23), is Section 50.41 inconsistent with Section 103(h)'s requirement that information requests be for information the Secretary "reasonably" requires. Consistent with Section 103(h), the Secretary interprets Section 50.41 to embody a requirement that the requested information be "reasonably required" for the Secretary to perform

her functions under Section 103(a) of the Act.  The Secretary's interpretation is supported by the principle that regulations should be construed to have a meaning that is consistent with the meaning of the statutory provisions they are meant to implement.  *See Joy Technologies, Inc. v. Secretary of Labor*, 99 F.3d 991, 995-96 (10th Cir. 1996), *cert. denied*, 520 U.S. 1209 (1997); *Emery Mining Corp. v. Secretary of Labor*, 744 F.2d 1411, 1414-1415 (10th Cir. 1984); *Secretary of Labor v. Western Fuels-Utah, Inc.*, 900 F.2d 318, 320 (D.C. Cir. 1990).  Under the Secretary's interpretation, when, as here, an operator disagrees that the Secretary "reasonably require[s]" the requested information, that dispute can be adjudicated by the Commission and reviewed by a Court of Appeals.   Thus, the assertion that Section 50.41 offends due process because it allows MSHA to "rule by fiat" fails.  B-Br. at 18.  Indeed, in this case, after carefully reviewing the reasonableness of the requests, the judge found that they were relevant and necessary, reasonable, and neither overly broad nor burdensome.  JA-23.  And the Commission affirmed those findings.  RSA-20.

Equally unavailing is Bickett's assertion that Section 50.41 is invalid because the Secretary's response in the preamble to the final rule to privacy concerns raised during comments was "so illogical as to be arbitrary and capricious."  B-Br. at 42-48.  The Court should not consider the argument, which is in effect an argument that the rule was procedurally defective because it failed to comply with the Administrative Procedure Act's ("APA's")

requirement that, after considering relevant material received during comments to a rule, the agency must "incorporate in the rules adopted a concise general statement of their bases and purpose." *See* 5 U.S.C. § 553(c). A procedural challenge to the rule, unlike a substantive challenge, was waived when it was not timely raised after the rule was promulgated over thirty years ago. *See JEM Broadcasting Co. v. FCC,* 22 F.3d 320, 324-25 (D.C. Cir. 1994) (distinguishing between procedural challenges to rulemakings, which must be brought within the statutory deadline, and substantive challenges, which may be brought as defenses in enforcement proceedings).

In any event, the argument is without merit. As long as an agency's explanation "adequately addresses the major policy concerns raised and demonstrates a course of reasoned decisionmaking," it complies with the APA requirement and is not arbitrary or capricious. *NMA v. MSHA,* 512 F.3d 696, 700-71 (D.C Cir. 2008). The preamble to Part 50.41 meets that standard.

Responding to a concern raised during the rulemaking, the Secretary acknowledged that miners have privacy interests in medical records that MSHA might access. 42 Fed. Reg. at 65535. She also emphasized, however, that those interests are not absolute when, as here, "disclosure of patient data is related to a valid purpose." *Id.* In addition, the Secretary emphasized that miners' personal medical information would be safeguarded from public disclosure under Freedom of Information Act ("FOIA")

46

exemptions in 5 U.S.C. §§ 552b(4) and b(6).  *Id.*  As discussed below, those determinations were legally correct and were reasonable bases for promulgating the rule.

   Nor, as Bickett asserts (B-Br. at 44-45), was it arbitrary for the Secretary to note that operators (who presumably raised the privacy concern) might not have standing to raise miners' privacy interests while also noting that no miner had commented adversely on the rule.  By doing so, the Secretary merely meant to emphasize that the entities that raised the privacy concern were not the entities whose privacy interests would be affected by the rule, and that the persons whose privacy interests would be affected had not raised any privacy concern.[11]  In any event, far from dismissing miners' privacy concerns, and despite the absence of adverse miner comments on the rule, the Secretary, as already stated, properly considered miners' privacy interests and correctly recognized that they were outweighed by her interest in

---

[11]  Contrary to Bickett's assertion, the Secretary was correct in recognizing that operators may not have standing to assert miners' privacy interests.  *See United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1241 (D.C. Cir. 1980), *cert. denied,* 453 U.S. 913 (1981) (expressing "very serious doubts" as to whether an employer has standing to assert that OSHA's access to employees' medical records violates employees' constitutional rights to privacy).  Presumably it was at least in part because of a concern that Peabody did not have standing to raise miners' privacy interests that, as counsel for intervening-miners below (who represents Bickett in this proceeding) acknowledged, Peabody approached him about representing miners in the proceeding and agreed to pay miners' attorney fees.  *See* Oral Argument Tr. at 25-27, SSA-29-31.

verifying Part 50 reporting and that they would be protected against disclosure.[12]  *See* discussion below.

## IV.

### THE INFORMATION REQUESTS
### DO NOT VIOLATE PEABODY'S FOURTH AMENDMENT RIGHTS

The "touchstone of [Fourth] Amendment analysis has been the question of whether a person has a constitutionally protected reasonable expectation of privacy." *Oliver v. United States*, 466 U.S. 170, 177 (1984) (internal citations and quotation marks omitted).  In *Donovan v. Dewey*, the Supreme Court recognized that mining is a pervasively regulated industry in which mine operators have diminished expectations of privacy, and upheld the Secretary's right to conduct warrantless nonconsensual mine inspections. 452 U.S. at 594.  It is well established when one "chooses to engage in [a] pervasively regulated business . . . , he does so with the knowledge that his business records . . . will be subject to effective inspection."  *New York v. Burger*, 482 U.S. 691, 701 (1987) (internal quotation marks and citations omitted).  Peabody and NMA nonetheless assert that the Secretary's information requests violate the Fourth Amendment because they seek information that operators are not required to maintain.  *E.g.*, P-Br. at 38. They are wrong.

---

[12] Nor can the Secretary be faulted for failing to specifically address Bickett's asserted concern that an MSHA inspector reviewing the documents might be personally acquainted with a miner whose medical information he sees.  B-Br at 46.  There is no indication that any such concern was expressed during the rulemaking.  Nor is there any record evidence to support the concern.

In *Civil Aeronautics Board,* this Court concluded that "there [were] no doubts based on the Fourth Amendment that would justify construing [the Federal Aviation Act]" to deny the CAB the power to conduct warrantless inspections of any "carrier record reasonably relevant to an investigation the Board is empowered to make." 542 F.2d at 401-02. Significantly, the Court reached that conclusion even though it also concluded that the air carrier industry was not pervasively regulated. *Id.* at 399. Given the pervasive regulation of the mining industry, and given mine operators' concomitantly lower expectations of privacy in records related to accidents, injuries, and illnesses, Peabody and NMA's Fourth Amendment argument is inconsistent with *Civil Aeronautics Board. See also U.S. v. Jamieson-McKames Pharmaceuticals, Inc.*, 651 F.2d 532, 536 (8th Cir. ), *cert. denied*, 455 U.S. 1016 (1981) (rejecting a Fourth Amendment challenge to a provision of the Food Drug and Cosmetic Act authorizing warrantless administrative inspections of all "things," "including records, files, papers, process, controls, and facilities," bearing on whether drugs were either adulterated or misbranded).

In *Donovan*, the Supreme Court used a three-part test to uphold the Secretary's right to conduct warrantless inspections. Under that test, searches of commercial property may be deemed unreasonable if "[1] they are not authorized by law or [2] are unnecessary for the furtherance of federal interests . . . [or if] [3] their occurrence is so random, infrequent, or

49

The requests satisfy the first prong of the *Donovan* test because, as discussed above and as the Commission found, the Secretary was authorized under Sections 103(a) and 103(h) to request the information.  The requests satisfy the second prong of the *Donovan* test because, as the Commission correctly found, the requests were reasonably necessary to enable the Secretary to verify Peabody's compliance with the Act's reporting requirements.  Finally, as the Commission correctly found, given the pervasive regulation of mining, given the Secretary's authority under Section 103(h) to access records she reasonably requires to perform her functions under the Act, and given the Secretary's authority under Section 50.41 to access records to verify compliance with the Part 50 reporting requirements, Peabody "could not help but be aware" that the Secretary might request the information during the performance of her statutory functions and could not have had a reasonable expectation of privacy in the information.  *Donovan*, 452 U.S. at 600.   The requests therefore satisfy the third prong of the *Donovan* test.  *See also Western States Cattle Co. v. Edwards*, 895 F.2d 438, 443 (8th Cir. 1980) (where appellants were aware that their records were open to inspection and that their industry was closely regulated, they could

not claim a reasonable expectation of privacy in records that were reviewed
by an agency sufficient to support a claim that their due process right to
privacy was violated when the agency showed the records to third parties).

In upholding the Secretary's right to conduct warrantless inspections,
*Donovan* recognized that "the Act establishes a predictable and guided
federal presence" under which "the operator of a mine 'is not left to wonder
about the purposes of the inspector or the limits of his task.'"  452 U.S. at 604
(citing *United States v. Biswell*, 406 U.S. 311, 316 (1972)).  *See also BHP
Copper*, 21 FMSHRC at 767 ("section 103 provides the `certainty and
regularity of its application' that is a substitute for a warrant") (citing
*Donovan*, 452 U.S. at 603).  Thus, interpreting Sections 103(a) and 103(h) to
permit the Secretary access to information that operators are not specifically
required to maintain does not give MSHA unbridled discretion to demand
"literally *anything*" in the operator's custody. P-Br. at 43 (emphasis in
original)).  *See also* NMA-Br. at 10.  The Secretary's ability to obtain
information under Section 103(h) is limited by the scope of her functions
under Section 103(a).

In this case, the Secretary's audit plainly falls within that authority.  The
audit is an investigation aimed at "obtaining information relating to health
and safety conditions, the causes of accidents, and the causes of diseases and
physical impairments," and at "gathering information with respect to
mandatory safety and health standards."  *See*  30 U.S.C. § 813(a).  It is also

51

[13]    Because Section 103(h) complements Section 103(a)'s inspection and

investigation authority -- authority that *Donovan* held the Secretary may

exercise without a warrant -- Peabody and NMA's Fourth Amendment

arguments fail.[14]

Nor is it constitutionally significant that the requests can be made "ad hoc."

P-Br. at 40.  The Supreme Court has specifically rejected the argument that a

warrantless inspection scheme is unconstitutional because it fails to limit the

---

[13]  Contrary to Peabody's assertion (P-Br. at 21), the audit was not merely aimed at determining compliance with "regulations," and therefore was fully authorized under Section 103(a)'s grant of authority to determine compliance with "mandatory standards" and "other requirements of [the Act]."  Among other things, the audit request was intended to determine compliance with Section 103(j)'s requirement that all "accidents" be reported to MSHA, and compliance with Section 103(j) and 30 C.F.R. § 50.10's requirement that accidents involving injuries that have a reasonable potential to cause death be reported within 15 minutes.  As Peabody acknowledges, Section 50.10 is a mandatory standard.  *See* P-Br. at 16.  The audit was also intended to determine compliance with Section 103(d)'s requirement that operators investigate the causes of accident, maintain records of accidents, and provide such information to MSHA, and compliance with Section 103(h)'s requirement that operators "establish and maintain such records [and] make such reports" as the Secretary may require -- here, the reports required by Part 50.

[14] Contrary to NMA's characterization (NMA-BR at 13), there is no evidence that the requests in this case involved "distinctive treatment without apparent justification," the concern raised by this Court in *Lesser v. Espy*, 34 F.3d 1301, 1309 (7th Cir. 1994).  The mines were audited because, after reviewing historical data that indicated potentially dangerous trends at the mines, MSHA determined that, but for pre-audit injuries and illness data provided by Peabody, the mines would have qualified for enhanced enforcement scrutiny under 30 C.F.R. §§ 104.2(b)(3) and 104.3 as exhibiting a potential pattern of violations.   *See* G-4 (JA 29); Oral Argument Tr. at pp. 45-46, SSA-33-34.

number of searches that may be conducted. *New York v. Burger*, 482 U.S. at

711 n.21 (1987); *LeRoy v. Illinois Racing Board*, 39 F.3d 711, 714 (7th Cir.

1994), *cert. denied* 515 U.S. 1131 (1995) (recognizing that *Burger* rejected "an

argument that the statute must create criteria for searches or announce a

schedule of inspections. Such steps, the Court held, would render the

inspections ineffectual, because persons with something to hide could use

their knowledge to avoid detection."). *See also Contreras v. City of Chicago*,

119 F.3d 1286, 1291-92 (7th Cir. 1997) (upholding a warrantless inspection,

even though it was the only time the agency had conducted such an

inspection, because the statute authorized the inspection and gave notice of

that fact, and stating, "Although the inspection by [the agency] may well

have been unusual, *Burger*'s protection is triggered not by peculiar searches

but by searches that are unrestrained by law.")

   Nor, as petitioners assert, are the information requests deficient because

they entail a search and rummaging through operator papers in which

operators may maintain a reasonable expectation of privacy. *See* P-Br. at 38.

To the extent the requested information is intermingled with such papers,

operators, consistent with Section 103(h)'s requirement that operators

"provide such information" to the Secretary and with Section 50.41's

requirement that operators allow MSHA to "inspect and copy" the

information, must separate the information and make it available for

inspection. *See also Western States Cattle Co. v. Edwards*, 895 F.2d 438, 441

Accordingly, Peabody's reliance on the District Court's decision in
*Youghiogheny Ohio Coal Co. v. Morton,* 364 F. Supp. 45 (S.D. Ohio 1973), and
the administrative law judge's decision in *Sewell Coal Co.*, 1 FMSHRC 864,
871 (1979) -- both pre-*Donovan* cases -- is misplaced.  The information
requests in this case do not amount to inspectors "rummag[ing] in any
wholesale way or [] initiat[ing] a general search of the mine operator's
offices," and are therefore not tantamount to the behavior the District Court
in *Youghiogheny* indicated was not authorized by the Act.  *See* 364 F. Supp.
at 51 n.5.  Similarly, the information requests do not involve "rummaging"
though personnel files that contain both relevant and non-relevant personnel
and medical information, the action the judge in *Sewell* found unlawful. *See* 1
FMSHRC at 873.

 Petitioners' reliance on the Sixth Circuit's pre-*Donovan* decision in *United
States v. Consolidation Coal Co.*, 560 F.2d 214, 217 (6th Cir. 1977), *vacated
and remanded*, 436 U.S. 942 (1978),  *judgment reinstated*, 579 F.2d 1011
(1978), is also misplaced.  Although recognizing that Section 103(a)
authorizes the Secretary to enter mine offices and search for "evidentiary
indicia of compliance," the Court in *Consolidation* held that, because offices
are "mines" within the meaning of Section 3(h) of the Act, 30 U.S.C. § 802(h),

It must be presumed that the absence of such a limitation in Section 103(a) was intentional.  *Russello*, 464 U.S. at 23.

In any event, unlike the situation in *Consolidation,* this case does not involve searching through mine offices -- it involves a request to "provide[] information" under Section 103(h).  *Consolidation* did not purport to interpret Section 103(h).

There is no merit to Peabody's suggestion that the information requests in this case are constitutionally infirm because there is no allegation that Peabody has not complied with the reporting requirements (e.*g.*, P-Br. at 44).  As the Supreme Court has long recognized, an administrative agency "charged with seeing that laws are enforced" "can investigate merely on suspicion that the law is being violated, or even just because it wants

There is also no merit to Peabody's assertion that the record requests violate the Fourth Amendment because "there is nothing to suggest that mine office managers are any more prone to misreporting data than their counterparts at other businesses regulated by OSHA [where warrantless inspections are not permitted.]" P-Br. at 40. The argument misses the point. Because the mining industry, unlike industries regulated under the OSH Act, is pervasively regulated, mine operators do not have a reasonable expectation of privacy in the requested information. [15]

In any event, contrary to Peabody's suggestion, courts, in analyzing whether warrantless inspection schemes are necessary, do not "evaluate[e] the necessity of each particular aspect of [the] regulatory scheme." *Contreras v. City of Chicago*, 119 F.3d at 1290.

In addition, Peabody's argument is inconsistent with the fact that Congress specifically recognized that mine operators have an incentive to hide non-compliance. *See* 30 U.S.C. § 813(a) (prohibiting advance notice of

---

[15]  Petitioners' reliance on OSH Act cases holding that an employer cannot be given a citation for requiring OSHA to issue a subpoena to obtain information are distinguishable. *E.g.*, B-Br at 36-37. OSHA is required to obtain a subpoena before requesting information because OSHA, unlike MSHA, exercises authority over non-"closely regulated" businesses and therefore does not have warrantless inspection authority. *See Brock v. Emerson Electric Co.,* 834 F.2d 994, 996 (11th Cir. 1987); *McLaughlin v. Taft Broadcasting Co., 849 F.2d 990, 995 (6th Cir. 1988).*

inspections). Finally, contrary to the factual premise of Peabody's argument, mine operators, unlike employers regulated under the OSH Act, have a particular incentive to underreport injuries to avoid the potential of heightened sanctions under Section 104(e) for having a pattern of significant and substantial violations -- sanctions that include mandatory withdrawal orders for every new significant and substantial violation until there has been a clean inspection of the mine. *See* 30 U.S.C. § 814(e), 30 U.S.C. § 813(e), 30 C.F.R. § 104.2(b)(3) (identifying an operator's rate of accidents, injuries, or illnesses as a factor in determining whether a mine should be placed on potential pattern of violations status). There is no comparable provision under the OSH Act. Indeed, the information provided by two other mines that were audited during the initiative -- the Randolph Mine and the Justice No. 1 Mine -- established that the injury rate for the mines had been significantly underreported. RSA-18 n.12. As a result of the audit information, the mines were placed on potential pattern of violation status under 30 C.F.R. § 104.4. *See* http://www.msha.gov/POV/povmines.asp.

Finally, even if *Donovan* did not establish the Secretary's right to inspect the documents without a warrant, the Secretary's requests would still pass constitutional muster. The Secretary's requests for information in this case -- which are authorized by Section 103(h)'s requirement that operators "provide [] information" to the Secretary, and by Section 50.41's requirement that operators allow MSHA "to inspect and copy" the information -- are in the

nature of subpoenas duces tecum. *See RSM, Inc. v. Buckles,* 254 F.3d 61, 69 (4th Cir. 2001) (holding that a letter demanding documents was in the nature of an administrative subpoena). Accordingly, under well-established law, the Secretary's requests satisfy the Fourth Amendment if they are "'sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonable.'" *Buckles*, 254 F.3d at 69 (citing *Donovan v. Lone Steer*, 464 U.S. 408, 415 (1984)). As discussed above and below, and as the Commission found, the Secretary's requests meet those requirements.

Because MSHA inspectors do not have the authority to enforce compliance with an information request -- and instead the Secretary must obtain an injunction under Section 108 of the Act in District Court to do so -- and because, as discussed below, an operator may challenge a request for information before the Commission before any penalty becomes final and payable -- NMA's suggestion (NMA-Br. at 14 n.4) that interpreting the requests to be in the nature of a subpoena duces tecum violates the Fourth Amendment fails. *See v. City of Seattle*, 387 U.S. 541, 544-45 (1967) (to satisfy the Fourth Amendment, a "demand to inspect may be issued by the agency, in the form of an administrative subpoena, [but] may not be made and enforced by the inspector in the field, and the subpoenaed party may obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply").

V.

## THE INFORMATION REQUESTS DO NOT
## VIOLATE MINERS' PRIVACY RIGHTS

1. *Miners' Fourth Amendment Rights*

Miners do not have a Fourth Amendment privacy interest in records that are possessed by a mine operator. *See United States v. Miller*, 425 U.S. 435, 443 (1976) ("[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." (citations omitted)). This Court has held that the third-party doctrine applies to medical records. *Young v. Murphy,* 90 F.3d 1225, 1236 (7th Cir. 1996) (holding that a patient had no Fourth Amendment claim arising out of an investigator's examination of his nursing home records).

Even if the third-party doctrine did not apply to miners' medical records in the possession of mine operators, the information requests here still would not violate miners' Fourth Amendment rights. Fourth Amendment protections are only triggered when an individual "has a legitimate expectation of privacy in the invaded place" or the item. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). A legitimate expectation of privacy exists when the individual seeking protection maintains a subjective expectation of privacy in the area searched that "society [is] willing to recognize as reasonable."

16

That miners do not have a Fourth Amendment privacy expectation that

"society is willing to recognize as reasonable" is not only reflected in the Mine

Act; it is also apparent from the Health Insurance Portability and

16  While it may be true that the requested information could contain personal and intimate information, many of the examples of the intimate information Bickett asserts would be unduly disclosed -- including  "injuries to sexual organs," "injuries from sexual assault," and "needlestick injuries" -- would already be provided to the Secretary on accident, injury and illness reports (Form 7000-1).  *See* JA 27 (Question 13 ("Name of Injured/Ill Employee"); Question 9 ("Describe Fully the Conditions Contributing to the Accident/Injury/Illness, and Quantify the Damage or Impairment)"; Question 22 ("Part of Body Injured or Affected").  For this reason also, miners' privacy interests in the requested information are significantly diminished. *See Dimeo v. Griffin*, 943 F.2d 679, 681 (7th Cir. 1991) (en banc) ("[L]osses of privacy should be evaluated at the margin. The issue is the *incremental* loss of privacy caused by the [] rule." (emphasis in original)).

Accountability Act of 1996 ("HIPAA"). HIPAA sets up a comprehensive national framework for the protection of health privacy. Significantly, 45 C.F.R. § 164.512(b) exempts "national priority disclosures" from HIPAA provisions that restrict disclosures by covered entities. Under that exception, a covered entity may disclose protected health information to a "public health authority" for the purpose of "preventing or controlling disease, injury or disability," including the "reporting of disease [and] injury" and the conduct of "public health investigations." 45 C.F.R § 164.512(b). The preamble to the HIPAA regulations explicitly recognizes MSHA as such a "public health authority." 65 Fed. Reg. 82624, 82670 (Dec. 28, 2000) ("OSHA, MSHA and their state equivalents are public health authorities when carrying out their activities related to the health and safety of workers.").[17] Although it is unclear whether Peabody is a "covered entity" under HIPAA, HIPAA reflects society's judgment that any privacy expectation miners may have in their records relating to injuries or illnesses originating in mines is not reasonable insofar as MSHA makes a request for the records as part of a public health investigation. *See Florida v. Riley,* 488 U.S. 445, 451 (1989) (plurality opinion) (analyzing defendant's expectation of privacy by reference to FAA regulations).

---

[17]  Moreover, covered health care providers under HIPAA are permitted to disclose miners' medical information to mine operators, so operators can comply with their obligations under Part 50 without first obtaining miners' approval. 45 C.F.R. § 164.512(b)(1)(v)(C)). Health care providers must, however, notify miners of the disclosure. 45 C.F.R. § 164.512(b)(1)(v)(D).

Finally, even if miners retained some expectation of privacy in medical records pertaining to injuries and illnesses originating in mines, MSHA's inspection of the records would not violate the Fourth Amendment under the "special needs" exception to the warrant requirement. *See Green v. Berge*, 354 F.3d 675, 677-78 (7th Cir. 2004). Under the "special needs" exception, this Court uses a balancing-of-interests analysis to permit warrantless searches without individualized suspicion. Id. The Court looks at the "governmental interest involved, the nature of the intrusion, the privacy expectations of the object of the search, and to some extent, the manner in which the search is carried out." *Id.* (internal citations and quotation marks omitted). As discussed above and below, given the Secretary's compelling need for accurate accident, injury, and illness information to protect miner safety and health, given the safeguards in place to protect the information, and given the miners' limited expectation of privacy in the information, the Secretary's requests fall within the "special needs" exception to the warrant requirement.

2. *Miners' Constitutional Right To Informational Privacy*

This Court has held that there is a constitutional right to the confidentiality of medical records*. Coffman v. Indianapolis Fire Department*, 578 F.3d 559, 566 (7th Cir. 2009). Although the Court has indicated that "some form of balancing test" is appropriate in determining whether that right is violated, it has not articulated the precise test. *Id.*

Recently, the Supreme Court, although declining to resolve disagreement among the courts over whether there is a constitutional right to informational privacy, held that, if there is such a right, a governmental request for personal information will outweigh individual privacy concerns as long as the request is "reasonable in light of the government interest at stake." *National Aeronautics and Space Administration v. Nelson,* 131 S.Ct. 746, 761 (2011). The Court further held that the request need not be "necessary or the least restrictive means of furthering [the government's] interests." *Id.* at 750 (internal quotation marks omitted). The information requests here easily meet that test, and indeed would pass constitutional muster even under a strict-scrutiny analysis.

As the Commission recognized, "complete and accurate reporting of accidents, injuries, and illnesses occurring at mines is critically important to the mission of MSHA to protect the health and safety of miners." RSA-15 (internal quotation marks and citation omitted). *See also Energy West*, 40 F.3d at 461; *Pero v. Cyprus Plateau,* 22 FMSHRC at 1364. Given MSHA's compelling need to ensure that operators have accurately reported injuries and illnesses, MSHA's audit requests "are reasonable in light of the government interest at stake" and should be upheld. *See NASA,* 131 S.Ct. at 761 (holding that the government's pre-hiring inquiries into the substance-abuse and mental-health histories of prospective employees were

"reasonable" in light of the governmental interest in maintaining secure facilities and a reliable workforce).

As the Supreme Court recognized in *Whalen v. Roe*, 429 U.S. 589, 602 (1977), disclosure of private medical information to public health agencies is "an essential part of modern medical practice." Accordingly, the courts have repeatedly allowed public health agencies to obtain otherwise confidential medical records when, as here, doing so furthers a proper governmental interest. *E.g., Whalen*, 429 U.S. at 600 (holding that a state law requiring doctors to provide a public health agency with the names and addresses of patients who were prescribed certain drugs was a "reasonable exercise" of the government's authority to deter and detect prescription drug abuse); *United States v. Westinghouse*, 638 F.2d 570, 574 (3d Cir. 1980) (granting NIOSH access to employee medical records pertaining to possible methyl ethyl ketone exposure); *United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1241 (D.C. Cir. 1980), *cert. denied*, 453 U.S. 913 (1981) (holding that a regulation requiring employers to furnish OSHA employees' medical records was "reasonably related to the general goal of preventing occupational lead disease" and the goal of "ensur[ing] that no single exposed employee suffers any illegal threat from lead," and granting OSHA access to employee medical records pertaining to possible lead exposure); *General Motors Corp. v. NIOSH,* 636 F.2d 163, 166 (6th Cir. 1980), *cert. denied,* 454 U.S. 877 (1981) (granting OSHA access to employee medical records pertaining to industrial

skin diseases). *See also Schachter v. Whalen*, 581 F.2d 35, 36 (2d Cir. 1978) (granting state agency access to medical records to investigate medical malpractice claims).

Moreover, the courts have consistently recognized that "the individual interest in protecting the privacy of the information sought by the government is significantly less important when, as here, the information is collected by the government but not disseminated publicly." *AFGE v. HUD*, 118 F.3d 786, 793 (D.C. Cir. 1997). *Accord Barry v. City of New York*, 712 F.2d 1554, 1561 (2d Cir.), *cert. denied*, 464 U.S. 1017 (1983) ("the degree of intrusion stemming from public exposure of the details of a person's life is exponentially greater than that stemming from disclosure to government officials" (internal quotation marks and citations omitted)).

In considering informational privacy interest defenses, the courts also consider whether safeguards are in place to avoid unwarranted disclosures. *See NASA,* 131 S.Ct. at 761; *Whalen,* 429 U.S. at 605; *Westinghouse*, 638 F.2d at 579-80; *Tucson Women's Clinic v. Eden*, 379 F.3d 531, 552 (9th Cir. 2004). To gain access, the government is not required to demonstrate that its security measures are fail-proof. *NASA*, 131 S.Ct. at 763 ("As the Court recognized in *Whalen*, the mere possibility that security measures will fail provides no 'proper ground' for a broad-based attack on government information-collection practices" (quoting 429 U.S. at 601-02)). *See also Schacter*, 581 F.2d at 36 n.2 (same effect); *AFGE*, 118 F.3d at 793 (same

effect).  In determining whether safeguards are adequate, the courts "have refused, in the absence of concrete proof, to entertain speculation that [public health agencies] will engage in unwarranted public disclosure of such information."  *United Steelworkers*, 647 F.2d at 1241 (*citing* Whalen, 429 U.S. at 601).

Here, individually identifiable personal information in the audit files is protected from unwarranted public disclosure under Freedom of Information Act exemptions 6 and 7(C).  *See* 5 U.S.C. § 552b(c)(6)  (exempting from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy") and 5 U.S.C. § 552b(c)(7)(C) (exempting from disclosure law enforcement information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy").[18]

The individually identifiable personal information is also protected from public disclosure, and from unnecessary internal disclosure and improper use, by internal MSHA safeguard directives.  *See* JA-30.  Any failure by

---

[18] Individually identifiable personal information in the audit files would not be subject to disclosure under those exemptions as "warranted" because such information would "reveal[] little or nothing about [MSHA's] own conduct" and would not "shed light on [MSHA's] performance of its statutory duties." *DOJ v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 773 (1989). Disclosure would not provide any fuller understanding of "what the Government is up to."  *NARA v. Favish*, 541 U.S. 157, 171 (2004).

MSHA employees to comply with those directives subjects them to possible disciplinary action.[19]

MSHA's safeguard directives remind auditors of the sensitive nature of individual medical information, and a copy of the internal procedures must be kept with each audit file. *Ibid.* The directives limit access to the information to those individuals "whose official duties require them to work with [the] information" and individuals "who have a need to know the information to perform related duties." *Ibid.* The directives require that the information be kept in a locked file cabinet when not in use, and that the information be stored separately from other mine files that are routinely accessible by other MSHA personnel. *Ibid.* The information also must be filed by mine name or mine identification number, rather than by information identifying a particular individual.[20] In addition, the directives

---

[19] All Department of Labor employees and contractors must be trained annually on information systems security awareness. 5 C.F.R. § 930.301. During that training, employees and contractors are expressly warned that they could be disciplined for disclosing private information and are required to sign a statement acknowledging as much. *See* JA 98-99 (2011 warning and signature request).

[20] Because MSHA retrieves the information by the name of the mine and not by the name of the miner or any other personal identifier, because the information is not reviewed to investigate individual miners, and because any information obtained about individual miners is an "administrative adjunct" to the Secretary's focus on accurate reporting by mine operators, the information is not in "a system of records" within the meaning of the Privacy Act and is not required to be protected under that Act. *See* 5 U.S.C. § 552a(a)(5); *Henke v. United States Dep't of Commerce*, 83 F.3d 1453, 1459-61 (D.C. Cir. 1996). *Accord Boyd v. Secretary of the Navy*, 709 F.2d 684, 686 (11th Cir. 1983), *cert. denied*, 464 U.S. 1043 (1984) (finding that, to be in a

require that the cover of the audit file display a warning label that the file

may contain personally identifiable medical or other sensitive information.

*Ibid.* Auditors must take precautions while transporting the information,

and an access log or other system must be used to identify individuals

accessing the information and to account for removal of the information from

the storage area. *Ibid.*

   FOIA's exemptions and MSHA's internal procedures greatly reduce the risk

of unauthorized disclosures of the audit information, and are equivalent to

the safeguards that have been found to be adequate by the courts. *See*

*NASA*, 131 S.Ct. at 761 (a "statutory or regulatory duty to avoid unwarranted

disclosures generally allays" privacy concerns and renders the government

action constitutional); *Whalen*, 429 U.S. at 605 (holding government access

permissible where records were kept in locked storage, a limited retention

policy was in effect, and a limited number of public health agency employees

were authorized to view the records); *Westinghouse*, 638 F.2d at 579-80

(same); *AFGE v. HUD*, 118 F.3d at 793 (finding that a statutory

nondisclosure provision, secure storage facilities, and access limited to

---

"system of records" "a record must be maintained by the agency in a group of
records cued to the requestor" (citations omitted)).

   Although the Part 50 audit files do not constitute a "system of records" and
are not governed by the Privacy Act, the statutory disclosures authorized in
the Privacy Act and the "Universal Routine Uses" that apply to all systems of
records describe the circumstances in which MSHA might disclose the
records to other entities. *See* Secretary's Response to Commission's questions
#1 and #2 posed at Oral Argument, AR 960E-960Q.

qualified government employees were "reasonable devices to secure the confidentiality of records"). *Compare with Tucson Women's Clinic*, 379 F.3d at 552 (access was unconstitutional where there were no security measures in place and "no safeguards at all against release of information to government employees who have no need for the information"). Particularly given the absence of any suggestion that MSHA has ever improperly disclosed private information, the protections in place are more than adequate. *See Stataros v. New York City Taxi and Limousine Commission*, 198 F.3d 317, 326 (2d Cir. 1999) (applying intermediate level of scrutiny and concluding that financial disclosure laws did not unconstitutionally impinge on informational right to privacy given agency's assurance that private information would not be divulged under state freedom of information law).

   Despite all the foregoing protections, Bickett suggests that Section 50.41 is constitutionally infirm because it does not include enforceable regulations protecting against unwarranted disclosure. B-Br. at 33. The courts, however, have found requirements for disclosure of private information to be constitutional without such protections. *See Stataros*, 198 F.3d at 326; *Murray v. Pittsburg Board of Education,* 759 F. Supp. 1178, 1182 (W.D. Pa. 1991).

   3. *Other Federal and State Privacy Rights*

   Pointing to the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"), Peabody and NMA assert that restrictions

on disclosure of medical information contained in other federal employment laws prohibit compliance with MSHA's demand for medical records.  *E.g.*, P-Br. at 44-45.  In essence, they assert that, by enacting those employment laws, Congress effectively repealed the Mine Act requirements that enable MSHA to view medical records as needed to determine injury and illness reporting compliance.

   Contrary to the assertion, statutory repeals by implication are "not favored" and "will not be presumed unless "the intention of the legislature to repeal is clear and manifest."  *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) (quoting *Watt v. Alaska* 451 U.S. 259, 267 (1981)).  Unless the later statute "'expressly contradicts the original act' or unless such a construction is 'absolutely necessary in order that the words of the later statute shall have any meaning at all,'" no repeal will be inferred. *Defenders of Wildlife*, 551 U.S. at 662 (quoting *Traynor v. Turnage*, 485 U.S. 535, 548 (1988)).  The provisions of the two statutes must be in "irreconcilable conflict," or the later statute must "cover the whole subject of the earlier one" and be "clearly intended as a substitute," before a repeal by implication will be inferred.  *Defenders of Wildlife*, 551 U.S. at 663 (quoting *Posadas v. National City Bank of New York*, 296 U.S. 497, 503 (1936)).  "Outside these limited circumstances, a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more

generalized spectrum." *Defenders of Wildlife*, 551 U.S. at 663 (quoting

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976)).

   The "limited circumstances" in which a court will find a repeal by

implication are wholly absent in this instance.  The assertedly repealed

provision, Section 103(h), operates in the "narrow, precise, and specific" area

of mine safety and health.  *See Defenders of Wildlife*, 551 U.S. at 663.  In

contrast, the nondisclosure provisions of the ADA and FMLA govern how

specific categories of medical records -- records relating to disabilities and

certifications of medical leave -- are to be safeguarded by private employers

generally.  29 C.F.R. §§ 1630.14(b), (c), and 825.500(g).  Petitioners cite no

legal authority to support their suggestion that Congress intended the ADA

or FMLA to "cover the whole subject" of Part 50 compliance audits, or

intended those statutes to "substitute" for Mine Act provisions granting

MSHA broad access to the information it requires to carry out its duty to

verify reporting compliance.  551 U.S. at 662-63.

   Petitioner and NMA's reliance on other federal statutes to relieve them of

their obligations under Section 103(h) and Section 50.41 is also inconsistent

with HIPAA.  As already discussed, HIPAA exempts from its non-disclosure

requirements "national priority disclosures" -- a category that includes

disclosures to "public health authorit[ies,]" including MSHA, for the purpose

of "preventing or controlling disease, injury or disability," the "reporting of

disease [and] injury," and the conduct of "public health investigations."  45

C.F.R § 164.512(b); 65 Fed. Reg at 82670.  In light of the well-established

canon that "statutes dealing with similar subjects should be interpreted

harmoniously" (*United States v. Nadar*, 542 F.3d 713, 717 (9th Cir. 2008),

*cert. denied,* 129 S.Ct. 879 (2009)), the assertion that other federal statutes

relieve operators of their obligation under Section 103(h) to provide medical

records to MSHA, when HIPAA -- the statute that most directly addresses

medical privacy -- expressly permits such disclosures by covered entities, is

far-fetched indeed.

   That there is no "clear and manifest" intent that Congress intended the

ADA or the FMLA to preclude the Secretary from exercising her authority to

request the information requested in this case under Sections 103(a) and

103(h) of the Act and Section 50.41 is not only highlighted by HIPAA; it is

apparent from the ADA's and FMLA's own implementing regulations.

   The implementing regulations for Title 1 of the ADA state:

> It may be a defense to a charge of discrimination under
> this part that a challenged action is required or
> necessitated by another Federal law or regulation, or
> that another Federal law or regulation prohibits an
> action (including the provision of a particular reasonable
> accommodaiton) that would otherwise be required by
> this part.

29 C.F.R. § 1630.15(e).  Interpretive guidance published by the Equal

Employment Opportunity Commission ("EEOC"), the entity charged with the

enforcement of Title 1 of the ADA, makes clear that the ADA was not

intended to repeal employers' obligations under federal laws and regulations

such as the operators' obligations in this case under Section 103(h) and

Section 50.41.  The guidance states:

> There are several Federal laws and regulations that
> address medical standards and safety requirements.  If
> the alleged discriminatory action was taken in
> compliance with another Federal law or regulation, the
> employer may offer its obligation to comply with the
> conflicting standard as a defense.  The employer's
> defense of a conflicting Federal requirement or
> regulation may be rebutted by a showing of pretext, or
> by showing that the Federal standard did not require
> the discriminatory action, or that there was a
> nonexclusionary means to comply with the standard that
> would not conflict with this part.

*Interpretive Guidance on Title I of the Americans With Disabilities Act*,

Appendix to Part 1630, 29 C.F.R. Pt. 1630 App. 1630.15(e).  *Cf. Bay v.*

*Cassens Transport Co.*, 212 F.3d 969, 974 (7th Cir. 2000) ("The ADA does not

override health and safety requirements established under other Federal

laws") (citing and quoting *Thoms v. ABF Freight System, Inc.*, 31 F.Supp.2d

119, 127 (E.D. Wis. 1998)).[21]

---

[21]   There is no merit to Peabody's assertion that Section 103 and Section
50.41 should not be given their plain meaning because an operator that
abates a citation alleging a violation of Section 50.41, and later succeeds in a
contest case challenging the citation, would be exposed to ADA civil liability
for disclosing the documents.  *See* P-Br. at 45.  Whenever a covered entity, in
attempting to comply with a federal law, discloses information that might
otherwise be protected under the ADA, the entity runs the risk of a finding
that the federal law did not apply and that the disclosure violated the ADA.
If Peabody's argument were accepted, it would mean that no federal law
could be interpreted to require disclosure of otherwise-ADA protected medical
information, and would render 29 C.F.R. § 1630.15(e) meaningless.  The
argument is particularly unpersuasive in this case because the plain meaning
of Section 103(h) and Section 50.41 requires disclosure.

Similarly, although the FMLA creates confidentiality requirements for medical records (see, *e.g.*, P-Br. at 44 (citing 29 C.F.R. § 825.500(g)), 29 C.F.R. § 825.500(g)(3) allows covered entities to provide government officials "investigating compliance with FMLA (*or other pertinent law*)" with "relevant information upon request" (emphasis added).  Insofar as Section 50.41 specifically requires operators to provide information that is relevant and necessary to determine operators' compliance with Part 50's reporting requirements, the exception to the FMLA's confidentiality requirements undercuts the assertion that the information requests conflict with the FMLA.

That 29 C.F.R. § 825.500(g) is not a valid basis for Peabody's continued non-compliance is also apparent from the language of Section 852.500(g) itself. Section 825.500(g) states that "if the ADA, as amended, is also applicable, such records shall be *maintained in conformance with ADA confidentiality requirements* (see 29 CFR 1630.14(c)(1)) * * * " (emphasis added)).  As discussed above, the ADA does not prohibit operators from furnishing the requested information to MSHA.  *See* ADA 29 C.F.R. § 1630.15(e).  *See also Johnson v. Moundsvista, Inc.,* 2002 WL 2007833 at *7 (D. Minn. Aug. 28, 2002) (interpreting Section 825.500(g) in light of the ADA).  Insofar as the ADA permits operators to disclose the requested information to MSHA, Section 825.500(g)'s requirement that medical information be "maintained in conformance with ADA confidentiality requirements" to the extent the ADA

is applicable likewise indicates that appropriately-safeguarded disclosure to MSHA is permitted.

4. *State Laws*

For three reasons, state medical privacy laws do not create any privacy interest in the requested information that is a valid basis for refusing to comply with the Secretary's requests.

First, the plain language of Section 506(a) of the Mine Act makes clear that any state law in conflict with the Mine Act is preempted. Section 506 states:

> No state law . . . shall be superseded by any provision of this chapter or order issued or any mandatory health or safety standard, *except insofar as such State law is in conflict with this chapter or with any order issued or any mandatory health or safety standard.*

30 U.S.C. § 955(a) (emphasis added). As the Commission correctly found, the plain meaning of both Section 103(h) of the Act and 30 C.F.R. § 50.41 is that an operator must provide the requested information because MSHA "reasonably requires" the information and it is "relevant and necessary" to a determination of Part 50 reporting compliance.[22]

---

[22]    Peabody's argument that Section 506(a) is not applicable because Section 50.41 is a "regulation" and not a "standard" is a red herring. *See* P-Br. at 47. Section 506(a) expressly preempts any state law conflicting with the Mine Act itself ("this chapter"). Both because Mine Act Sections 103(a) and 103(h) themselves authorize the information requests and because they provide the authority for Section 50.41, the fact that Section 50.41 is not a "standard" is legally irrelevant.

Independent of Section 506, "[t]he Supremacy Clause, on its face, makes federal law 'the supreme Law of the Land' even absent an express statement by Congress." *PLIVA, Inc. v. Mensing*, 131 S.Ct. 2567, 2577 (2011). To the extent that a state medical privacy law might otherwise prevent the disclosure of the audit information, that state law is "in conflict" with Section 103(h) and Section 50.41 and is pre-empted under the Supremacy Clause. *PLIVA*, 131 at 2577 ("state and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements'" (citing *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)); *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008) (recognizing that, under the Supremacy Clause of the Constitution, Art. VI, cl. 2, "state laws that conflict with federal law are 'without effect'") (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).

Moreover, reliance on state medical privacy laws to prevent disclosure in these cases would improperly expand the scope of federal state privilege law. Under Federal Rule of 501, "when a plaintiff asserts federal claims, federal privilege law governs, but when he asserts state claims, state privilege law applies." *Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923, 925 (7th Cir. 2004); *In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1212 (D.C. Cir. 2004); *General Motors Corp. v. NIOSH*, 636 F.2d at 165. The Secretary is asserting a federal claim. This rule of privilege in federal

question cases applies "at all stages of all actions, cases, and proceedings," including during the investigative stage.  Fed. R. Evid. 1101(c).[23]

## VI.

### THE INFORMATION REQUESTS DO NOT VIOLATE THE FIFTH AMENDMENT

Citing *Ex Parte Young*, 209 U.S. 123 (1908), NMA asserts that the risk of severe daily civil penalties that a mine operator faces for choosing not to comply with an information request and to challenge it before the Commission violates the Fifth Amendment by precluding adequate judicial review.  NMA-Br. at 14-16.   Bickett similarly asserts that, under the Secretary's interpretation, the Mine Act's penalty scheme deprives operators of meaningful review.  B-Br at 29-31.  Although couched as arguments specific to the Secretary's interpretations in this case, the arguments, because the Mine Act's civil penalty scheme applies to all violations under the Act, are effectively arguments that the Mine Act's civil penalty scheme is unconstitutional.

The Supreme Court, however, has specifically held that, because penalties under the Mine Act become final and payable only after review by the Commission and a Court of Appeals, the Act's penalty scheme is

---

[23] Because there is no federal physician-patient privilege, state law physician-patient privilege statutes, such as those relied on by Peabody and NMA, do not prevent disclosure by the operators.  *See Northwestern Memorial Hospital*, 362 F.3d at 925-26 ("the enforcement of federal law might be hamstrung if state-law privileges more stringent than any federal privilege regarding medical records were applicable to all federal cases"); *General Motors Corp. v. NIOSH*, 636 F.2d at 165 (same effect).

constitutional. *Thunder Basin*, 510 U.S. at 217-218 ("Although the Act's civil penalties unquestionably may become onerous if petitioner chooses not to comply, the Secretary's penalty assessments become final and payable only after full review by both the Commission and the appropriate court of appeals. A mine operator may request that the Commission expedite its proceedings, § 815(d), and temporary relief of certain orders is available from the Commission and the court of appeals. Thus this case does not present the situation confronted in *Ex Parte Young,* in which the practical effect of coercive penalties for noncompliance was to foreclose all access to the courts.") (citation omitted).

*Ex Parte Young* concerns are particularly unjustified in the context of Section 104(b) penalties for failing to abate violations -- the only situation in which daily penalties may be assessed under the Act. *See* 30 U.S.C. § 814(b). Not only are penalties the Secretary proposes for failing to abate violations, like all penalties the Secretary proposes under the Mine Act, subject to *de novo* review by the Commission (*see Thunder Basin*, 510 U.S. at 208), but the imposition of any penalty for failing to abate a violation, including the imposition of daily civil penalties, is discretionary. *Compare* 30 U.S.C. § 820(a) (the operator of a mine in which a violation occurs "*shall* be assessed" a civil penalty) *with* 30 U.S.C. § 820(b) (any operator who fails to correct a violation . . . "*may* be assessed" a civil penalty) (emphases added). *See also UMWA v. Maple Creek*, 29 FMSHRC 583, 591 (2007). Because the

Commission has the discretion to impose no penalty for failing to abate a violation -- and may do so on the basis that the operator had a good faith defense -- the daily penalty scheme satisfies due process. *Reisman v. Caplin*, 375 U.S. 440, 446-50 (1964) (holding that a statute was constitutional because "noncompliance [was] not subject to prosecution [ ] when the summons [was] attacked in good faith"); *General Electric Co. v. Jackson*, 610 F.3d 110, 118 (D.C. Cir. 2010), *cert. denied*, 131 S.Ct. 1259 (2011) (there is no "constitutional violation if the imposition of penalties is subject to judicial discretion").

Moreover, when the Commission assesses any penalty under the Act, it is required to consider the operator's negligence. *See* 30 U.S.C. § 820(i). The negligence criterion is constitutionally equivalent to the "good faith" and "reasonable grounds" defenses the Supreme Court has found sufficient to satisfy due process even for severe fines. *See Employers Insurance of Wausau v. Browner,* 52 F.3d 656, 661 (7th Cir. 1995), *cert. denied*, 516 U.S. 1042 (1996) (the risk of losing a suit brought by the EPA under CERCLA, arising from a potentially responsible party's failure to comply with a cleanup order, and the risk of being assessed heavy sanctions, do not violate due process when the sanctions can be mitigated by a defense of "sufficient cause"); *Solid State Circuits, Inc. v. EPA*, 812 F.3d 383, 391-92 (8th Cir. 1987) (same effect). In assessing any penalty under the Act, the Commission is also required to consider the appropriateness of the penalty to the size of the

business of the operator.  30 U.S.C. § 820(i).  NMA's asserted concern that the threat of daily civil penalties will be particularly coercive to small mine operators is therefore unfounded.  *See* NMA-Br. at 14, 15 and n.5.

Bickett also asserts that contesting an information request will automatically place operators in legal jeopardy because they will receive a withdrawal order for non-compliance.  B-Br. at 30.  As MSHA's actions in this case illustrate, however, because no specific area of a mine is normally affected by an information request refusal, any Section 104(b) withdrawal order MSHA may issue for refusing an information request will normally be a "no area affected" order that will not require the withdrawal of any person from the mine.  *See* JA-38; AR 393.  The fear of such an order therefore cannot be so coercive as to offend due process.  Indeed, the order will normally not be coercive at all.

Similarly unconvincing is Bickett's attempt to highlight the assertedly coercive nature of the information requests in this case by pointing to the fact that, after Peabody refused to provide the information, the Secretary issued citations to Peabody setting 15-minute abatement times and issued Section 104(b) failure-to-abate orders when Peabody continued to refuse access.  B-Br. at 30.  Contrary to Bickett's implication, operators may challenge a failure-to abate-order on the basis that the time set for abatement is unreasonable.  *Energy West Mining Co. v. FMSHRC,* 111 F.3d 900, 903-904 (D.C Cir. 1997); *Clinchfield Coal  Co.,* 11 FMSHRC 2120, 2128 (1989).

Significantly, noting the testimony of Peabody's senior human resources manager and the testimony of Peabody's safety manager that if Peabody had been given additional time to produce the records it still would not have complied with the requests, the Commission in this case rejected Peabody's claim that the abatement times were objectively unreasonable. RSA-20 n.15. Peabody has not appealed that finding.[24]

Finally, to the extent that an information request raises an unusual concern in a particular document, a Commission judge can, if appropriate, redact the sensitive part of the document. The operator can also refuse to furnish the document. To gain access, the Secretary would then be required to obtain injunctive relief in District Court under Section 108(a)(1)(E) or 108(a)(1)(F) of the Act. In that proceeding, the District Court could issue a protective order to allay the concern. *See Marshall v. Stoudts Ferry Prep.*, 602 F.2d 589, 594 (3rd Cir. 1979), *cert. denied*, 444 U.S. 1015 (1980) (upholding Mine Act's warrantless inspection scheme because, *inter alia,* the "Act provides for immediate judicial review by requiring the Secretary to secure an injunction in the district court if he is refused entry. Any unusual

---

[24]  At the time that MSHA set the 15-minute abatement times on November 9, 2010, it had already received the October 28 and October 29, 2010, letters from Peabody's in-house counsel declining to provide the requested information and insisting that Section 50.41 did not entitle MSHA to the records. JA-67-72. Although the letters indicated that Peabody would welcome further discussion, that comment was conditioned on MSHA's cooperation in narrowing the demands. JA-69, 72 MSHA was not obligated to extend the abatement time because Peabody gave it no reason to do so. *See Energy West Mining,* 111 F.3d at 904 .

privacy expectations may be fully explored in that proceeding and a reasonable accommodation may be achieved.")

## VII.

## THE INFORMATION REQUESTS DO NOT VIOLATE THE PAPERWORK REDUCTION ACT

NMA asserts that the information requests violate the Paperwork Reduction Act, 44 U.S.C. §§ 3501, *et seq.* ("PRA").  NMA-Br at 21-22.  That argument was never raised before the Commission, and the Court therefore has no jurisdiction to consider it.  *See* 30 U.S.C. § 816(a)(1).[25]

In any event, the assertion is unavailing.  By its terms, the PRA exempts from its requirements "an administrative action or investigation involving an agency against specific individuals or entities."  44 U.S.C. § 3518(c)(1)(B)(ii).  The audit initiative falls within that exemption because it was "an administrative action or investigation" and was "against specific individuals or entities."

---

[25]  For the same reasons, to the extent that NMA's bald assertions, relegated to a footnote, can be read as arguing that the requests violate 5 U.S.C. § 601 et seq. (the Small Business Regulatory Enforcement Fairness Act), Executive Order No. 12,866 (1994), and Executive Order No. 13,272 (2003), they  are not properly before the Court.  *See* NMA-Br. at 19 n.10.  The arguments were never raised before the Commission, and therefore have been waived.  30 U.S.C. § 816(a)(1).

The arguments also should not be considered because they were relegated to a footnote in NMA's brief to the Court. *Moriarty ex re. Local Union No. 727 v. Svec*, 429 F.3d 710, 722 (7th Cir. 2005) ("A footnote does not preserve an issue for review.")   In any event, the cited authorities apply to rulemakings, and the information requests were not rulemakings.

In is well established that the phrase "administrative action or investigation" includes administrative audits. *MacKenzie Medical Supply Inc. v. Leavitt*, 506 F.3d 341, 350 (4th Cir. 2007) ("The PRA specifically exempts activities such as an [agency] audit from its requirements." (internal citation and quotation marks omitted)); *Phillips Petroleum Co. v. Lujan*, 963 F.2d 1380, 1386-87 (10th Cir. 1992) (holding that the PRA exempted from coverage an audit of specific leases); 5 C.F.R. § 1320.4(a)(2) (exempting from coverage "the conduct of an administrative action, investigation, or audit involving an agency against specific individuals").

Under 5 C.F.R. § 1320.4(c), an agency action or investigation is considered to be "against specific individuals or entities" if it is conducted "after a case file or equivalent [has been] opened with respect to a particular party." MSHA attempted to audit Peabody (and the other mines that were part of the audit initiative) only after MSHA had reviewed historical data for the mines indicating potentially dangerous trends and had determined that, but for pre-audit injuries and illness data provided by the mines, the mines would have qualified for enhanced enforcement scrutiny under 30 C.F.R. §§ 104.2(b)(3) and 104.3. *See* G-4 (JA 29); Oral Argument Tr. at pp. 45-46, SSA-32-33. The audits were therefore aimed "against specific individuals or entities," and were exempt under Section 44 U.S.C. 3518(c)(1)(B)(ii), because "a case file or equivalent" had already been "opened with respect to Peabody (and each of

the other audited mines)]" before the information requests were made.  5
C.F.R. § 1320.4(c).

## CONCLUSION

For all of the foregoing reasons, the Court should deny the petitions for
review and affirm the Commission's conclusion that the Secretary's
information requests were lawful in all respects.


Respectfully submitted,

M. PATRICIA SMITH
Solicitor of Labor

HEIDI W. STRASSLER
Associate Solicitor

W. CHRISTIAN SCHUMANN
Counsel, Appellate Litigation

s/Robin A. Rosenbluth
ROBIN A. ROSENBLUTH
Senior Attorney

U.S. Department of Labor
Office of the Solicitor
1100 Wilson Blvd, 22nd Floor
Arlington, Virginia 22209-2296
Telephone (202) 693-9333

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief  was prepared in compliance with Fed.

R. App. P. 32(a), as amended by this Court's order of October 5, 2012,

enlarging the word limitation to 21,000 words, using Microsoft Word for

Windows, in Century font, 12 point, and according to the word processing

system's word count, there are no more than 20,630, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


s/ Robin Rosenbluth
ROBIN ROSENBLUTH
Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF System.

I certify that all participants in the case are represented by attorneys who are registered CM/ECF users with this Court and that service on such participants will be accomplished by CM/ECF system service on the following:

Thomas C. Means, Esq.
Daniel W. Wolff, Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004

James Lastowka, Esq.
Arthur Sapper, Esq.
McDermott Will & Emery LLP
600 13th Street, NW
Washington, D.C. 20005-3096

John T. Sullivan, Esq.
Office of General Counsel
Federal Mine Safety and Health Review Commission
1331 Pennsylvania Ave., NW, Suite 520N
Washington, D.C. 20004

/s/ Robin A. Rosenbluth
Robin A. Rosenbluth

# ADDENDUM

# ADDENDUM
# TABLE OF CONTENTS

Page

Section 103 of the Mine Act
    30 U.S.C. § 813 ...................................................................................1

Section 104 of the Mine Act
    30 U.S.C. § 814 ...................................................................................6

Section 108 of the Mine Act
    30 U.S.C. § 818 .................................................................................10

Section 110 of the Mine Act
    30 U.S.C. § 820 .................................................................................12

Section 508 of the Mine Act
    30 U.S.C. § 820 .................................................................................16

Section 3518 of the Paperwork Reduction Act
    44 U.S.C. § 3518 ...............................................................................18

29 C.F.R. § 825.500(g) ...............................................................................20

29 C.F.R. § 1630.15 ....................................................................................21

30 C.F.R. § 50.1...........................................................................................23

30 C.F.R. § 50.2...........................................................................................24

30 C.F.R. § 50.10.........................................................................................26

30 C.F.R. § 50.20.........................................................................................27

30 C.F.R. § 50.20-3......................................................................................28

30 C.F.R. § 50.20-6......................................................................................30

30 C.F.R. § 50.20-7......................................................................................35

30 C.F.R. § 50.30.........................................................................................37

30 C.F.R. § 50.30-1 ...................................................................................................38

30 C.F.R. § 50.40...................................................................................................41

30 C.F.R. § 50.41...................................................................................................42

30 C.F.R. § 104.2...................................................................................................43

45 C.F.R. § 164.512(b) .........................................................................................44

## Section 103 of the Mine Act,
## 30 U.S.C. 813

§ 813.  Inspections, investigations, and recordkeeping.

(a) Purposes; advance notice; frequency; guidelines; right of access

Authorized representatives of the Secretary or the Secretary of Health and Human Services shall make frequent inspections and investigations in coal or other mines each year for the purpose of (1) obtaining, utilizing, and disseminating information relating to health and safety conditions, the causes of accidents, and the causes of diseases and physical impairments originating in such mines, (2) gathering information with respect to mandatory health or safety standards, (3) determining whether an imminent danger exists, and (4) determining whether there is compliance with the mandatory health or safety standards or with any citation, order, or decision issued under this subchapter or other requirements of this chapter. In carrying out the requirements of this subsection, no advance notice of an inspection shall be provided to any person, except that in carrying out the requirements of clauses (1) and (2) of this subsection, the Secretary of Health and Human Services may give advance notice of inspections. In carrying out the requirements of clauses (3) and (4) of this subsection, the Secretary shall make inspections of each underground coal or other mine in its entirety at least four times a year, and of each surface coal or other mine in its entirety at least two times a year. The Secretary shall develop guidelines for additional inspections of mines based on criteria including, but not limited to, the hazards found in mines subject to this chapter, and his experience under this chapter and other health and safety laws. For the purpose of making any inspection or investigation under this chapter, the Secretary, or the Secretary of Health and Human Services, with respect to fulfilling his responsibilities under this chapter, or any authorized representative of the Secretary or the Secretary of Health and Human Services, shall have a right of entry to, upon, or through any coal or other mine.

(b) Notice and hearing; subpoenas; witnesses; contempt

For the purpose of making any investigation of any accident or other occurrence relating to health or safety in a coal or other mine, the Secretary may, after notice, hold public hearings, and may sign and issue subpoenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and administer oaths. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpoena served upon any person under this section, the district court of the United

States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Secretary or to appear and produce documents before the Secretary, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(c) Records of employee exposure to toxic materials or harmful physical agents; undue exposure

The Secretary, in cooperation with the Secretary of Health and Human Services, shall issue regulations requiring operators to maintain accurate records of employee exposures to potentially toxic materials or harmful physical agents which are required to be monitored or measured under any applicable mandatory health or safety standard promulgated under this chapter. Such regulations shall provide miners or their representatives with an opportunity to observe such monitoring or measuring, and to have access to the records thereof. Such regulations shall also make appropriate provisions for each miner or former miner to have access to such records as will indicate his own exposure to toxic materials or harmful physical agents. Each operator shall promptly notify any miner who has been or is being exposed to toxic materials or harmful physical agents in concentrations or at levels which exceed those prescribed by an applicable mandatory health or safety standard promulgated under section 811 of this title, or mandated under subchapter II of this chapter, and shall inform any miner who is being thus exposed of the corrective action being taken.

(d) Accident investigations; records

All accidents, including unintentional roof falls (except in any abandoned panels or in areas which are inaccessible or unsafe for inspections), shall be investigated by the operator or his agent to determine the cause and the means of preventing a recurrence. Records of such accidents and investigations shall be kept and the information shall be made available to the Secretary or his authorized representative and the appropriate State agency. Such records shall be open for inspection by interested persons. Such records shall include man-hours worked and shall be reported at a frequency determined by the Secretary, but at least annually.

(e) Collecting information without unreasonable burden on operators

Any information obtained by the Secretary or by the Secretary of Health and Human Services under this chapter shall be obtained in such a manner as not to impose an unreasonable burden upon operators, especially those

2

operating small businesses, consistent with the underlying purposes of this chapter. Unnecessary duplication of effort in obtaining information shall be reduced to the maximum extent feasible.

(f) Participation of representatives of operators and miners in inspections

Subject to regulations issued by the Secretary, a representative of the operator and a representative authorized by his miners shall be given an opportunity to accompany the Secretary or his authorized representative during the physical inspection of any coal or other mine made pursuant to the provisions of subsection (a) of this section, for the purpose of aiding such inspection and to participate in pre- or post-inspection conferences held at the mine. Where there is no authorized miner representative, the Secretary or his authorized representative shall consult with a reasonable number of miners concerning matters of health and safety in such mine. Such representative of miners who is also an employee of the operator shall suffer no loss of pay during the period of his participation in the inspection made under this subsection. To the extent that the Secretary or authorized representative of the Secretary determines that more than one representative from each party would further aid the inspection, he can permit each party to have an equal number of such additional representatives. However, only one such representative of miners who is an employee of the operator shall be entitled to suffer no loss of pay during the period of such participation under the provisions of this subsection. Compliance with this subsection shall not be a jurisdictional prerequisite to the enforcement of any provision of this chapter.

(g) Immediate inspection; notice of violation or danger; determination

(1) Whenever a representative of the miners or a miner in the case of a coal or other mine where there is no such representative has reasonable grounds to believe that a violation of this chapter or a mandatory health or safety standard exists, or an imminent danger exists, such miner or representative shall have a right to obtain an immediate inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, signed by the representative of the miners or by the miner, and a copy shall be provided the operator or his agent no later than at the time of inspection, except that the operator or his agent shall be notified forthwith if the complaint indicates that an imminent danger exists. The name of the person giving such notice and the names of individual miners referred to therein shall not appear in such copy or notification. Upon receipt of such notification, a special inspection shall be made as soon as possible to determine if such violation or danger exists in accordance with the provisions of this subchapter. If the Secretary

determines that a violation or danger does not exist, he shall notify the miner or representative of the miners in writing of such determination.

(2) Prior to or during any inspection of a coal or other mine, any representative of miners or a miner in the case of a coal or other mine where there is no such representative, may notify the Secretary or any representative of the Secretary responsible for conducting the inspection, in writing, of any violation of this chapter or of any imminent danger which he has reason to believe exists in such mine. The Secretary shall, by regulation, establish procedures for informal review of any refusal by a representative of the Secretary to issue a citation with respect to any such alleged violation or order with respect to such danger and shall furnish the representative of miners or miner requesting such review a written statement of the reasons for the Secretary's final disposition of the case.

(h) Records and reports; compilation and publication; availability

In addition to such records as are specifically required by this chapter, every operator of a coal or other mine shall establish and maintain such records, make such reports, and provide such information, as the Secretary or the Secretary of Health and Human Services may reasonably require from time to time to enable him to perform his functions under this chapter. The Secretary or the Secretary of Health and Human Services is authorized to compile, analyze, and publish, either in summary or detailed form, such reports or information so obtained. Except to the extent otherwise specifically provided by this chapter, all records, information, reports, findings, citations, notices, orders, or decisions required or issued pursuant to or under this chapter may be published from time to time, may be released to any interested person, and shall be made available for public inspection.

(i) Spot inspections

Whenever the Secretary finds that a coal or other mine liberates excessive quantities of methane or other explosive gases during its operations, or that a methane or other gas ignition or explosion has occurred in such mine which resulted in death or serious injury at any time during the previous five years, or that there exists in such mine some other especially hazardous condition, he shall provide a minimum of one spot inspection by his authorized representative of all or part of such mine during every five working days at irregular intervals. For purposes of this subsection, "liberation of excessive quantities of methane or other explosive gases" shall mean liberation of more than one million cubic feet of methane or other explosive gases during a 24-hour period. When the Secretary finds that a coal or other mine liberates more than five hundred thousand cubic feet of methane or other explosive

4

gases during a 24-hour period, he shall provide a minimum of one spot inspection by his authorized representative of all or part of such mine every 10 working days at irregular intervals. When the Secretary finds that a coal or other mine liberates more than two hundred thousand cubic feet of methane or other explosive gases during a 24-hour period, he shall provide a minimum of one spot inspection by his authorized representative of all or part of such mine every 15 working days at irregular intervals.

(j) Accident notification; rescue and recovery activities

In the event of any accident occurring in any coal or other mine, the operator shall notify the Secretary thereof and shall take appropriate measures to prevent the destruction of any evidence which would assist in investigating the cause or causes thereof. For purposes of the preceding sentence, the notification required shall be provided by the operator within 15 minutes of the time at which the operator realizes that the death of an individual at the mine, or an injury or entrapment of an individual at the mine which has a reasonable potential to cause death, has occurred. In the event of any accident occurring in a coal or other mine, where rescue and recovery work is necessary, the Secretary or an authorized representative of the Secretary shall take whatever action he deems appropriate to protect the life of any person, and he may, if he deems it appropriate, supervise and direct the rescue and recovery activities in such mine.

(k) Safety orders; recovery plans

In the event of any accident occurring in a coal or other mine, an authorized representative of the Secretary, when present, may issue such orders as he deems appropriate to insure the safety of any person in the coal or other mine, and the operator of such mine shall obtain the approval of such representative, in consultation with appropriate State representatives, when feasible, of any plan to recover any person in such mine or to recover the coal or other mine or return affected areas of such mine to normal.

## Section 104 of the Mine Act,
## 30 U.S.C. § 814

§ 814.  Citations and orders.

(a) Issuance and form of citations; prompt issuance

If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter, he shall, with reasonable promptness, issue a citation to the operator. Each citation shall be in writing and shall describe with particularity the nature of the violation, including a reference to the provision of the chapter, standard, rule, regulation, or order alleged to have been violated. In addition, the citation shall fix a reasonable time for the abatement of the violation. The requirement for the issuance of a citation with reasonable promptness shall not be a jurisdictional prerequisite to the enforcement of any provision of this chapter.

(b) Follow-up inspections; findings

If, upon any follow-up inspection of a coal or other mine, an authorized representative of the Secretary finds (1) that a violation described in a citation issued pursuant to subsection (a) of this section has not been totally abated within the period of time as originally fixed therein or as subsequently extended, and (2) that the period of time for the abatement should not be further extended, he shall determine the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to immediately cause all persons, except those persons referred to in subsection (c) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(c) Exempt persons

The following persons shall not be required to be withdrawn from, or prohibited from entering, any area of the coal or other mine subject to an order issued under this section:

(1) any person whose presence in such area is necessary, in the judgment of the operator or an authorized representative of the Secretary, to eliminate the condition described in the order;

Case: 12-2316    Document: 31    Filed: 10/24/2012    Pages: 147

(2) any public official whose official duties require him to enter such area;

(3) any representative of the miners in such mine who is, in the judgment of the operator or an authorized representative of the Secretary, qualified to make such mine examinations or who is accompanied by such a person and whose presence in such area is necessary for the investigation of the conditions described in the order; and

(4) any consultant to any of the foregoing.

(d) Findings of violations; withdrawal order

(1) If, upon any inspection of a coal or other mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, and if he finds such violation to be caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any citation given to the operator under this chapter. If, during the same inspection or any subsequent inspection of such mine within 90 days after the issuance of such citation, an authorized representative of the Secretary finds another violation of any mandatory health or safety standard and finds such violation to be also caused by an unwarrantable failure of such operator to so comply, he shall forthwith issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c) of this section to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(2) If a withdrawal order with respect to any area in a coal or other mine has been issued pursuant to paragraph (1), a withdrawal order shall promptly be issued by an authorized representative of the Secretary who finds upon any subsequent inspection the existence in such mine of violations similar to those that resulted in the issuance of the withdrawal order under paragraph (1) until such time as an inspection of such mine discloses no similar violations. Following an inspection of such mine which discloses no similar violations, the provisions of paragraph (1) shall again be applicable to that mine.

(e) Pattern of violations; abatement; termination of pattern

7

(1) If an operator has a pattern of violations of mandatory health or safety standards in the coal or other mine which are of such nature as could have significantly and substantially contributed to the cause and effect of coal or other mine health or safety hazards, he shall be given written notice that such pattern exists. If, upon any inspection within 90 days after the issuance of such notice, an authorized representative of the Secretary finds any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine safety or health hazard, the authorized representative shall issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (c) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

(2) If a withdrawal order with respect to any area in a coal or other mine has been issued pursuant to paragraph (1), a withdrawal order shall be issued by an authorized representative of the Secretary who finds upon any subsequent inspection the existence in such mine of any violation of a mandatory health or safety standard which could significantly and substantially contribute to the cause and effect of a coal or other mine health or safety hazard. The withdrawal order shall remain in effect until an authorized representative of the Secretary determines that such violation has been abated.

(3) If, upon an inspection of the entire coal or other mine, an authorized representative of the Secretary finds no violations of mandatory health or safety standards that could significantly and substantially contribute to the cause and effect of a coal or other mine health and safety hazard, the pattern of violations that resulted in the issuance of a notice under paragraph (1) shall be deemed to be terminated and the provisions of paragraphs (1) and (2) shall no longer apply. However, if as a result of subsequent violations, the operator reestablishes a pattern of violations, paragraphs (1) and (2) shall again be applicable to such operator.

(4) The Secretary shall make such rules as he deems necessary to establish criteria for determining when a pattern of violations of mandatory health or safety standards exists.

(f) Respirable dust concentrations; dust control person or team

If, based upon samples taken, analyzed, and recorded pursuant to section 842(a) of this title, or samples taken during an inspection by an authorized representative of the Secretary, the applicable limit on the concentration of respirable dust required to be maintained under this chapter is exceeded and

thereby violated, the Secretary or his authorized representative shall issue a citation fixing a reasonable time for the abatement of the violation. During such time, the operator of the mine shall cause samples described in section 842(a) of this title to be taken of the affected area during each production shift. If, upon the expiration of the period of time as originally fixed or subsequently extended, the Secretary or his authorized representative finds that the period of time should not be further extended, he shall determine the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to cause immediately all persons, except those referred to in subsection (c) of this section, to be withdrawn from, and to be prohibited from entering, such area until the Secretary or his authorized representative has reason to believe, based on actions taken by the operator, that such limit will be complied with upon the resumption of production in such mine. As soon as possible after an order is issued, the Secretary, upon request of the operator, shall dispatch to the mine involved a person, or team of persons, to the extent such persons are available, who are knowledgeable in the methods and means of controlling and reducing respirable dust. Such person or team of persons shall remain at the mine involved for such time as they shall deem appropriate to assist the operator in reducing respirable dust concentrations. While at the mine, such persons may require the operator to take such actions as they deem appropriate to insure the health of any person in the coal or other mine.

(g) Untrained miners

(1) If, upon any inspection or investigation pursuant to section 813 of this title, the Secretary or an authorized representative shall find employed at a coal or other mine a miner who has not received the requisite safety training as determined under section 825 of this title, the Secretary or an authorized representative shall issue an order under this section which declares such miner to be a hazard to himself and to others, and requiring that such miner be immediately withdrawn from the coal or other mine, and be prohibited from entering such mine until an authorized representative of the Secretary determines that such miner has received the training required by section 825 of this title.

(2) No miner who is ordered withdrawn from a coal or other mine under paragraph (1) shall be discharged or otherwise discriminated against because of such order; and no miner who is ordered withdrawn from a coal or other mine under paragraph (1) shall suffer a loss of compensation during the period necessary for such miner to receive such training and for an authorized representative of the Secretary to determine that such miner has received the requisite training.

(h) Duration of citations and orders

Any citation or order issued under this section shall remain in effect until
modified, terminated or vacated by the Secretary or his authorized
representative, or modified, terminated or vacated by the Commission or the
courts pursuant to section 815 or 816 of this title.

**Section 108 of the Mine Act,**
**30 U.S.C. § 818**

§ 108.  Injunctions.

(a) Civil action by Secretary.

(1) The Secretary may institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order in the district court of the United States for the district in which a coal or other mine is located or in which the operator of such mine has his principal office, whenever such operator or his agent--

(A) violates or fails or refuses to comply with any order or decision issued under this chapter, or fails or refuses to comply with any order or decision, including a civil penalty assessment order, that is issued under this chapter,

(B) interferes with, hinders, or delays the Secretary or his authorized representative, or the Secretary of Health and Human Services or his authorized representative, in carrying out the provisions of this chapter,

(C) refuses to admit such representatives to the coal or other mine,

(D) refuses to permit the inspection of the coal or other mine, or the investigation of an accident or occupational disease occurring in, or connected with, such mine,

(E) refuses to furnish any information or report requested by the Secretary or the Secretary of Health and Human Services in furtherance of the provisions of this chapter, or

(F) refuses to permit access to, and copying of, such records as the Secretary or the Secretary of Health and Human Services determines necessary in carrying out the provisions of this chapter.

(2) The Secretary may institute a civil action for relief, including permanent or temporary injunction, restraining order, or any other appropriate order in the district court of the United States for the district in which the coal or other mine is located or in which the operator of such mine has his principal office whenever the Secretary believes that the operator of a coal or other mine is engaged in a pattern of violation of the mandatory health or safety standards of this chapter, which in the judgment of the Secretary constitutes a continuing hazard to the health or safety of miners.

(b) Jurisdiction; relief; findings of Commission or Secretary

In any action brought under subsection (a) of this section, the court shall have jurisdiction to provide such relief as may be appropriate. In the case of an action under subsection (a)(2) of this section, the court shall in its order require such assurance or affirmative steps as it deems necessary to assure itself that the protection afforded to miners under this chapter shall be provided by the operator. Temporary restraining orders shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure, as amended, except that the time limit in such orders, when issued without notice, shall be seven days from the date of entry. Except as otherwise provided herein, any relief granted by the court to enforce any order under paragraph (1) of subsection (a) of this section shall continue in effect until the completion or final termination of all proceedings for review of such order under this subchapter, unless prior thereto, the district court granting such relief sets it aside or modifies it. In any action instituted under this section to enforce an order or decision issued by the Commission or the Secretary after a public hearing in accordance with section 554 of Title 5, the findings of the Commission or the Secretary, as the case may be, if supported by substantial evidence on the record considered as a whole, shall be conclusive.

**Section 110 of the Mine Act**
**30 U.S.C. § 820**

§ 820  Penalties.

(a) Civil penalty for violation of mandatory health or safety standards.

(1) The operator of a coal or other mine in which a violation occurs of a mandatory health or safety standard or who violates any other provision of this chapter, shall be assessed a civil penalty by the Secretary which penalty shall not be more than $50,000 for each such violation. Each occurrence of a violation of a mandatory health or safety standard may constitute a separate offense.

(2) The operator of a coal or other mine who fails to provide timely notification to the Secretary as required under section 813(j) of this title (relating to the 15 minute requirement) shall be assessed a civil penalty by the Secretary of not less than $5,000 and not more than $60,000.

(3)(A) The minimum penalty for any citation or order issued under section 814 (d)(1) of this title shall be $2,000.

(B) The minimum penalty for any order issued under section 814(d)(2) of this title shall be $4,000.

(4) Nothing in this subsection shall be construed to prevent an operator from obtaining a review, in accordance with section 816 of this title, of an order imposing a penalty described in this subsection. If a court, in making such review, sustains the order, the court shall apply at least the minimum penalties required under this subsection.

(b) Civil penalty for failure to correct violation for which citation has been issued

(1) Any operator who fails to correct a violation for which a citation has been issued under section 814(a) of this title within the period permitted for its correction may be assessed a civil penalty of not more than $ $5,000 for each day during which such failure or violation continues.

(2) Violations under this section that are deemed to be flagrant may be assessed a civil penalty of not more than $220,000. For purposes of the preceding sentence, the term "flagrant" with respect to a violation means a reckless or repeated failure to make reasonable efforts to eliminate a known violation of a mandatory health or safety standard that substantially and

proximately caused, or reasonably could have been expected to cause, death
or serious bodily injury.

(c) Liability of corporate directors, officers, and agents

Whenever a corporate operator violates a mandatory health or safety
standard or knowingly violates or fails or refuses to comply with any order
issued under this chapter or any order incorporated in a final decision issued
under this chapter, except an order incorporated in a decision issued under
subsection (a) of this section or section 815(c) of this title, any director, officer,
or agent of such corporation who knowingly authorized, ordered, or carried
out such violation, failure, or refusal shall be subject to the same civil
penalties, fines, and imprisonment that may be imposed upon a person under
subsections (a) and (d) of this section.

(d) Criminal penalties

Any operator who willfully violates a mandatory health or safety standard, or
knowingly violates or fails or refuses to comply with any order issued under
section 814 of this title and section 817 of this title, or any order incorporated
in a final decision issued under this title, except an order incorporated in a
decision under subsection (a)(1) or section 815(c) of this title, shall, upon
conviction, be punished by a fine of not more than $250,000, or by
imprisonment for not more than one year, or by both, except that if the
conviction is for a violation committed after the first conviction of such
operator under this chapter, punishment shall be by a fine of not more than
$500,000, or by imprisonment for not more than five years, or both.

(e) Unauthorized advance notice of inspections

Unless otherwise authorized by this chapter, any person who gives advance
notice of any inspection to be conducted under this chapter shall, upon
conviction, be punished by a fine of not more than $1,000 or by imprisonment
for not more than six months, or both.

(f) False statements, representations, or certifications

Whoever knowingly makes any false statement, representation, or
certification in any application, record, report, plan, or other document filed
or required to be maintained pursuant to this chapter shall, upon conviction,
be punished by a fine of not more than $10,000, or by imprisonment for not
more than five years, or both.

(g) Violation by miners of safety standards relating to smoking

Any miner who willfully violates the mandatory safety standards relating to smoking or the carrying of smoking materials, matches, or lighters shall be subject to a civil penalty assessed by the Commission, which penalty shall not be more than $250 for each occurrence of such violation.

(h) Equipment falsely represented as complying with statute, specification, or regulations

Whoever knowingly distributes, sells, offers for sale, introduces, or delivers in commerce any equipment for use in a coal or other mine, including, but not limited to, components and accessories of such equipment, which is represented as complying with the provisions of this chapter, or with any specification or regulation of the Secretary applicable to such equipment, and which does not so comply, shall, upon conviction, be subject to the same fine and imprisonment that may be imposed upon a person under subsection (f) of this section.

(i) Authority to assess civil penalties

The Commission shall have authority to assess all civil penalties provided in this chapter. In assessing civil monetary penalties, the Commission shall consider the operator's history of previous violations, the appropriateness of such penalty to the size of the business of the operator charged, whether the operator was negligent, the effect on the operator's ability to continue in business, the gravity of the violation, and the demonstrated good faith of the person charged in attempting to achieve rapid compliance after notification of a violation. In proposing civil penalties under this chapter, the Secretary may rely upon a summary review of the information available to him and shall not be required to make findings of fact concerning the above factors.

(j) Payment of penalties; interest

Civil penalties owed under this chapter shall be paid to the Secretary for deposit into the Treasury of the United States and shall accrue to the United States and may be recovered in a civil action in the name of the United States brought in the United States district court for the district where the violation occurred or where the operator has its principal office. Interest at the rate of 8 percent per annum shall be charged against a person on any final order of the Commission, or the court. Interest shall begin to accrue 30 days after the issuance of such order.

(k) Compromise, mitigation, and settlement of penalty

No proposed penalty which has been contested before the Commission under section 815(a) of this title shall be compromised, mitigated, or settled except with the approval of the Commission. No penalty assessment which has become a final order of the Commission shall be compromised, mitigated, or settled except with the approval of the court.

(l) Inapplicability to black lung benefit provisions

The provisions of this section shall not be applicable with respect to subchapter IV of this chapter.

**Section 508 of the Mine Act,**
**30 U.S.C. § 957**

§ 957 Promulgation of regulations.

The Secretary, the Secretary of Health and Human Services, the
Commissioner of Social Security, and the Panel are authorized to issue such
regulations as each deems appropriate to carry out any provision of this
chapter.

## 44 U.S.C. § 3518

## Section 3518 of the Paperwork Reduction Act,

**(a)** Except as otherwise provided in this subchapter, the authority of an agency under any other law to prescribe policies, rules, regulations, and procedures for Federal information resources management activities is subject to the authority of the Director under this subchapter.

**(b)** Nothing in this subchapter shall be deemed to affect or reduce the authority of the Secretary of Commerce or the Director of the Office of Management and Budget pursuant to Reorganization Plan No. 1 of 1977 (as amended) and Executive order, relating to telecommunications and information policy, procurement and management of telecommunications and information systems, spectrum use, and related matters.

**(c)(1)** Except as provided in paragraph (2), this subchapter shall not apply to the collection of information--

**(A)** during the conduct of a Federal criminal investigation or prosecution, or during the disposition of a particular criminal matter;

**(B)** during the conduct of--

**(i)** a civil action to which the United States or any official or agency thereof is a party; or

**(ii)** an administrative action or investigation involving an agency against specific individuals or entities;

**(C)** by compulsory process pursuant to the Antitrust Civil Process Act and section 13 of the Federal Trade Commission Improvements Act of 1980; or

**(D)** during the conduct of intelligence activities as defined in section 3.4(e) of Executive Order No. 12333, issued December 4, 1981, or successor orders, or during the conduct of cryptologic activities that are communications security activities.

**(2)** This subchapter applies to the collection of information during the conduct of general investigations (other than information collected in an antitrust investigation to the extent provided in subparagraph (C) of paragraph (1)) undertaken with reference to a category of individuals or entities such as a class of licensees or an entire industry.

**(d)** Nothing in this subchapter shall be interpreted as increasing or decreasing the authority conferred by sections 11331 and 11332 of title 40 on the Secretary of

Commerce or the Director of the Office of Management and Budget.

**(e)** Nothing in this subchapter shall be interpreted as increasing or decreasing the authority of the President, the Office of Management and Budget or the Director thereof, under the laws of the United States, with respect to the substantive policies and programs of departments, agencies and offices, including the substantive authority of any Federal agency to enforce the civil rights laws.

**29 C.F.R. § 825.500(g)**

(g) Records and documents relating to certifications, recertifications or medical histories of employees or employees' family members, created for purposes of FMLA, shall be maintained as confidential medical records in separate files/records from the usual personnel files, and if the ADA, as amended, is also applicable, such records shall be maintained in conformance with ADA confidentiality requirements (see 29 CFR 1630.14(c)(1)), except that:

(1) Supervisors and managers may be informed regarding necessary restrictions on the work or duties of an employee and necessary accommodations;

(2) First aid and safety personnel may be informed (when appropriate) if the employee's physical or medical condition might require emergency treatment; and

(3) Government officials investigating compliance with FMLA (or other pertinent law) shall be provided relevant information upon request.

**29 C.F.R. § 1630.15**

Defenses to an allegation of discrimination under this part may include, but are not limited to, the following:

(a) Disparate treatment charges. It may be a defense to a charge of disparate treatment brought under §§ 1630.4 through 1630.8 and 1630.11 through 1630.12 that the challenged action is justified by a legitimate, nondiscriminatory reason.

(b) Charges of discriminatory application of selection criteria--

(1) In general. It may be a defense to a charge of discrimination, as described in § 1630.10, that an alleged application of qualification standards, tests, or selection criteria that screens out or tends to screen out or otherwise denies a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished with reasonable accommodation, as required in this part.

(2) Direct threat as a qualification standard. The term "qualification standard" may include a requirement that an individual shall not pose a direct threat to the health or safety of the individual or others in the workplace. (See § 1630.2(r) defining direct threat.)

(c) Other disparate impact charges. It may be a defense to a charge of discrimination brought under this part that a uniformly applied standard, criterion, or policy has a disparate impact on an individual with a disability or a class of individuals with disabilities that the challenged standard, criterion or policy has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished with reasonable accommodation, as required in this part.

(d) Charges of not making reasonable accommodation. It may be a defense to a charge of discrimination, as described in § 1630.9, that a requested or necessary accommodation would impose an undue hardship on the operation of the covered entity's business.

(e) Conflict with other Federal laws. It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action (including the provision of a particular reasonable accommodation) that would otherwise be required by this part.

(f) Claims based on transitory and minor impairments under the "regarded as" prong. It may be a defense to a charge of discrimination by an individual claiming coverage under the "regarded as" prong of the definition of disability that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) "transitory

and minor." To establish this defense, a covered entity must demonstrate that the impairment is both "transitory" and "minor." Whether the impairment at issue is or would be "transitory and minor" is to be determined objectively. A covered entity may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the covered entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor. For purposes of this section, "transitory" is defined as lasting or expected to last six months or less.

(g) Additional defenses. It may be a defense to a charge of discrimination under this part that the alleged discriminatory action is specifically permitted by § 1630.14 or § 1630.16.

## 30 C.F.R. § 50.1

§ 50.1 Purpose and scope.

This Part 50 implements sections 103(e) and 111 of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. 801 et seq., and sections 4 and 13 of the Federal Metal and Nonmetallic Mine Safety Act, 30 U.S.C. 721 et seq., and applies to operators of coal, metal, and nonmetallic mines. It requires operators to immediately notify the Mine Safety and Health Administration (MSHA) of accidents, requires operators to investigate accidents, and restricts disturbance of accident related areas. This part also requires operators to file reports pertaining to accidents, occupational injuries and occupational illnesses, as well as employment and coal production data, with MSHA, and requires operators to maintain copies of reports at relevant mine offices. The purpose of this part is to implement MSHA's authority to investigate, and to obtain and utilize information pertaining to, accidents, injuries, and illnesses occurring or originating in mines. In utilizing information received under Part 50, MSHA will develop rates of injury occurrence (incident rates or IR), on the basis of 200,000 hours of employee exposure (equivalent to 100 employees working 2,000 hours per year). The incidence rate for a particular injury category will be based on the formula: IR=(number of cases x 200,000) divided by hours of employee exposure. MSHA will develop data respecting injury severity using days away from work or days of restricted work activity and the 200,000 hour base as criteria. The severity measure (SM) for a particular injury category will be based on the formula:
SM=(sum of days x 200,000) divided by hours of employee exposure.

# 30 C.F.R. § 50.2

§ 50.2 Definitions.

As used in this part:

(a) Mine means: (1) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground (2) private ways and roads appurtenant to such area, and (3) lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the work of preparing coal or other minerals, and includes custom coal preparation facilities.

(b) Work of preparing the coal means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine.

(c) Operator means

(1) Any owner, lessee, or other person who operates, controls, or supervises a coal mine; or,

(2) The person, partnership, association, or corporation, or subsidiary of a corporation operating a metal or nonmetal mine, and owning the right to do so, and includes any agent thereof charged with responsibility for the operation of such mine.

(d) Miner means any individual working in a mine.

(e) Occupational injury means any injury to a miner which occurs at a mine for which medical treatment is administered, or which results in death or loss of consciousness, inability to perform all job duties on any day after an injury, temporary assignment to other duties, or transfer to another job.

(f) Occupational illness means an illness or disease of a miner which may have resulted from work at a mine or for which an award of compensation is made.

(g) First aid means one-time treatment, and any follow-up visit for observational purposes, of a minor injury.

(h) Accident means

(1) A death of an individual at a mine;

(2) An injury to an individual at a mine which has a reasonable potential to cause death;

(3) An entrapment of an individual for more than 30 minutes or which has a reasonable potential to cause death;

(4) An unplanned inundation of a mine by a liquid or gas;

(5) An unplanned ignition or explosion of gas or dust;

(6) In underground mines, an unplanned fire not extinguished within 10 minutes of discovery; in surface mines and surface areas of underground mines, an unplanned fire not extinguished within 30 minutes of discovery;

(7) An unplanned ignition or explosion of a blasting agent or an explosive;

(8) An unplanned roof fall at or above the anchorage zone in active workings where roof bolts are in use; or, an unplanned roof or rib fall in active workings that impairs ventilation or impedes passage;

(9) A coal or rock outburst that causes withdrawal of miners or which disrupts regular mining activity for more than one hour;

(10) An unstable condition at an impoundment, refuse pile, or culm bank which requires emergency action in order to prevent failure, or which causes individuals to evacuate an area; or, failure of an impoundment, refuse pile, or culm bank;

(11) Damage to hoisting equipment in a shaft or slope which endangers an individual or which interferes with use of the equipment for more than thirty minutes; and

(12) An event at a mine which causes death or bodily injury to an individual not at the mine at the time the event occurs.

## 30 C.F.R. § 50.10

§ 50.10 Immediate notification.

The operator shall immediately contact MSHA at once without delay and within 15 minutes at the toll-free number, 1–800–746–1553, once the operator knows or should know that an accident has occurred involving:

(a) A death of an individual at the mine;

(b) An injury of an individual at the mine which has a reasonable potential to cause death;

(c) An entrapment of an individual at the mine which has a reasonable potential to cause death; or

(d) Any other accident.

**30 C.F.R. § 50.20**

§50.20  Preparation and submission of MSHA Report Form 7000-1 --
  Mine Accident, Injury, and Illness Report.

(a) Each operator shall maintain at the mine office a supply of MSHA Mine
Accident, Injury, and Illness Report Form 7000-1. These may be obtained
from the MSHA District Office. Each operator shall report each accident,
occupational injury, or occupational illness at the mine. The principal officer
in charge of health and safety at the mine or the supervisor of the mine area
in which an accident or occupational injury occurs, or an occupational illness
may have originated, shall complete or review the form in accordance with
the instructions and criteria in §§ 50.20-1 through 50.20-7. If an occupational
illness is diagnosed as being one of those listed in § 50.20-6(b)(7), the operator
must report it under this part. The operator shall mail completed forms to
MSHA within ten working days after an accident or occupational injury
occurs or an occupational illness is diagnosed. When an accident specified in §
50.10 occurs, which does not involve an occupational injury, sections A, B,
and items 5 through 12 of section C of Form 7000-1 shall be completed and
mailed to MSHA in accordance with the instructions in § 50.20-1 and criteria
contained in §§ 50.20-4 through 50.20-6.

(b) Each operator shall report each occupational injury or occupational illness
on one set of forms. If more than one miner is injured in the same accident or
is affected simultaneously with the same occupational illness, an operator
shall complete a separate set of forms for each miner affected. To the extent
that the form is not self-explanatory, an operator shall complete the form in
accordance with the instructions in § 50.20-1 and criteria contained in §§
50.20-2 through 50.20-7.

### 30 C.F.R. § 50.20-3

§ 50.20-3 Criteria--Differences between medical treatment and first aid.

(a) Medical treatment includes, but is not limited to, the suturing of any wound, treatment of fractures, application of a cast or other professional means of immobilizing an injured part of the body, treatment of infection arising out of an injury, treatment of bruise by the drainage of blood, surgical removal of dead or damaged skin (debridement), amputation or permanent loss of use of any part of the body, treatment of second and third degree burns. Procedures which are diagnostic in nature are not considered by themselves to constitute medical treatments. Visits to a physician, physical examinations, X-ray examinations, and hospitalization for observations, where no evidence of injury or illness is found and no medical treatment given, do not in themselves constitute medical treatment. Procedures which are preventive in nature also are not considered by themselves to constitute medical treatment. Tetanus and flu shots are considered preventative in nature. First aid includes any one-time treatment, and follow-up visit for the purpose of observation, of minor injuries such as, cuts, scratches, first degree burns and splinters. Ointments, salves, antiseptics, and dressings to minor injuries are considered to be first aid.

(1) Abrasion.

(i) First aid treatment is limited to cleaning a wound, soaking, applying antiseptic and nonprescription medication and bandages on the first visit and follow-up visits limited to observation including changing dressing and bandages. Additional cleaning and application of antiseptic constitutes first aid where it is required by work duties that soil the bandage.

(ii) Medical treatment includes examination for removal of imbedded foreign material, multiple soakings, whirlpool treatment, treatment of infection, or other professional treatments and any treatment involving more than a minor spot-type injury. Treatment of abrasions occurring to greater than full skin depth is considered medical treatment.

(2) Bruises.

(i) First aid treatment is limited to a single soaking or application of cold compresses, and follow-up visits if they are limited only to observation.

28

(ii) Medical treatment includes multiple soakings, draining of collected blood, or other treatment beyond observation.

(3) Burns, Thermal and Chemical (resulting in destruction of tissue by direct contact).

(i) First aid treatment is limited to cleaning or flushing the surface, soaking, applying cold compresses, antiseptics or nonprescription medications, and bandaging on the first visit, and follow-up visits restricted to observation, changing bandages, or additional cleaning. Most first degree burns are amenable to first aid treatment.

(ii) Medical treatment includes a series of treatments including soaks, whirlpool, skin grafts, and surgical debridement (cutting away dead skin). Most second and third degree burns require medical treatment.

(4) Cuts and Lacerations.

(i) First aid treatment is the same as for abrasions except the application of butterfly closures for cosmetic purposes only can be considered first aid.

(ii) Medical treatment includes the application of butterfly closures for non-cosmetic purposes, sutures, (stitches), surgical debridement, treatment of infection, or other professional treatment.

(5) Eye Injuries.

(i) First aid treatment is limited to irrigation, removal of foreign material not imbedded in eye, and application of nonprescription medications. A precautionary visit (special examination) to a physician is considered as first aid if treatment is limited to above items, and follow-up visits if they are limited to observation only.

(ii) Medical treatment cases involve removal of imbedded foreign objects, use of prescription medications, or other professional treatment.

(6) Inhalation of Toxic or Corrosive Gases.

## 30 C.F.R. § 50.20-6

§ 50.20-6 Criteria--MSHA Form 7000-1, Section C.

(a) Complete items 5 through 12 for each accident, occupational injury, or occupational illness.

(1) Item 5. Location and mining method. Circle the appropriate location code that was nearest to the location of the accident injury or illness. If the accident injury or illness occurred at the surface, circle only the surface location code in column (a). If the accident injury or illness occurred underground, circle only the underground location code in column (b). Where applicable, circle the underground mining method code in column (c). Applicable codes for columns (a), (b), and (c) are as follows:

(i) Column (a)--Surface location codes. If the accident injury or illness occurred at the surface of a mine, circle one of the following codes which best describes where the accident injury or illness occurred and ignore columns (b) and (c):

Code 02--Surface shop, yard, etc., at an underground mine;
Code 30--Mill operation, preparation plant, or breaker, including associated shops and yards;
Code 03--Surface strip or open pit mine, including shop and yard;
Code 04--Surface auger coal operation on a coal mine, including shop and yard;
Code 05--Surface culm bank or refuse pile at a coal mine, including shop and yard;
Code 06--Dredge mining, including shop and yard;
Code 12--Other surface mining;
Code 17--Independent shops;
Code 99--Office facilities.

(ii) Column (b)--Underground location codes. If the accident injury or illness occurred underground, circle the one code which best describes where the accident injury or illness occurred:

Code 01--Vertical shaft;
Code 02--Slope/Inclined shaft;
Code 03--Face;
Code 04--Intersection;
Code 05--Underground Shop/Office;
Code 06--Other.

(iii) Column (c)--Underground mining method. If the underground accident injury or illness occurred on a working section or working place, enter the code for the mining method at that working section or working place:

Code 01--Longwall;
Code 02--Shortwall;
Code 03--Conventional/stopping;
Code 05--Continuous Miners;
Code 06--Hand Loading;
Code 07--Caving;
Code 08--Other.

(2) Item 6. Date of accident injury or illness. Enter the date the accident injury or illness occurred.

(3) Item 9. Describe fully the conditions contributing to the accident injury or illness and quantify the damage or impairment. Describe what happened and the reasons therefor, identify the factors which led or contributed to the accident, injury or illness and identify any damage or impairment to the mining operation. The narrative shall clearly specify the actual cause or causes of the accident injury or illness and shall include the following:

(i) Whether the accident injury or illness involved any aspect of compliance with rules and regulations;

(ii) Whether the accident injury or illness involved mine equipment or the mining system;

(iii) Whether the accident injury or illness involved job skills and miner proficiency, training and attitude; and

(iv) Whether the accident injury or illness involved protective items relating to clothing, or protective devices on equipment.

(4) Item 10. If equipment was involved in the accident, injury or illness specify type (loader, shuttle car, dozer, etc.), name of manufacturer, and equipment model number.

(5) Item 11. Name of witness to accident injury or illness. If any miner witnessed the accident injury or illness, enter the name.

(b) Complete items 13-27 for each occupational injury, or occupational illness.

31

(1) Item 13. Name of injured/ill miner. Enter the miner's name (first, middle initial, and last).

(2) Item 17. Regular job title. Enter the miner's regular job title. For example: "shuttle car operator".

(3) Item 19. Check if this injury/illness resulted in permanent total or partial disability.

(i) "Permanent total disability." The classification for any injury or illness other than death which permanently and totally incapacitates an employee from following any gainful occupation or which results in the loss, or the complete loss of use, of any of the following in one accident injury or illness:

(A) Both eyes;

(B) One eye and one hand, or arm, or leg, or foot;

(C) Any two of the following not on the same limb: hand, arm, foot, or leg.

(ii) "Permanent partial disability." The classification for any injury or illness other than death or permanent total disability which results in the loss, or complete loss of use, of any member or part of a member of the body, or any permanent impairment of functions of the body or part thereof, regardless of any preexisting disability of the affected member or impaired body function.

(4) Item 20. What directly inflicted injury or illness. Name the object or substance which directly affected the miner. For example: the machine or thing struck against or which struck the miner; the vapor or poison inhaled or swallowed; the chemical or non-ionizing radiation which irritated the skin; or in cases of strains or hernias, the thing lifted or pulled.

(5) Item 21. Nature of injury or illness. For injuries, use commonly used medical terms to answer this question such as puncture wound, third degree burn, fracture, dislocation, amputation. For multiple injuries, enter the injury which was the most serious. For illness, name the illness, such as pneumoconiosis, silicosis. Avoid general terms such as "hurt", "sore", "sick".

(6) Item 22. Part of body injured or affected. Name the part of the body with the most serious injury. For example, if an injured employee has a bruised finger and a broken ankle, write "ankle". If amputation, enter part of the body lost.

(7) Item 23. Occupational Illness. Circle the code from the list below which most accurately describes the illness. These are typical examples and are not to be considered the complete listing of the types of illnesses and disorders that should be included under each category. In cases where the time of onset of illness is in doubt, the day of diagnosis of illness will be considered as the first day of illness.

(i) Code 21--Occupational Skin Diseases or Disorders. Examples: Contact dermatitis, eczema, or rash caused by primary irritants and sensitizers or poisonous plants; oil acne; chrome ulcers; chemical burns or inflammations.

(ii) Code 22--Dust Diseases of the Lungs (Pneumoconioses). Examples: Silicosis, asbestosis, coal worker's pneumoconiosis, and other pneumoconioses.

(iii) Code 23--Respiratory Conditions due to Toxic Agents. Examples: Pneumonitis, pharyngitis, rhinitis, or acute congestion due to chemicals, dusts, gases, or fumes.

(iv) Code 24--Poisoning (Systemic Effects of Toxic Materials). Examples: Poisoning by lead, mercury, cadmium, arsenic, or other metals, poisoning by carbon monoxide, hydrogen sulfide or other gases; poisoning by benzol, carbon tetrachloride, or other organic solvents; poisoning by insecticide sprays such as parathion, lead arsenate; poisoning by other chemicals such as formaldehyde, plastics and resins.

(v) Code 25--Disorders Due to Physical Agents (Other than Toxic Materials). Examples: Heatstroke, sunstroke, heat exhaustion and other effects of environmental heat; freezing, frostbite and effects of exposure to low temperatures; caisson disease; effects of ionizing radiation (radon daughters, non-medical, non-therapeutic X-rays, radium); effects of nonionizing radiation (welding flash, ultra-violet rays, micro-waves, sunburn).

(vi) Code 26--Disorders Associated with Repeated Trauma. Examples: Noise-induced hearing loss; synovitis, tenosynovitis, and bursitis; Raynaud's phenomena; and other conditions due to repeated motion, vibration or pressure.

(vii) Code 29--All Other Occupational Illnesses. Examples: Infectious hepatitis, malignant and benign tumors, any form of cancer, kidney diseases, food poisoning, histoplasmosis.

(8) Item 24. Miner's work activity when injury or illness occurred. Describe exactly the activity of the injured miner when the occupational injury or

occupational illness occurred. For example: "Setting temporary support prior to drilling holes for roof bolts."

(i) First aid treatment is limited to removal of the miner to fresh air or the one-time administration of oxygen for several minutes.

(ii) Medical treatment consists of any professional treatment beyond that mentioned under first aid and all cases involving loss of consciousness.

(7) Foreign Objects.

(i) First aid treatment is limited to cleaning the wound, removal of any foreign object by tweezers or other simple techniques, application of antiseptics and nonprescription medications, and bandaging on the first visit. Follow-up visits are limited to observation including changing of bandages. Additional cleaning and applications of antiseptic constitute first aid where it is required by work duties that soil the bandage.

(ii) Medical treatment consists of removal of any foreign object by physician due to depth of imbedment, size or shape of object, or location of wound. Treatment for infection, treatment of a reaction to tetanus booster, or other professional treatment, is considered medical treatment.

(8) Sprains and Strains.

(i) First aid treatment is limited to soaking, application of cold compresses, and use of elastic bandages on the first visit. Follow-up visits for observation, including reapplying bandage, are first aid.

(ii) Medical treatment includes a series of hot and cold soaks, use of whirlpools, diathermy treatment, or other professional treatment.

**30 C.F.R. § 50.20-7**

§ 50.20-7 Criteria--MSHA Form 7000-1, Section D.

This section requires information concerning the miner's return to duty.

(a) Item 28. Permanently transferred or terminated. Check this block if the miner's employment was terminated or if the miner was permanently transferred to another regular job as a direct result of the occupational injury or occupational illness.

(b) Item 29. Show the date that the injured person returned to his regular job at full capacity (not to restricted work activity) or was transferred or terminated.

(c) Item 30. Number of days away from work. Enter the number of work-days, consecutive or not, on which the miner would have worked but could not because of occupational injury or occupational illness. The number of days away from work shall not include the day of injury or onset of illness or any days on which the miner would not have worked even though able to work. If an employee loses a day from work solely because of the unavailability of professional medical personnel for initial observation or treatment and not as a direct consequence of the injury or illness, the day should not be counted as a day away from work.

(d) Item 31. Number of days of restricted work activity. Enter the number of workdays, consecutive or not, on which because of occupational injury or occupational illness:

(1) The miner was assigned to another job on a temporary basis;

(2) The miner worked at a permanent job less than full time; or

(3) The miner worked at a permanently assigned job but could not perform all duties normally connected with it. The number of days of restricted work activity shall not include the day of injury or onset of illness, or any days the miner did not work even though able to work.

If an injured or ill employee receives scheduled follow-up medical treatment or observation which results in the loss of a full workday solely because of the unavailability of professional medical personnel, it will not be counted as a day of restricted work activity. Days of restricted work activity end as the result of any of the following:

(i) The miner returns to his regularly scheduled job and performs all of its duties for a full day or shift;

(ii) The miner is permanently transferred to another permanent job (which shall be reported under Item 28, Permanently Transferred or Terminated). If this happens, even though the miner could not perform this original job any longer, the Days of Restricted Work Activity will stop; or

(iii) The miner is terminated or leaves the mine. (Termination shall also be reported under Item 28, Permanently Transferred or Terminated).

**30 C.F.R. § 50.30**

§ 50.30 Preparation and submission of MSHA Form 7000-2--Quarterly Employment and Coal Production Report.

(a) Each operator of a mine in which an individual worked during any day of a calendar quarter shall complete a MSHA Form 7000-2 in accordance with the instructions and criteria in § 50.30-1 and submit the original to the MSHA Office of Injury and Employment Information, P.O. Box 25367, Denver Federal Center, Denver, Colo. 80225, within 15 days after the end of each calendar quarter. These forms may be obtained from the MSHA District Office. Each operator shall retain an operator's copy at the mine office nearest the mine for 5 years after the submission date. You may also submit reports by facsimile, 888-231-5515. To file electronically, follow the instructions on the MSHA Internet site at http://www.msha.gov. For assistance in electronic filing, contact the MSHA help desk at 877-778-6055.

(b) Each operator of a coal mine in which an individual worked during any day of a calendar quarter shall report coal production on Form 7000-2.

## 30 C.F.R. § 50.30-1

§ 50.30-1 General instructions for completing MSHA Form 7000-2.

(a) MSHA I.D. Number is the 7-digit number assigned to the mine operation by MSHA. Any questions regarding the appropriate I.D. number to use should be directed to your local MSHA District Office.

(b) Calendar Quarter: First quarter is January, February, and March. Second quarter is April, May, and June. Third quarter is July, August, and September. Fourth quarter is October, November, and December.

(c) County is the name of the county, borough, or independent city in which the operation is located.

(d) Operation Name is the specific name of the mine or plant to which the MSHA I.D. number was assigned and for which the quarterly employment report is being submitted.

(e) Company Name is the name of the operating company that this report pertains to.

(f) Mailing Address is the address of the mine office where the quarterly employment report is to be retained. This should be as near the operation as possible.

(g) Employment, Employee Hours, and Coal Production.

(1) Operation Sub-Unit:

(i) Underground Mine: Report data for your underground workers on the first line. If you have personnel working at the surface of your underground mine, report data for those persons on the second line;

(ii) Surface Mine (Including Shops and Yards): Report on the appropriate line, employment and coal production for the mining operation. For surface mining sub-units 03, 04, 05 and 06, include all work associated with shops and yards;

(iii) Mill Operations, Preparation Plants, Breakers: Report data on all persons employed at your milling (crushing, sizing, grinding, concentrating, etc.) operation, preparation plant, or breaker, including those working in associated shops and yards. (Do not include personnel reported in shops and

yards associated with other sub-units.);

(iv) Office: Include in this category employees who work principally at the mine or preparation facility office.

(2) Average number of persons working during quarter: Show the average number of employees on the payroll during all active periods in the quarter. Include all classes of employees (supervisory, professional, technical proprietors, owners, operators, partners, and service personnel) on your payroll, full or part-time, Report Each Employee Under One Activity Only. For example: If one or more persons work both in the mine and the mill, report these employees under the activity where they spend most of their time. If necessary, estimate for the major activity. The average number may be computed by adding together the number of employees working during each pay period and then dividing by the number of pay periods. Do not include pay periods where no one worked. For example, during the quarter you had 5 pay periods where employees worked. The number of employees in each pay period was 10, 12, 13, 14 and 15 respectively. To compute the average, add the number of employees working each pay period (10+12+13+14+15=64). Then divide by the number of pay periods (64 divided by 5=12.8). Rounding this to the nearest whole number, we get 13 as the average number of persons working.

(3) Total employee-hours worked during the quarter: Show the total hours worked by all employees during the quarter covered. Include all time where the employee was actually on duty, but exclude vacation, holiday, sick leave, and all other off-duty time, even though paid for. Make certain that each overtime hour is reported as one hour, and not as the overtime pay multiple for an hour of work. The hours reported should be obtained from payroll or other time records. If actual hours are not available, they may be estimated on the basis of scheduled hours. Make certain not to include hours paid but not worked.

(4) Production of clean coal (short tons): This section is to be compiled only by operators of underground or surface mines, but not by operators of central or independent coal preparation plants or operators of metal or nonmetal mines. Enter the total production of clean coal from the mine. This must include coal shipped from the mine and coal used for fuel at the mine, but exclude refuse and coal produced at another mine and purchased for use at the mine.

(h) Other Reportable Data. Indicate the number of reportable injuries or illnesses occurring at your operation during the quarter covered by this report. Show the name, title, and telephone number of the person to be

contacted regarding this report, and show the date that this report was completed.

**30 C.F.R. § 50.40**

§ 50.40 Maintenance of records.

(a) Each operator of a mine shall maintain a copy of each investigation report required to be prepared under § 50.11 at the mine office closest to the mine for five years after the concurrence.

(b) Each operator shall maintain a copy of each report submitted under § 50.20 or § 50.30 at the mine office closest to the mine for five years after submission. Upon request by the Mine Safety and Health Administration, an operator shall make a copy of any report submitted under § 50.20 or § 50.30 available to MSHA for inspection or copying.

**30 C.F.R. § 50.41**

§ 50.41 Verification of reports.

Upon request by MSHA, an operator shall allow MSHA to inspect and copy information related to an accident, injury or illnesses which MSHA considers relevant and necessary to verify a report of investigation required by § 50.11 of this part or relevant and necessary to a determination of compliance with the reporting requirements of this part.

## 30 C.F.R. § 104.2

At least once each year, MSHA shall review the compliance records of mines. MSHA's review shall include an examination of the following:

(a) The mine's history of--

(1) Significant and substantial violations;

(2) Section 104(b) of the Act closure orders resulting from significant and substantial violations; and

(3) Section 107(a) of the Act imminent danger orders.

(b) In addition to the compliance records listed in paragraph (a) of this section, the following shall also be considered as part of the initial screening:

(1) Enforcement measures, other than section 104(e) of the Act, which have been applied at the mine.

(2) Evidence of the mine operator's lack of good faith in correcting the problem that results in repeated S&S violations.

(3) An accident, injury, or illness record that demonstrates a serious safety or health management problem at the mine.

(4) Any mitigating circumstances.

(c) Only citations and orders issued after October 1, 1990, shall be considered as part of the initial screening.

## 45 C.F.R. § 164.512(b)

A covered entity may use or disclose protected health information without the written authorization of the individual, as described in § 164.508, or the opportunity for the individual to agree or object as described in § 164.510, in the situations covered by this section, subject to the applicable requirements of this section. When the covered entity is required by this section to inform the individual of, or when the individual may agree to, a use or disclosure permitted by   this section, the covered entity's information and the individual's agreement may be given orally.

* * *

(b) Standard: uses and disclosures for public health activities.

(1) Permitted disclosures. A covered entity may disclose protected health information for the public health activities and purposes described in this paragraph to:

(i) A public health authority that is authorized by law to collect or receive such information for the purpose of preventing or controlling disease, injury, or disability, including, but not limited to, the reporting of disease, injury, vital events such as birth or death, and the conduct of public health surveillance, public health investigations, and public health interventions; or, at the direction of a public health authority, to an official of a foreign government agency that is acting in collaboration with a public health authority;

(ii) A public health authority or other appropriate government authority authorized by law to receive reports of child abuse or neglect;

(iii) A person subject to the jurisdiction of the Food and Drug Administration (FDA) with respect to an FDA-regulated product or activity for which that person has responsibility, for the purpose of activities related to the quality, safety or effectiveness of such FDA-regulated product or activity. Such purposes include:

(A) To collect or report adverse events (or similar activities with respect to food or dietary supplements), product defects or problems (including problems with the use or labeling of a product), or biological product deviations;

(B) To track FDA-regulated products;

(C) To enable product recalls, repairs, or replacement, or lookback (including locating and notifying individuals who have received products that have been recalled, withdrawn, or are the subject of lookback); or

(D) To conduct post marketing surveillance;

(iv) A person who may have been exposed to a communicable disease or may otherwise be at risk of contracting or spreading a disease or condition, if the covered entity or public health authority is authorized by law to notify such person as necessary in the conduct of a public health intervention or investigation; or

(v) An employer, about an individual who is a member of the workforce of the employer, if:

(A) The covered entity is a covered health care provider who is a member of the workforce of such employer or who provides health care to the individual at the request of the employer:

(1) To conduct an evaluation relating to medical surveillance of the workplace; or

(2) To evaluate whether the individual has a work-related illness or injury;

(B) The protected health information that is disclosed consists of findings concerning a work-related illness or injury or a workplace-related medical surveillance;

(C) The employer needs such findings in order to comply with its obligations, under 29 CFR parts 1904 through 1928, 30 CFR parts 50 through 90, or under state law having a similar purpose, to record such illness or injury or to carry out responsibilities for workplace medical surveillance; and

(D) The covered health care provider provides written notice to the individual that protected health information relating to the medical surveillance of the workplace and work-related illnesses and injuries is disclosed to the employer:

(1) By giving a copy of the notice to the individual at the time the health care is provided; or

(2) If the health care is provided on the work site of the employer, by posting the notice in a prominent place at the location where the health care is provided.

(2) Permitted uses. If the covered entity also is a public health authority, the covered entity is permitted to use protected health information in all cases in which it is permitted to disclose such information for public health activities under paragraph (b)(1) of this section.